IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ANTHONY WASHINGTON,　　　　　:
　　　　　Petitioner,　　　　　　:　　　　CIVIL ACTION
　　　　　　　　　　　　　　　　:
　　v.　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　:　　　　No. 07-3462
JEFFREY BEARD, Commissioner,　:
Pennsylvania Department of　　:　　　　THIS IS A CAPITAL CASE
Corrections, et al.,　　　　　　:
　　　　　Respondents.　　　　　:

## O P I N I O N

Stengel, J.　　　　　　　　　　　　　　　　January 16, 2015

## TABLE OF CONTENTS

I.　Anthony Washington's Conviction for First-Degree Murder in the Court of Common Pleas of Philadelphia ........................................................................... 3

II.　Mr. Washington's Post-Conviction Relief Act Petitions ........................................ 11

III.　A Brief History of Mr. Washington's Petition for a Writ of Habeas Corpus ..... 13

IV.　The District Court's Legal Standard for Determining the Merits of a Habeas Petition ........................................................................................................................ 17

V.　A Discussion of Certain Issues Raised by Mr. Washington's Habeas Petition ... 18

　A.　Claim 2: The Use of the Co-Defendant's Statement at Mr. Washington's Trial ........................................................................................................................ 18

　　1.　Bruton, Richardson, and Gray ........................................................... 18

　　2.　The Redacted Statement of Derrick Teagle ........................................ 20

　　3.　The Pennsylvania Supreme Court's View of the Bruton Issue ........... 26

　　4.　What AEDPA Requires for Habeas Relief ........................................ 27

5.   This Court's Review of the State Court Rulings Under the AEDPA Habeas Standard ....................................................................................................... 29

**B.   Claim 3: Did the Prosecutor's Closing Argument Violate <u>Bruton</u>?** ................. 41

1.   In His Closing, the Prosecutor Referred to Teagle's Statement and Specifically to Washington ........................................................................................................ 42

2.   The Pennsylvania Supreme Court Addressed This Issue Directly ..................... 44

3.   This Claim is Exhausted for AEDPA Purposes ................................................. 45

4.   The Pennsylvania Supreme Court's Decision on This Issue was Contrary to Federal Law ............................................................................................................. 46

5.   This Constitutional Violation Was More than Harmless Error ........................... 48

**C.   Claim 1: Washington Claims He is "Innocent" Because Newly Discovered Evidence Shows He Was Not the Shooter** ................................................................. 50

1.   AEDPA § 2254(d) Does Not Apply ................................................................... 51

2.   PCRA Waiver Rule is "Adequate" in Petitioner's Case .................................... 53

3.   Exhaustion and Procedural Default .................................................................... 57

4.   The <u>Brady</u> case and Procedurally Defaulted Claims ........................................... 63

5.   The Commonwealth's Suppression of Evidence Establishes "Cause" ............... 65

6.   When Considered Together, the Suppressed Documents Were Material and The Commonwealth's Failure to Disclose Them Was Prejudicial .................................... 68

7.   The Evidence Withheld by the Commonwealth Was Very Likely Favorable to Mr. Washington ....................................................................................................... 84

**VI. CONCLUSION** ................................................................................................. 86

Petitioner Anthony Washington was convicted of first-degree murder by a jury in the Court of Common Pleas of Philadelphia County. After exhausting his state court remedies, the petitioner filed a federal habeas petition pursuant to 28 U.S.C. § 2254(d)(1).

The petitioner requested and I held a limited evidentiary hearing.[1] For the reasons discussed below, I will grant Mr. Washington's habeas petition, vacate his conviction and death sentence, and require the Commonwealth to retry Mr. Washington.

## I. Anthony Washington's Conviction for First-Degree Murder in the Court of Common Pleas of Philadelphia[2]

On the night of January 23, 1993, two men robbed a Save-A-Lot in the Kensington section of Philadelphia.[3] Tracy Lawson, the store's unarmed security guard, chased the robbers.[4] Office Gerard Smith, an off-duty police officer who was moonlighting as a security guard at an adjacent store, also pursued the robbers and fired a shot at them.[5] One of the robbers, while fleeing, fired in Lawson's direction.[6] Lawson, the security

---

[1] I limited the scope of that evidentiary hearing based on the Supreme Court ruling in <u>Cullen v. Pinholster</u>, 131 S. Ct. 1388 (2011), as I will explain.

[2] I cite to both the record itself and the state court decisions in this section because, as I will explain, my analysis required both a *de novo* review of the record and review under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). The facts set out in the petitioner's PCRA appeal decision are taken from his initial appeal. For this reason, I only cite to the initial appeal. <u>See</u> <u>Commonwealth v. Washington</u>, 700 A.2d 400, 405-06 (Pa. 1997); <u>Commonwealth v. Washington</u>, 592 Pa. 698, 708-10 (2007).

[3] <u>See</u> N.T. 9/29/94, 106-10 (Robles Testimony); N.T. 9/29/94, 135, 141-46 (Buchanan Testimony); N.T. 9/30/94, 24-65 (Rodriguez Testimony); N.T. 9/30/94, 66-104 (Phongsak Testimony); N.T. 9/30/94, 105-42 (Cooper Testimony); N.T. 10/3/94, 58-162 (Smith Testimony); N.T. 10/4/94, 122-26 (Murphy Testimony).

[4] N.T. 10/3/94, 61, 105-07 (Smith Testimony). <u>See also</u> <u>Commonwealth v. Washington</u>, 700 A.2d 400, 405 (Pa. 1997).

[5] N.T. 9/30/94, 109-10 (Cooper Testimony); N.T. 10/3/94, 59-62, 71 (Smith Testimony). <u>See also</u> <u>Commonwealth v. Washington</u>, 700 A.2d 400, 405 (Pa. 1997).

[6] N.T. 9/30/94, 133 (Cooper Testimony).  <u>See also</u> <u>Commonwealth v. Washington</u>, 700 A.2d 400, 405 (Pa. 1997).

guard, was hit in the head with a bullet and killed.[7] Ballistics testing found that Officer

Smith's gun did not fire the fatal shot.[8]

At trial, the jury was presented with evidence that the petitioner and Derrick

Teagle were involved in the robbery. Three store employees, Cielito Rodriguez, Suphea

Phongsak Lance and Anne Marie Buchanan testified as did two customers, Juana Robles

and Michael Murphy. All were present in the Save-A-Lot at the time of the robbery.[9] The

witnesses gave similar accounts of the facts.[10] Two men came into the store, asking for

job applications.[11] They purchased a bag of potato chips.[12] The two men left and returned

several minutes later.[13] One man pulled out a gun and ordered employees to open the

---

[7] N.T. 10/4/94, 5 (Officer Meissler Testimony); N.T. 10/4/94, 59-63 (Officer Coulter Testimony); N.T. 10/5/94, 76-83 (Dr. Mirchandani Testimony). See also Washington, 700 A.2d at 405.

[8] N.T. 10/5/94, 132, 142 (Officer Finor Testimony). See N.T. 10/5/94, 47-54 (Officer Offner Testimony); N.T. 10/5/94, 82-83 (Dr. Mirchandani Testimony); N.T. 10/5/94, 118-145 (Officer Finor Testimony). See also Commonwealth v. Washington, 700 A.2d 400, 406 (Pa. 1997).

[9] See N.T. 9/29/94, 105-34 (Robles Testimony); N.T. 9/29/94, 135-47 (Buchanan Testimony); N.T. 9/30/94, 24-65 (Rodriguez Testimony); N.T. 9/30/94, 66-104 (Phongsak Testimony); N.T. 10/4/94, 122-26 (Murphy Testimony).

[10] The robbery overall took about ten to twenty minutes. See N.T. 9/2/93, 61 (Rodriguez preliminary hearing testimony)(claiming it was 10-15 minutes); N.T. 9/30/94, 27, 51, 52 (Rodriguez Testimony)(claiming 15-20 minutes); N.T. 9/29/94, 130 (Robles Testimony)(claiming it was about 20 minutes); N.T. 9/30/94, 10-11 (Buchanan Testimony)(saying that the time between when she was ordered to open the safe and when the robbers fled was 5-7 minutes); N.T. 9/30/94, 37, 66 (Phongsak Testimony).

[11] N.T. 9/29/94, 136-39 (Buchanan Testimony); N.T. 9/30/94, 27, 59 (Rodriguez Testimony); N.T. 9/30/94, 68-72 (Phongsak Testimony). See also Commonwealth v. Washington, 700 A.2d 400, 404 (Pa. 1997).

[12] N.T. 9/30/94, 25-26, 28-29, 48 (Rodriguez Testimony); N.T. 9/29/94, 144 (Buchanan Testimony); N.T. 9/30/94, 20 (Buchanan Testimony); N.T. 9/30/94, 68-72, 86 (Phongsak Testimony). According to Phongsak, they also had been in the store the prior Thursday night, and on that night they had purchased chips. N.T. 9/30/94, 68-71 (Phongsak Testimony). See also Commonwealth v. Washington, 700 A.2d 400, 404 (Pa. 1997). She remembers them from the Thursday night visit. See N.T. 9/30/94, 68-71 (Phongsak Testimony).

[13] N.T. 9/29/94, 139, N.T. 9/30/94, 5 (Buchanan Testimony); N.T. 9/30/94, 72 (Phongsak Testimony)(about 15 minutes later). See also Commonwealth v. Washington, 700 A.2d 400, 405 (Pa. 1997).

cash registers.[14] The other man went with Buchanan, the assistant manager, to open the

store safe.[15] It was not clear if this second robber had a gun.[16] In the meantime, Lawson

began to close the metal grate on the store's entrance.[17] Hearing the grate close, the

robbers fled under the grate and across the parking lot.[18] The man with the gun near the

---

[14] N.T. 9/29/94, 141; N.T. 9/30/94, 6 (Buchanan Testimony); N.T. 9/30/94, 31, 49-50, 59 (Rodriguez Testimony); N.T. 9/30/94, 68, 73-74 (Phongsak Testimony). See also Commonwealth v. Washington, 700 A.2d 400, 405 (Pa. 1997).

[15] N.T. 9/29/94, 141 (Buchanan Testimony); N.T. 9/30/94, 29, 31-33, 36, 49-50, 59-60 (Rodriguez Testimony); N.T. 9/30/94, 74 (Phongsak Testimony). See also Commonwealth v. Washington, 700 A.2d 400, 405 (Pa. 1997).

Cooper also testified that, once Lawson alerted him to the robbery in progress, he had looked over at the Save-A-Lot from the front entrance of Kelly's Corner where he was working as a manager and saw two black men in the store, "one at the safe and one was by the register." N.T. 9/30/94, 107 (Cooper Testimony).

[16] At trial, Juana Robles identified the petitioner as being the robber having a gun. N.T. 9/29/94, 111 (Robles Testimony). However, Cielito Rodriguez testified that the man who pointed a gun at Ms. Robles was the robber with the gun near the cashiers, not the second robber. N.T. 9/30/94, 33-34 (Rodriguez Testimony). Rodriguez testified that the same man who pointed the gun at Robles also pointed the gun at Murphy, further corroborating the point that only the first robber had a gun. N.T. 9/30/94, 33-35, 64-65 (Rodriguez Testimony). The other robber, who was closer to her, did not have a gun, or at least one she could see. N.T. 9/30/94, 31-33, 36-37 (Rodriguez Testimony). See also N.T. 9/29/94, 144 (Buchanan Testimony). Murphy only saw one of the robbers and that robber had a gun. N.T. 10/4/94, 123 (Murphy Testimony). Office Smith only saw one robber; that robber had a gun. N.T. 10/3/94, 60, 96, 153 (Smith Testimony). David Cooper saw two men but only saw one with a gun. N.T. 9/30/94, 107-114, 119, 140 (Cooper Testimony).

In a court hearing on December 2, 1993, the prosecutor implied that Rodriguez had testified that both assailants had guns. N.T. 12/2/93, 41 ("Mr. Gilson: Your Honor, at the preliminary hearing and even at the trial the Commonwealth would be entitled to any reasonable inference that you can draw from the testimony of Miss Rodriguez which was quite clear. Two men entered the store, both with guns…"). A review of the preliminary hearing on September 2, 1993 indicates otherwise. While Ms. Rodriguez did at one point testify that "they," meaning the robbers, had "a gun," this statement was objected to and clarified by the court. See N.T. 9/2/93, 46-47, 48-49 (after second objection to "they pointed the gun at her" the court clarified that "the other one as the potato chip man. That is the one with the gun."), 57 ("the same person always had the gun.").

[17] N.T. 9/30/94, 110, 126-27 (Cooper Testimony); N.T. 10/3/94, 67, 95 (Smith Testimony). See N.T. 9/29/94, 111, 131-32 (Robles Testimony); N.T. 9/29/94, 141, 145-46; N.T. 9/30/94, 10-12, 18-19 (Buchanan Testimony); N.T. 9/30/94, 38 (Rodriguez Testimony); N.T. 9/30/94, 74-75 (Phongsak Testimony). See also Commonwealth v. Washington, 700 A.2d 400, 405 (Pa. 1997).

[18] See N.T. 9/30/94, 111-12, 127 (Cooper Testimony); N.T. 9/30/94, 74-75, 91, 99-100 (Phongsak Testimony); N.T. 9/30/94, 38-39 (Rodriguez Testimony); N.T. 9/29/94, 411, 145-46 (Buchanan Testimony); N.T. 9/30/94, 12 (Buchanan Testimony); N.T. 10/3/94, 59-62, 68 (Smith Testimony). See also Commonwealth v. Washington, 700 A.2d 400, 405 (Pa. 1997).

Cooper initially testified that he only saw one man come out of the building though he had seen two inside the building. N.T. 9/30/94, 127 (Cooper Testimony). In his police statement from the night of the shooting, however, he told police he saw two men leaving the building. N.T. 9/30/94, 131 (Cooper Testimony). Cooper's recollection was

registers left a potato chip bag on the counter.[19] The employees and Robles remained in the store.[20] They heard one shot fired outside.[21]

As the two men fled, Lawson ran after them.[22] Officer Smith, after being alerted to the robbery, also pursued the robbers.[23] Smith heard gunshots, and he fired a shot in their direction.[24] Smith testified that one robber turned around, pointed a gun in Lawson's

then "refreshed" and he testified that he saw two men exit. N.T. 9/30/94, 131-32, 142 (Cooper Testimony). Smith testified that he only saw one man exit. N.T. 10/3/94, 60, 96, 153 (Smith Testimony). He described him as being a "black male." N.T. 10/3/94, 60 (Smith Testimony). He later identified this man to be the petitioner. N.T. 10/3/94, 153 (Smith Testimony).

[19] N.T. 9/30/94, 61-62 (Rodriguez Testimony). See also N.T. 9/29/94, 144 (Buchanan Testimony).

[20] N.T. 9/29/94, 112, 129 (Robles Testimony); N.T. 9/29/94, 146 (Buchanan Testimony); N.T. 9/30/94, 20 (Buchanan Testimony); N.T. 9/30/94, 41, 62 (Rodriguez Testimony); N.T. 9/30/94, 76 (Phongsak Testimony).

[21] See N.T. 9/2/93, 51, 58 (Rodriguez Preliminary Hearing); N.T. 9/29/94, 111-12, 131 (Robles Testimony); N.T. 9/29/94, 146 (Buchanan Testimony); N.T. 9/30/94, 11-12, 13 (Buchanan Testimony); N.T. 9/30/94, 39-40, 49, 53 (Rodriguez Testimony); N.T. 9/30/94, 75-76, 91-92 (Phongsak Testimony).

[22] N.T. 10/3/94, 61, 105-07 (Smith Testimony). See also Commonwealth v. Washington, 700 A.2d 400, 405 (Pa. 1997).

Cooper testified that Lawson had "started walking towards the building" when he fell. He did not see Lawson get shot. N.T. 9/30/94, 114 (Cooper Testimony).

[23] N.T. 10/3/94, 61, 71, 101-05 (Smith Testimony). He testified, however, that he was only running after the robber with the gun that he saw. N.T. 10/3/94, 60-61, 101-05 (Smith Testimony). See also Commonwealth v. Washington, 700 A.2d 400, 405 (Pa. 1997).

[24] N.T. 10/3/94, 61, 63, 72, 77 (Smith Testimony). Smith testified that he had heard two gunshots before he fired one shot in the direction of the robber – "the same black male [who was across the parking lot] with the pistol in a raised position looking directly in [his] way." N.T. 10/3/94, 61, 72-73, 103-04 (Smith Testimony). This is the testimony that Officer Smith gave at the preliminary hearing and at trial. See N.T. 12/2/93, 14-15 (Smith Preliminary Testimony); N.T. 10/3/94, 152 (Smith Testimony). However, he did not include this information in the statement he gave to Internal Affairs on the night of the shooting. See N.T. 12/2/93, 15 (note) and N.T. 10/3/94, 121-22 (Smith Testimony); N.T. 10/5/94, 61-63 (Officer Offner Testimony). See also Commonwealth v. Washington, 700 A.2d 400, 405 (Pa. 1997).

Cooper testified that he "heard a gunshot, then [Officer Smith] shot back at him." N.T. 9/30/94, 113-14 (Cooper Testimony). See also N.T. 9/30/94, 133-35 (Cooper Testimony).

direction, and fired a shot.[25] Lawson was struck in the head and died.[26] The robbers fled

in a getaway car.[27]

At an August 1993 line-up, Suphea Phongsak Lance positively identified Teagle

as the man with the gun at the cash register.[28] She could not identify the petitioner as the

other robber.[29] Cielito Rodriguez had given a detailed description of the man with the

gun—one which described Teagle.[30] She also testified that this man left the potato chip

bag on the counter.[31] Teagle's fingerprints matched those found on the potato chip bag.[32]

---

[25] N.T. 10/3/94, 61-63, 77, 106 (Smith Testimony).

[26] See N.T. 10/3/94, 63 (Smith Testimony)("At this time I fired one shot in his direction, and it was just a second later he fired a shot and I saw the security guard fall."); N.T. 10/3/94, 63 (Smith Testimony)(indicating Lawson had gunshot wound near his right eye); N.T. 10/4/94, 5 (Officer Meissler Testimony); N.T. 10/4/94, 59-63 (Officer Coulter Testimony); N.T. 10/5/94, 76- 83 (Dr. Mirchandani Testimony). See also Commonwealth v. Washington, 700 A.2d 400, 405 (Pa. 1997).

[27] Smith testified that he pursued the shooter who ran down steps to Sergeant Street. N.T. 10/3/94, 63, 75 (Smith Testimony). He ran after him and found a Hispanic woman in a "dark-colored old auto" who gave him information about the robber. N.T. 10/3/94, 63, 78-79 (Smith Testimony). He then testified that he told Officer Chris Rudy, who arrived on the scene shortly thereafter, that the shooter "had gotten into a white Toyota and escaped in a white Toyota" which "went east on Sergeant Street, then north on Jasper Street." N.T. 10/3/94, 64 (Smith Testimony).

[28] N.T. 9/30/94, 78-81 (Phongsak Testimony). She also identified Teagle in court and the description she gave to police of the man who pointed the gun at her matched that of Teagle. N.T. 9/30/94, 79, 81-83 (Phongsak Testimony). See N.T. 10/6/94, 3-38 (Officer Wynn Testimony). See also Commonwealth v. Washington, 700 A.2d 400, 405 (Pa. 1997).

Phongsak had described the first robber as being a "[y]oung black male, in his 20s, dark skinned, slim, about five six, five seven" and that "[h]e wore a leather brown jacket, three [fourth] quarters length." N.T. 9/30/94, 81-82 (Phongsak Testimony). She described the gun as being "silver and automatic." N.T. 9/30/94, 82 (Phongsak Testimony).

[29] N.T. 9/30/94, 102-04 (Phongsak Testimony); N.T. 10/6/94, 18 (Officer Wynn Testimony). See N.T. 10/6/94, 3-38 (Officer Wynn Testimony). See also Commonwealth v. Washington, 700 A.2d 400, 405-06 (Pa. 1997).

[30] N.T. 9/30/94, 29, 40-41, 42-43 (Rodriguez Testimony). Rodriguez testified that the man with the gun had a "three-quarter length, light-brown jacket. He was dark-skinned, slight mustache and maybe five four." N.T. 9/30/94, 40 (Rodriguez Testimony). He was "thin." N.T. 9/30/94, 43 (Rodriguez Testimony).

[31] N.T. 9/30/94, 29, 40-41, 49, 62-64 (Rodriguez Testimony). See also N.T. 9/30/94, 77-78, 94-95 (Phongsak Testimony).

[32] N.T. 10/5/94, 19, 10, 13-19 (Forrest Gorodetzer Testimony). See N.T. 10/4/94, 67-69 (Officer McIver Testimony); N.T. 10/4/94, 73-77, 94-106 (Jeffrey Parker Testimony).

During the August 1993 line-up, the other in-store witnesses could not make positive identifications of either the petitioner or Teagle.[33] At a separate line-up in November 1993, which was ordered by the court, Officer Smith identified the petitioner as the robber who shot at Lawson.[34] He had also previously identified the petitioner in a photo array in March 1993.[35] Officer Smith again identified the petitioner as the shooter at the preliminary hearing and at trial.[36] Robles, who had previously been unable to identify the petitioner at the line-up, identified him in court as the robber with the gun.[37]

Anthony Washington's former girlfriend, Melissa Harrington, and her sister, Martha Harrington, both testified that Washington confessed to being the shooter.[38] Martha Harrington also testified that the petitioner owned a three-quarter length green

---

[33] Buchanan, Rodriguez, and Robles also attended the lineup. N.T. 9/29/94, 112-27 (Robles Testimony); N.T. 9/30/94, 16 (Buchanan Testimony); N.T. 9/30/94, 44-45, 53-59 (Rodriguez Testimony)(about misidentifying the assailants at both the petitioner's and Teagle's lineup); N.T. 10/6/94, 4-5, 16-23 (Officer Wynn Testimony). See N.T. 10/6/94, 3-38 (Officer Wynn Testimony)(explaining the line-up procedure).

[34] N.T. 10/3/94, 63, 91-93 (Smith Testimony); N.T. 10/6/94, 23-25 (Officer Wynn Testimony). See N.T. 10/6/94, 3-38 (Officer Wynn Testimony). See also Commonwealth v. Washington, 700 A.2d 400, 406 (Pa. 1997).

[35] N.T. 10/3/94, 84, 89-91 (Smith Testimony). See also Commonwealth v. Washington, 700 A.2d 400, 406 (Pa. 1997).

[36] N.T. 10/3/94, 69, 93-95 (Smith Testimony)(trial ID); N.T. 12/2/93, 13 (Smith Preliminary Hearing Testimony) (preliminary hearing ID).

[37] N.T. 9/29/94, 108-114 (Robles Testimony). See also Commonwealth v. Washington, 700 A.2d 400, 405 (Pa. 1997).

[38] N.T. 10/4/94, 7-13, 20-21 (Martha Harrington Testimony); N.T. 10/4/94, 34-38 (Melissa Harrington Testimony). Martha Harrington also testified that the petitioner owned a green three-quarter length leather jacket. N.T. 10/4/94, 19 (Martha Harrington Testimony). Martha Harrington overheard the petitioner make this confession to his friend LaVaughn Robinson while the two were talking on the phone. N.T. 10/4/94, 7, 9-12, 26-28 (Martha Harrington Testimony). Robinson himself did not testify at trial though the prosecution had subpoenaed him. N.T. 10/7/94, 50 (Washington Closing Argument); N.T. 10/7/94, 81-86 (Commonwealth Closing Argument). Martha also testified that the petitioner confessed to the shooting to her on another occasion, in person. N.T. 10/4/94, 12, 28-30 (Martha Harrington Testimony). Melissa Harrington testified that the petitioner confessed to the shooting both over the phone and in person. N.T. 10/4/94, 35-37 (Melissa Harrington Testimony). Melissa testified that the petitioner told her to lie on the stand when she went to visit him in prison and threatened to hurt her if she did not. N.T. 10/4/94, 56-57 (Melissa Harrington Testimony). See also Commonwealth v. Washington, 700 A.2d 400, 405 (Pa. 1997).

leather coat.[39] One of the robbers was described as wearing a three-quarter length green leather coat.[40] David Cooper, an employee of an adjacent store who was in the parking lot at the time of the shooting, indicated that the taller of the two assailants had a gun when they fled.[41] Washington was the taller of the two.[42] The petitioner's brother, Elijah Washington, testified that the petitioner had beeped him on the night of the robbery.[43] Elijah came to the house of the petitioner's then-girlfriend, Meshe Miller, and found Washington, Miller, and Teagle sitting in front of stacks of money.[44] The petitioner told Elijah to drive Teagle home because the police might be looking for the petitioner and Teagle.[45]

---

[39] N.T. 10/4/94, 19 (Martha Harrington Testimony). See also Commonwealth v. Washington, 700 A.2d 400, 405 (Pa. 1997).

[40] N.T. 9/30/94, 43 (Rodriguez Testimony); N.T. 9/30/94, 83 (Phongsak Testimony). See also Commonwealth v. Washington, 700 A.2d 400, 405 (Pa. 1997).

[41] N.T. 9/30/94, 111-14, 119, 133, 135, 139-40 (Cooper Testimony). Cooper testified that the taller assailant, with the gun, was about his height – 5' 9." N.T. 9/30/94, 139-40 (Cooper Testimony). The other robber was about three to four inches shorter than them both. N.T. 9/30/94, 140 (Cooper Testimony).

Cooper testified that Lawson had "started walking towards the building" when he fell. He did not see Lawson get shot. N.T. 9/30/94, 114 (Cooper Testimony). He had heard shots coming from the direction of the fleeing robbers and appeared to see one of the robbers "standing" after the shot was fired but he could not see his face. See N.T. 9/30/94, 111-14, 119, 133, 135 (Cooper Testimony).

[42] The petitioner is about 5' 10." See Commonwealth's Response to Habeas Petition, Doc. No. 31, Ex. 8. Teagle is about 5' 4." See N.T. 9/30/94, 4, 29, 34 (Rodriguez Testimony); N.T. 9/30/94, 79, 81-83 (Phongsak Testimony).

[43] N.T. 10/5/94, 28-31 (Elijah Washington Testimony). See also Commonwealth v. Washington, 700 A.2d 400, 405 (Pa. 1997).

[44] N.T. 10/5/94, 31-32, 34, 86 (Elijah Washington Testimony). See also Commonwealth v. Washington, 700 A.2d 400, 405 (Pa. 1997).

[45] N.T. 10/5/94, 30-34, 42-43, 87-90 (Elijah Washington Testimony). See also Commonwealth v. Washington, 700 A.2d 400, 405 (Pa. 1997).

Teagle gave a statement to the police prior to his arrest. This statement was offered as evidence by the Commonwealth at trial.[46] Teagle's statement outlined his involvement in the robbery and implicated Washington as the other robber. Some of these details matched those offered by witnesses. He claimed they both were carrying guns on the night of the robbery, but his gun did not work.[47] He implied that the petitioner, who had the working gun, was the shooter.[48] The petitioner's name was replaced with "blank" when the statement was read to the jury at trial.[49] Neither the petitioner nor Teagle testified at trial.[50]

The jury convicted Anthony Washington of first-degree murder and sentenced him to death.[51] Derrick Teagle was convicted of second-degree murder and sentenced to life

---

[46]N.T. 10/6/94, 62-81 (Officer Quick Testimony of Teagle Statement). See N.T. 10/5/94, 106-07 (Officer McGuffin Testimony).

[47] N.T. 10/6/94, 75, 77, 79 (Officer Quick Testimony of Teagle Statement). See also Commonwealth v. Washington, 700 A.2d 400, 405 (Pa. 1997).

[48] N.T. 10/6/94, 76 (Officer Quick Testimony of Teagle Statement)("QUESTION: Did you see Blank fire any shots? ANSWER: I didn't see Blank fire any shots but I heard more shots and they were coming from behind me and Blank was running behind me.").

[49] N.T. 10/6/94, 62-64, 73-81 (Officer Quick Testimony).

[50] Evidence was also presented at trial about Washington's arrest. The police had received an anonymous tip about the petitioner's location. When they arrived at the home, the petitioner answered the door. The police told him, "Anthony Washington, we have an arrest warrant for you for murder." The petitioner claimed not to be Anthony. One of the officers then held up a picture of him at which point the petitioner said, "[T]hat's me. You got me." The petitioner was then arrested. See 10/6/94, 52-54.The Pennsylvania Supreme Court considered this to be evidence of the petitioner's guilt. See Commonwealth v. Washington, 700 A.2d 400, 404, 407 (Pa. 1997).

[51] The petitioner was also convicted of three counts of robbery, criminal conspiracy, simple assault, and possessing an instrument of crime. N.T. 10/11/94, 46-48 (Washington Conviction); N.T. 10/12/94, 42-45 (Washington Sentence). See also Commonwealth v. Washington, 700 A.2d 400, 406 (Pa. 1997); Commonwealth v. Washington, 592 Pa. 698, 710 (2007).

imprisonment.[52] On August 20, 1997, the Supreme Court of Pennsylvania affirmed the petitioner's conviction and death sentence on direct appeal. Commonwealth v. Washington, 700 A.2d 400 (Pa. 1997). His motion for reargument was denied on September 27, 1997. On June 26, 1998, the United States Supreme Court denied his petition for writ of certiorari. Washington v. Pennsylvania, 524 U.S. 955 (1998).

## II.    Mr. Washington's Post-Conviction Relief Act Petitions

On July 7, 1998, the petitioner filed a *pro se* petition for relief under Pennsylvania's Post-Conviction Relief Act (PCRA).[53] In his post-conviction proceedings, the petitioner had allegedly uncovered "evidence" that Teagle was the shooter. The Pennsylvania court did not grant a hearing.[54]

Judge Poserina, the trial judge, dismissed the petition on July 28, 1998. On July 31, 1998, the Federal Habeas Unit of the Philadelphia Defender Association filed an appeal as petitioner's new counsel.[55] On August 10, 1998, the Pennsylvania Supreme Court granted the petitioner's emergency motion for stay of execution, vacated the PCRA

---

[52] See Transcript of Evidentiary Hearing, Doc. No. 115 at 6. Teagle was also convicted of three counts of robbery, two counts of simple assault, criminal conspiracy, and possessing an instrument of crime. His convictions were affirmed on appeal. Commonwealth v. Teagle, 686 A.2d 1368 (Pa. Super. 1996). N.T. 10/11/94, 48-51. See also Commonwealth v. Washington, 700 A.2d 400, 406 n. 1 (Pa. 1997).

[53] Commonwealth v. Washington, 592 Pa. 698, 710 (2007); Judge Poserina PCRA Opinion, Doc. No. 31-3, Ex. 4 at 1.

[54] Commonwealth v. Washington, 592 Pa. 698 at 714-15.

[55] Id. at 710; Judge Poserina PCRA Opinion, Doc. No. 31-3, Ex. 4 at 1-2.

court's order dismissing the petition, and remanded the case to the Philadelphia Court of Common Pleas.[56]

On March 31, 2000, the petitioner filed an amended PCRA petition.[57] On February 5, 2001, Judge Poserina issued to the petitioner a notice of intent to dismiss the petition without a hearing, under Pa. R. Crim. P. 1507.[58] On June 6, 2001, the petitioner filed a supplemental amended petition, without first being granted leave to do so.[59] Judge Poserina dismissed the petition on June 26, 2001 and then denied the petitioner's motion for reconsideration on July 25, 2001.[60] On July 18, 2007, the Pennsylvania Supreme Court affirmed the dismissal. Commonwealth v. Washington, 592 Pa. 698 (2007). The Governor of Pennsylvania signed a warrant for Washington's execution. On August 20, 2007, the petitioner filed a motion to stay the execution and to appoint counsel to represent him in a to-be-filed habeas petition.[61] I granted this motion on August 23, 2007.[62]

---

[56] Commonwealth v. Washington, 592 Pa. 698 at 710 n. 6; Commonwealth's Response in Opposition to Habeas Petition, Doc. No. 32 at 10.

[57] Commonwealth's Response to Habeas Petition, Doc. No. 31, Ex. 29 (State Court Docket) at 13.

[58] Id.

[59] Id. at 14.

[60] Id.; Commonwealth v. Washington, 592 Pa. 698 at 710.

[61] See Doc. No. 1.

[62] See Doc. No. 3.

### III. A Brief History of Mr. Washington's Petition for a Writ of Habeas Corpus

The petitioner filed this federal habeas petition on May 5, 2008 and the supporting memorandum of law on July 25, 2008.[63] He presented seventeen (17) claims: claims 1 through 10 deal with the guilt phase of his proceedings; while claims 11 through 16 pertain to the penalty phase. Claim 17 relates to both phases and discusses relief based on "cumulative error." The Commonwealth has agreed that the petitioner is entitled to a new penalty hearing, thereby mooting Claims 11 through 16.

Counsel submitted briefs on the petitioner's request for an evidentiary hearing. After several conferences with counsel, I granted the petitioner an evidentiary hearing on Claims 1 and 4. This was prior to the Supreme Court's decision in Cullen v. Pinholster, 131 S. Ct. 1388 (2011).[64] Claim 1 is an "actual innocence" claim based on evidence which showed that the petitioner's co-defendant was the actual shooter.[65] Claim 4 relates to the constitutionality of the identifications of the petitioner.

Following the Supreme Court's holding in Pinholster and in response to the Commonwealth's motion, I limited the hearing to: (1) the petitioner's claims under Brady v. Maryland, 373 U.S. 83 (1968), that were not decided on the merits; (2) the petitioner's Schlup gateway actual innocence claim; (3) evidence supporting petitioner's claim of

---

[63] Doc. No. 9, 20.

[64] See Doc. No. 64, 99, 100. I had also granted a hearing on Claim 11, which alleged that counsel rendered ineffective assistance by failing to investigate and present readily available mitigating evidence. However, since the Commonwealth had agreed to a new penalty phase, this Claim became moot.

[65] A freestanding actual innocence claim has not been recognized in this Circuit but the evidence of actual innocence could be relevant to the Schlup gateway analysis. See Herrera v. Collins, 506 U.S. 390, 417 (1993); House v. Bell, 547 U.S. 518, 555 (2006).

freestanding actual innocence; and (4) the ineffectiveness of petitioner's counsel at the guilt stage of his trial.[66]

At the hearing, the petitioner argued that his claim of actual innocence—supported by Teagle's admission to being the shooter—is an amalgamation of newly discovered evidence, ineffective assistance of counsel, and Brady violations. He stated that he possessed evidence showing that Teagle fired the shot that killed the victim, that Teagle later admitted that he shot the victim, and that the Commonwealth's key witness lied at trial. The petitioner called Teagle as a witness for the hearing.[67] Teagle had previously signed an affidavit admitting that he was responsible for shooting and killing the victim in this case at the hearing.[68] Teagle recanted, explaining that he signed the affidavit only to help Washington. After consulting with his attorney, Teagle invoked his Fifth Amendment rights and refused to testify in support of Washington's federal habeas

---

[66] Doc. No. 99, 100. This included all of the petitioner's Brady claims other than the claim regarding Meshe Miller's statement to police. See Doc. No. 99 at 6-7.

The Commonwealth also filed a motion to preclude expert testimony. See Doc. No. 71, 86. Expert testimony that eyewitness identification is not reliable is not admissible in Pennsylvania state courts. See, e.g., Pennsylvania v. Abdul-Salaam, 678 A.2d 342, 352 (Pa. 1996) (holding that court properly denied expert witness expense because expert testimony on eyewitness identification was not admissible). However, such expert testimony is admissible in federal court. See, e.g., United States v. Brownlee, 454 F.3d 131, 144 (3d Cir. 2006); United States v. Downing, 753 F.2d 1224 (3d Cir. 1985) (holding that Fed. R. Evid. 702 may permit a defendant to adduce testimony from an expert in the field of human perception and memory concerning the reliability of eyewitness identifications and that the admission of this kind of expert testimony is not automatic, but must survive preliminary scrutiny by the district court). Additionally, petitioner's expert testimony was relevant to his claim of actual innocence under Schlup v. Delo, 513 U.S. 298 (1995). The expert testified as to the credibility of the eyewitness testimony. Because Schlup is a verdict accuracy inquiry requiring the fact-finder to consider all of the evidence and determine whether it is probable that any reasonable juror would have reasonable doubt, I was able to consider the impeachment evidence despite the fact that it could not possibly prove that petitioner did not commit the crime. See House v. Bell, 547 U.S. 518, 538 (2006).

[67] Transcript of Evidentiary Hearing, Doc. No. 115 at 4.

[68] Petitioner's Memorandum of Law in Support of Habeas Petition, Doc. No. 20 at 11-15; Transcript of Evidentiary Hearing, Doc. No. 115 at 4-7; Commonwealth's Response to Habeas Petition, Doc. No. 31, Ex. 9. See Commonwealth v. Washington, 592 Pa. 698, 715-17 (2007).

claims.[69] Without Teagle's testimony, the petitioner rested on his unsupported actual

innocence claims.[70]

The petitioner then presented evidence regarding his Brady claims that were not

considered by the state court.[71] These concern documents not produced to the defense at

trial.[72] They are: (1) a teletype sent to Investigator Maslo of the Millbourne Police

Department on January 27, 1993, that provided a description of three suspects involved in

the shooting;[73] (2) a handwritten note titled "Descriptions" describing two suspects;[74] (3)

a general radio message that was sent on January 24, 1993, at 1:00 a.m., which described

two of the suspects;[75] and (4) a police activity sheet, dated February 25, 1993, which

---

[69] Counsel for the petitioner objected to Teagle's invocation of his Fifth Amendment rights. However, I found that because Teagle was still eligible for certain leniencies and privileges within the prison system, he had a protectable self-incrimination interest, which fell squarely within the purview of the Fifth Amendment. These collateral consequences include a change to Teagle's current possibility for parole, potential programs and privileges in prison, and ability to obtain commutation. Additionally, Teagle could face perjury charges. See Transcript of Evidentiary Hearing, Doc. No. 115 at 4-30.

[70] Id. at 31-32.

[71] I previously ruled that petitioner's claims that: 1) the identifications were unconstitutionally suggestive; 2) the Brady claim regarding Ms. Miller's statement to the police; and 3) the claims of ineffective assistance of counsel—for failing to investigate Ms. Harrington, Ms. Miller, and Mr. Robinson and for failing to claim the identification testimony was unreliable—were all rejected by the state court on the merits. Doc. No. 99 at 8-9.

[72] Transcript of Evidentiary Hearing, Doc. No. 115 at 33-36.

[73] These three suspects were described as "(1) black male, approximately 21 years old, 5'4", thin build, brown complexion, slight mustache, wearing a ¾ sleeve brown leather jacket and a dark blue wool baseball cap, and armed with a silver semi-automatic; (2) black male, mid-20's, 5'6", brown complexion, slight mustache, wearing a ¾ sleeve green leather jacket; and (3) the driver of the getaway car was described as black male, 20's, 6'1", medium build, medium brown complexion, short black haircut, wearing a brown leather jacket."

[74] These two suspects were described as "(1) black male, 21 yrs, 5'4", thin build, brown skinned, light mustache, wearing a ¾ length brown leather jacket, and a baseball cap, color unknown. Armed with a silver automatic; and (2) black male, late 20's, 5'6", heavier than male #1, brown skinned, slight mustache, wearing a ¾ sleeve green leather jacket, No Firearm Detected (N.F.D.)."

[75] This radio message described the suspects as "(1) black male, 21 years old, 5'4", thin build, brown complected, light mustache, wearing a dark blue wool baseball cap and a light brown ¾ length leather jacket, armed with a silver automatic; and (2) black male, mid-20's, 5'6", medium build, brown comp., slight mustache, wearing a ¾ sleeve

stated that Detectives McGuffin and Piree showed photos, including a photo of Washington, to eyewitnesses Juana Robles, Judith Bonaparte, and David Cooper resulting in no identification of the petitioner.[76] The Commonwealth stipulated that none of these documents were disclosed to the defense prior to trial.[77]

The Commonwealth moved two documents into evidence at the hearing: 1) the radio memorandum called in by Officer McIver, and 2) the statement Officer McIver gave to Detective Danks on January 23, 1993 at 1:30 a.m.[78] The Commonwealth and the petitioner stipulated to the testimony of Officer McIver.[79] His testimony indicated that Officer McIver arrived on the scene and went to the Save-A-Lot supermarket where he spoke to two cashiers, Suphea Phongsak and Cielito Rodriguez, and obtained the flash

---

green leather jacket." The radio message also stated that the males "fled the area in an older model small white station wagon, possibly a Toyota or Subaru, males are considered to be armed and dangerous."

[76] The activity sheet also included information that on February 18, 1993, the assigned detective was contacted by Detectives Peterman and Breenan and informed that they had someone giving information that the petitioner was bragging that he shot the guard at Kelly's Korner.

[77] See Transcript of Evidentiary Hearing, Doc. No. 115 at 34-35.

[78] The radio memorandum contains descriptions of the two suspects who were wanted for aggravated assault/robbery "with a nickel plated automatic weapon at 2513 Kensington at 7:00 p.m. The suspects escaped east on Sergeant St. in a white Toyota hatchback. Suspect No. 1 was described as a black male, dark complexion, late 20's, height 5'3", weight 170, close cut hair, mustache, wearing a blue wool baseball cap, a brown leather waist length jacket, and no glasses. Suspect No. 2 was described as a black male, medium complexion, early 20's, height 5'5", weight 145, close cut hair, very thin mustache, wearing a green leather ¾ length jacket and no hat or glasses."

The statement that Officer McIver gave to Detective Danks stated that Officer McIver responded to a radio call of a shooting and robbery at 2513 Kensington where he observed a black male lying on his back in the parking lot near the Rite Aid. He observed blood coming from his forehead and he appeared to be the victim of a gunshot. He helped place the victim in a police wagon and informed radio that the victim was on its way to Temple Hospital. Officer McIver then proceeded to the Save-A-Lot Store where he asked the cashiers who was robbed. The store cashier came forward and explained that she was robbed. She indicated that the male that robbed her touched the cash register and she showed him a bag of chips and candy. Officer McIver brought all the employees to the front of the store and obtained information from several witnesses and called in the radio memorandum. Officer McIver was assigned to secure the store and remain there until approximately 10:30 p.m. when the scene was released.

[79] See Transcript of Evidentiary Hearing, Doc. No. 115 at 38.

information or description of the two black males who participated in the robbery.[80]

Officer McIver prepared a memorandum with these descriptions.[81]

## IV. The District Court's Legal Standard for Determining the Merits of a Habeas Petition

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), federal habeas relief for any claim adjudicated on the merits in state court proceedings can be granted only if I determine that the state court's adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. 28 U.S.C. § 2254(d)(1)-(2). I presume the state court's findings of fact are correct; the petitioner can rebut that presumption only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Review under habeas provision § 2254(d)(1) providing relief on a claim of a state prisoner "is limited to the record that was before the state court that adjudicated the claim on the merits."[82] Cullen v. Pinholster, 131 S. Ct. 1388, 1398 (2011).

---

[80] Id. at 36-38.

[81] See id.

[82] Specifically, the Court held that new evidence introduced at a federal evidentiary hearing in support of a claim previously adjudicated on the merits in state court is irrelevant to § 2254(d)(1). Pinholster, 131 S. Ct. at 1398. Therefore, the habeas court may not take into account any facts that were not before the state court in deciding the reasonableness of the state court's ruling, meaning no additional facts may be used in evaluating whether the state court decision was contrary to, or an unreasonable application of, clearly established federal law. See Washington v. Beard, No. 07–3462, 2012 WL 1033526, at *4 (E.D. Pa. Mar. 28, 2012) (Stengel, J.).

## V.    A Discussion of Certain Issues Raised by Mr. Washington's Habeas Petition

### A.    Claim 2: The Use of the Co-Defendant's Statement at Mr. Washington's Trial

Claim 2 addresses the petitioner's claim under the Confrontation Clause, and specifically under <u>Bruton v. United States</u>, 391 U.S. 123 (1968), <u>Richardson v. Marsh</u>, 481 U.S. 200 (1987), and <u>Gray v. Maryland</u>, 523 U.S. 185 (1998). The reading of Teagle's redacted statement at trial is the claimed constitutional violation.

### 1.    <u>Bruton</u>, <u>Richardson</u>, and <u>Gray</u>[83]

In <u>Bruton v. United States</u>, the Supreme Court held that the admission of a non-testifying co-defendant's confession, which inculpates the defendant, violates the defendant's rights under the Confrontation Clause of the Sixth Amendment when the two are tried together. 391 U.S. 123, 126 (1968). The use of such a statement is a constitutional violation even if the jury is given an instruction not to use the co-defendant's statement against the defendant. <u>Id.</u> at 126, 128-136. The Court recognized that such a context was one "in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." <u>Id.</u> at 135.

---

[83] The Commonwealth argues that Teagle's redacted statement did not prejudice the petitioner and, therefore, the court's decision not to sever the trial was neither contrary to nor "an unreasonable application of, clearly established Federal law, as determined by the Supreme Court" under <u>United States v. Lane</u>, 474 U.S. 438 n. 8 (1986); <u>United States v. Thornton</u>, 1 F.3d 149, 152-53 (3d Cir. 1993), <u>cert. denied</u>, 510 U.S. 982 (1993); and <u>United States v. Ward</u>, 793 F.2d 551 (3d Cir. 1986), <u>cert. denied</u>, 454 U.S. 871 (1981)). Commonwealth's Response to Petition for Writ of Habeas Corpus, Doc. No. 32 at 75. While the Commonwealth parses the trial court's decision not to sever the trial from that of admitting Teagle's statement, I will decline to split such hairs and instead focus on whether the use of the statement at the joint trial was a violation of <u>Bruton</u>. These sorts of claims are typically considered under <u>Bruton</u>. <u>See, e.g.</u>, <u>Eley v. Erickson</u>, 712 F.3d 837 (3d Cir. 2013), <u>cert. denied</u>, 134 S.Ct. 254 (2013); <u>Vazquez v. Wilson</u>, 550 F.3d 270 (3d Cir. 2008); <u>Greene v. Fisher</u>, 132 S.Ct. 38 (2011).

In Richardson v. Marsh, the Court further clarified that Bruton applied when the co-defendant's confession "facially incriminated" the defendant.[84] 481 U.S. 200, 208-09 (1987). Richardson found, however, that "the Confrontation Clause is not violated by the admission of a non-testifying codefendant's confession with a proper limiting instruction when…the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." Id. at 211.

In Gray v. Maryland, the Supreme Court answered the question it had left open in Richardson.[85] Gray held that redactions which replace a defendant's name with an "obvious indication of deletion, such as a blank space, the word 'deleted,' or a similar symbol, still fall[] within Bruton's protective rule." Gray v. Maryland, 523 U.S. 185, 192 (1998). Such redactions "so closely resemble Bruton's unredacted statements that, in our view, the law must require the same result." Id. "This is true even when the State does not blatantly link the defendant to the deleted name…." Id. at 193.

As in Bruton, a limiting instruction will not cure a Gray constitutional violation. The deletion itself coupled with the limiting instruction "may well call the jurors' attention especially to the removed name" and encourage jurors to speculate by reference

---

[84] The term "facially incriminating" was used by Richardson but not clarified until Gray. Richardson used the term to describe the confession in Bruton, which violated the Confrontation Clause. Richardson, 481 U.S. at 207. The Court explained that "evidence requiring linkage differs from evidence incriminating on its face in the practical effects which application of the Bruton exception would produce." Id. at 208. This distinction was the difference between whether the use of the statement violated the Confrontation Clause or not. Id. at 209. The Court did not explain *what* on the face of the confession made it incriminating, expressly leaving open the question of whether the replacement of the defendant's name with a symbol of pronoun would still be *facially* incriminating. Id. at 211 n.5. Gray clarified that a redacted confession with the "blank" prominent on its face was, in fact, "facially incriminating." Gray, 523 U.S. at 196.

[85] Both the petitioner and the Commonwealth agree that Gray would apply to this petition because it was decided before the State Supreme Court took up the petitioner's PCRA appeal. See Commonwealth's Response to Habeas Petition, Doc. No. 32 at 79 n. 30. I explain further below why Gray applies to this claim.

as to whom the deletion refers. Id. "A juror who does not know the law and who therefore wonders to whom the blank might refer need only lift his eyes to [the defendant], sitting at counsel table, to find what will seem the obvious answer, at least if the juror hears the judge's instruction not to consider the confession as evidence against [the defendant], for that instruction will provide an obvious reason for the blank." Id.[86]

The Supreme Court made clear that redactions that replaced a name with a "blank" are not controlled by Richardson. Gray, 523 U.S. at 195. Richardson, instead, covered those "statements that did not directly refer to the defendant himself and which became incriminating 'only when linked with evidence introduced later at trial.'" Id. at 196.

## 2. The Redacted Statement of Derrick Teagle

Derrick Teagle gave a lengthy statement to the police in which he referred to Washington's, and his own, role in the crime.[87] Teagle did not testify. The statement was redacted to replace "Washington" with "blank."[88] Teagle implicitly blamed "blank" for the shooting.[89]

---

[86] Compare Priester v. Vaughn, 382 F.3d 394, 398-401 (3d Cir. 2004)(finding no violation of Bruton when statement redacted with "the other guy," "someone else," etc. and trial included at least fifteen other perpetrators involved in the shooting).

[87] See Commonwealth v. Washington, 592 Pa. 698, 709, 736-37 (2007); Commonwealth's Response to Habeas Petition, Doc. No. 31-18, Ex. 9.

[88] See N.T. 10/6/94, 74-80 (Officer Quick of Teagle Statement Testimony); See Commonwealth v. Washington, 592 Pa. 698, 736-37 (2007).

Defense counsel requested that Teagle's statement be redacted of "any reference" to his client. See N.T. 9/2/93, 64.

[89] See N.T. 10/6/94, 76 (Officer Quick Testimony of Teagle Statement)("QUESTION: Did you see Blank fire any shots? ANSWER: I didn't see Blank fire any shots but I heard more shots and they were coming from behind me and Blank was running behind me.").

Teagle's statement was the last piece of evidence the prosecution presented to the jury before resting its case.[90] The following was the statement as read to the jury:

QUESTION: Derrick, were [sic] at the Save-A-Lot market at 2501 Kensington Avenue on the night of the murder and robbery, Saturday, 1-23-93, about 6:59 p.m.?

ANSWER: Yeah.

QUESTION: I would like you to go on in your own words **and tell me who you were with** and everything else about the robbery and shooting that occurred at Save-A-Lot the night of the shooting, okay?

ANSWER: It was about 6:00 or 6:30 p.m. **Blank** came to my house and picked me up. **Blank** said let's drive out to Save-A-Lot in Kensington and get some money. We drove up there. When we got there, **Blank** gave me a gun. I think it was a .22, a nickel plated .22. **Blank** got it out of the trunk and **Blank** had another gun in the trunk that **Blank** took out. It was silver with black handles and it was either a .45 or .38 automatic. It was big and it had a clip. **Blank** told me that **Blank** was going to walk over to the safe and for me to go over to the register.

We went in and I walked over to the register and **Blank** walked over to the safe. The safe was right by the door. I walked over to the register and pulled out my gun and told the girl at the register to just stand there and don't move. She stood there and I held the gun on her. I looked over to where **Blank** was and I saw **Blank** making the lady open the safe. Then I told the girl to open up the register. Then I told her to step back and I started taking the money out of the register.

While I was taking the money out of the register I heard the shutters closing outside the store. Then me and **Blank** ran over to where they were closing the shutters and then we was trying to lift up the shutters.

QUESTION: When you and **Blank** got over to where the shutters were closed, what did you see?

ANSWER: I saw about six or seven feet, the people were trying to close the shutters. I guess they saw what we were doing.

---

[90] <u>See</u> N.T. 10/6/94, 82 (Officer Quick Testimony).

QUESTION: Then what happened?

ANSWER: We got the shutters up and we started running. We got to where the Rite-Aid was. I started hearing some shooting.

QUESTION: Who was firing the shots?

ANSWER: I don't know. The shots were coming from toward the Save-A-Lot.

QUESTION: How many shots did you hear?

ANSWER: It was either two or three.

QUESTION: What did you do then?

ANSWER: I looked back and saw the shots coming from the Save-A-Lot and I kept running, but I ducked down. I kept running and jumped down the steps. **Blank** was running a little bit behind me.

QUESTION: Did you see **Blank** firing any shots?

ANSWER: I didn't see **Blank** fire any shots but I heard more shots and they was coming from behind me and **Blank** was running behind me.

QUESTION: Did you fire any shots?

ANSWER: The gun I had wasn't even working. The hammer was broke.

QUESTION: How many times before had you seen the gun that you had to know that the hammer was broken?

ANSWER: I hadn't seen it before, but when **Blank** gave it to me, **Blank** asked me if I wanted to take the real gun or the broken gun.

QUESTION: So how did you know which one to - - gun to take?

ANSWER: The one I had you could see that part where the hammer was broke.

QUESTION: Where did you go after the robbery?

ANSWER: We went to Broad and Lehigh, then I got on the sub and went home. I went in the house and stayed there until the news came on. And I saw the broadcast about the robbery at the Save-A-Lot and they were saying that a guard had got shot. After I saw the news, I called **Blank** and I said to **Blank**, you know we fucked up. **Blank** said I know and **Blank** said that **Blank** would call me back. **Blank** call me back two days later and I asked **Blank** if **Blank** had seen anything else about the robbery on the news, because I read about it in the newspaper. **Blank** said that **Blank** didn't hear anything about – else about it.

QUESTION: When you were - - when you went in the store, did you see the guard that was shot during the robbery?

ANSWER: Yes, I saw him.

QUESTION: Did you see whether or not the guard was armed?

ANSWER: I knew he was unarmed before we got there.

QUESTION: Did you know that the guard was unarmed prior to going to the store?

ANSWER: Because **Blank** had went up there a couple of days before that, about two days before the robbery. **Blank** told me that the guard was unarmed and said that **Blank** was going to rob the Save-A-Lot and that **Blank** wanted me to go with him, **Blank**, but I didn't want anybody to get hurt. That's why I didn't take the real gun because I knew the guard was unarmed.[91]

QUESTION: Did you go - - you go to Save-A-Lot the night of the robbery and check it out before you and **Blank** actually robbed the store?

ANSWER: Yeah. About five or ten minutes before the robbery, we went in and I asked one of the people that worked in the store for a job application and I bought a bag of potato chips. But I left them on the counter when we ran out of the store.

QUESTION: What is **Blank**'s real name and where does **Blank** live?

---

[91] This contradicts Phongsak's testimony which said that both robbers came to the store the Thursday before the robbery. See N.T. 9/30/94, 68-71 (Phongsak Testimony).

ANSWER: **Blank**'s name is either **Blank** or **Blank**.[92]

QUESTION: Have you ever seen **Blank** with either of the guns that were used in the robbery before?

ANSWER: Yeah, the one that had the broken hammer, **Blank** had bought it off this piper about three or four months after - - before the robbery. **Blank** told me **Blank** bought it from a smoker up Logan.

QUESTION: How much money did you get in the robbery?

ANSWER: I got 300 some dollars from the girl at the counter.

QUESTION: Do you know how much **Blank** got from the robbery?

ANSWER: **Blank** got three hundred and some dollars too.

QUESTION: Have you seen that gun since the robbery?

ANSWER: No.

QUESTION: Did **Blank** tell you what **Blank** did with either of the guns used in the robbery?

ANSWER: No. I never asked.

QUESTION: What were you wearing the night of the robbery?

ANSWER: I don't remember what I was wearing.

QUESTION: Do you remember what **Blank** was wearing the night of the robbery?

---

[92] I will note though that the petitioner contends that his real name is Anthony Williams, not Anthony Washington. This was not mentioned at trial. Other parts of the record support his contention that he uses the last name "Williams"—his maternal grandmother's name—as opposed to "Washington" his stepfather's name. See Doc. No. 31, Ex. 8 (Court History), Doc. No. 31-16, Ex. K (Presentence Report); Doc. No. 31-17, Ex. L (Presentence Report); Doc. No. 31-18, Ex. 11 at 5 (Teagle statement to police); N.T. 10/6/94, 42-45 (Officer Permint Testimony). This part of the statement may have prevented defense counsel from further crossing the arresting officer on the petitioner's initial denial of being Anthony Washington when he was first arrested. See N.T. 10/6/94, 52-55 (Officer Permint Testimony)("Q" Initially Anthony Washington denied being Anthony Washington? A: That's correct."). For counsel to do so could have implicated his client via this statement. The Pennsylvania Supreme Court denied his motion to amend the caption to include the name Anthony Williams. See Petition for Writ of Habeas Corpus, Doc. No. 9 at 1 n.1.

ANSWER: I don't remember what **Blank** had on, but I think we both might have had on baseball caps. I think the one I had on was either black or brown. I don't remember what color **Blank**'s cap was.

QUESTION: Who did you tell about what happened at the Save-A-Lot?

ANSWER: I just told my girlfriend, no one else.

QUESTION: Do you know where **Blank** got the gun that is used in the robbery?

ANSWER: No.

QUESTION: Is there anything else that you remember about the robbery and murder that may aid us in this investigation?

ANSWER: I told you everything that I know.

N.T. 10/6/94, 74-80 (Officer Quick of Teagle Statement Testimony).[93]

The trial judge instructed the jury to use the statement only against Teagle.[94] The petitioner's trial counsel had made a motion to sever his trial from Teagle's, in light of the use of Teagle's statement. This motion was denied.[95]

---

[93] At the beginning of the interview, Teagle indicated he had been read his rights but waived them, had no difficulties in communicating, and was not under the influence of drugs or alcohol. N.T. 10/6/94, 743-74 (during Officer Quick Testimony). He also indicated at the end of the statement that the police had not forced him to give the statement. Id. at 80. I included the text of the entire statement in order to more accurately present the context of the repeated redactions.

[94] Specifically, Judge Poserina stated:
> Members of the Jury Panel, what you are now going to hear is this detective read a statement given by Mr. Teagle. The law of Pennsylvania and in fact the law of the United States is very clear that a person says something against his own interest, that's admissible and as evidence against him, but it's not admissible against anybody else because it's not evidence against the other person who is not subject to cross examination, or under oath, okay? Which means this. Is that when the detective reads the statement, he will be referring to Blank, Blank, Blank. That's not what the Defendant Teagle said. He didn't say Blank. He said something that's not admissible in this trial. Therefore when you hear it, it's called a redacted statement. That's admissible only against the person who gave it.

N.T. 10/6/94, 64-65 (during Officer Quick Testimony).

The judge gave this instruction after a sidebar with counsel and before the statement was read. Id. at 62-64. Both the petitioner's and Teagle's counsel asked for the instruction. Id.

25

### 3. The Pennsylvania Supreme Court's View of the <u>Bruton</u> Issue

In 1997, on direct appeal, the Pennsylvania Supreme Court held that no <u>Bruton</u> violation occurred. 700 A.2d 400, 406-07 (Pa. 1997). The court explained that, as a blanket rule, "no <u>Bruton</u> violation occurs if the co-defendant's statement is redacted to remove any specific references to the defendant and if a proper limiting instruction is given," citing <u>Richardson</u> as its support. 700 A.2d at 406. Because the statement was redacted and a limiting instruction was given, the court found no violation of <u>Bruton</u>. 700 A.2d 406-07. The court went on to find that "even assuming a violation did occur, the error was harmless in light of the properly admitted evidence clearly establishing [petitioner's] guilt." <u>Id.</u> at 407.

In 1998, after the Pennsylvania Supreme Court denied Washington's appeal, the United States Supreme Court decided <u>Gray</u>. On appeal in his PCRA case, the petitioner again argued that the use of the redacted Teagle statement at his trial violated <u>Gray</u>. The Pennsylvania Supreme Court found that <u>Gray</u> did not change that outcome because the court had already explained that any <u>Bruton</u> error would be harmless. <u>Commonwealth v. Washington</u>, 592 Pa. 698, 737 (2007).[96] The Pennsylvania Supreme Court cited to its

---

[95] <u>See</u> N.T. 9/21/94, 14; N.T. 9/29/94, 3-5 (the court ruled that "all identification references" such as "any objective criteria by which the person can be identified" should be deleted but allowed references that a second robber was involved).

[96] The court explained in a footnote that <u>Richardson</u> held that "no <u>Bruton</u> violation occurs where the statement is redacted to remove any specific references to the defendant and a proper limiting instruction is given." <u>Commonwealth v. Washington</u>, 592 Pa. 698, 716 n. 9 (2007). This was the same language it had used to describe <u>Richardson</u>'s holding prior to <u>Gray</u>. <u>Commonwealth v. Washington</u>, 700 A.2d 400, 406 (Pa. 1997).

original "harmless error analysis" and found the Bruton claim to have been "previously

litigated" under the state PCRA.[97] Id.

### 4. What AEDPA Requires for Habeas Relief

Claim 2 was presented on direct appeal and raised again during the PCRA

proceedings. It was analyzed by the state court on the merits and is, therefore,

exhausted.[98]

---

[97] While the State Supreme Court appeared to rely on both federal law in terms of its harmless error analysis and its state procedural rule 42 Pa.C.S. § 9544(a)(2) in dismissing the Bruton claim during the PCRA appeal, it ruled on the Gray argument on the merits—making the petitioner's claim under Gray exhausted. Alternatively, the state court's PCRA would not be a procedural bar because it was not an "independent" rule that would bar review of that decision. See Michigan v. Long, 463 U.S. 1032, 1043 (1983); Harris v. Reed, 489 U.S. 255, 262 (1989)("The adequate and independent state ground doctrine, and the problem of ambiguity resolved by Long, is of concern not only in cases on direct review pursuant to 28 U.S.C. § 1257, but also in federal habeas corpus proceedings pursuant to 28 U.S.C. § 2254); Coleman v. Thompson, 501 U.S. 722, 735 (1991)("In habeas, if the decision of the last state court to which the petitioner presented his federal claims fairly appeared to rest primarily on resolution of those claims, or to be interwoven with those claims, and did not clearly and expressly rely on an independent and adequate state ground, a federal court may address the petition."); Evan v. Chavis, 546 U.S. 189, 206 (2006)(citing Harris v. Reed, 489 U.S. 255, 261-262 (1989))(in the context of habeas petitions, "[t]he mere fact that a federal petitioner failed to abide by a state procedural rule does not prevent a federal court from resolving a federal claim unless the state court actually relied on the state procedural bar 'as an independent basis for its disposition of the case.'").

In any event, it would be appropriate for this court to review this claim because it is either exhausted with a ruling on the merits or is not procedurally barred because the court based its ruling on both state and federal law. See also Cone v. Bell, 556 U.S. 449, 466 (2009)("When a state court declines to review the merits of a petitioner's claim on the ground that it has done so already, it creates no bar to federal habeas review."); Boyd v. Waymart, 579 F.3d 330, 369 (3d Cir. 2009)("Thus, when a PCRA court refuses to reach the merits of an issue because it was 'previously litigated,' it confirms that a Pennsylvania appellate court already rendered a decision on the merits."). A district court is not required to review the state court's harmless error analysis under § 2254(d) but instead must do so under Brecht, as explained below.

[98] See Commonwealth v. Washington, 700 A.2d 400, 406-07 (Pa. 1997)(direct appeal decision reviewing Bruton claim), and Commonwealth v. Washington, 592 Pa. 698, 608-09 (2007)(PCRA appeal decision reviewing Bruton claim in light of Gray).

Before a state prisoner may obtain federal habeas review of his conviction, he must first exhaust the remedies available to him in state courts. O'Sullivan v. Boerckel, 119 S. Ct. 1728, 1731 (1999); 28 U.S.C. § 2254(b)(1)(A). The exhaustion rule requires a petitioner to "fairly present" his claims to the state courts in order to give the state courts a meaningful opportunity to pass upon and correct alleged violations of the petitioner's federal constitutional rights. Duncan v. Henry, 513 U.S. 364, 365 (1995)(citing Picard v. Connor, 404 U.S. 270, 275 (1971)). To "fairly present" a claim, a prisoner must "use the State's established appellate procedures before he presents his claims to a federal court," O'Sullivan, 119 S.Ct. at 1733, and "must present a federal claim's factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being assessed." McCandless v. Vaughn, 172 F.3d 255, 261 (3d Cir. 1999).

Under AEDPA, federal habeas relief on these claims would only be appropriate if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2).[99]

A federal habeas petitioner is entitled to relief under the "contrary to" provision only if "the state court arrives at a conclusion opposite that reached by [the U.S. Supreme] Court on a question of law or if the state court decides a case differently than [the U.S. Supreme] Court on a set of materially indistinguishable facts." Williams v. Taylor, 120 S.Ct. 1495, 1523 (2000). Under the "unreasonable application" provision, "a federal habeas court may not issue the writ simply because that court concludes in its judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Williams, 120 S.Ct. at 1522. The state court decision must be "objectively unreasonable" for relief to be appropriate. Id. Section 2254(d)(1) restricts the source of clearly established law to that of Supreme Court precedent, not precedent of a lower federal court. See Williams, 120 S.Ct. at 1523; Matteo v. Superintendent, SCI

---

When a petitioner has not presented claims to state courts, but no state remedy remains available to him to present those claims, these claims would be considered procedurally defaulted. Review of the merits of these claims is procedurally barred under AEDPA. O'Sullivan, 119 S.Ct. at 1734, 1737. See also Hull v. Kyler, 190 F.3d 88, 97 (3d Cir. 1999)("If state avenues of relief, including post-conviction proceedings, have been exhausted, but the petitioner has failed to raise the alleged grounds for error, the claim is procedurally defaulted and may not be raised in federal court."); Coleman v. Thompson, 501 U.S. 722, 732 (1991). Since the petitioner raised his Bruton claims on both direct appeal and on his PCRA appeal, the claims are not procedurally defaulted or procedurally barred.

[99] The petitioner's arguments only relate to § 2254(d)(1) so I will focus on the case law related to that section and not § 2254(d)(2).

<u>Albion</u>, 171 F.3d 877, 890 (3d Cir. 1999), <u>cert. denied</u>, 120 S.Ct. 73 (1999). The key

inquiry is whether the state court's decision is inconsistent with Supreme Court

precedent, not whether the state court decision contains any particular language or case

law. <u>See</u> <u>Woodford v. Visciotti</u>, 123 S.Ct. 357, 360 (2002); <u>Early v. Packer</u>, 123 S.Ct.

362, 365 (2002); <u>Priester v. Vaughn</u>, 382 F.3d 394 (3d Cir. 2004).[100]

   **5.    This Court's Review of the State Court Rulings Under the
          AEDPA Habeas Standard**

        **a)    <u>Gray</u> is Clearly Established Law and Applies to This Case**

Under § 2254(d)(1), our review is limited to deciding whether a state court

decision is contrary to or an unreasonable application of Supreme Court precedent "as of

the time of the relevant state-court decision." <u>Williams v. Taylor</u>, 529 U.S. 362, 412

(2000).

    The petitioner's case presents an unusual situation. <u>Gray</u>, which speaks directly to

his claim, was decided between the State Supreme Court's direct appeal decision and its

PCRA appeal decision. The direct appeal decision was rendered on August 20, 1997 and

reargument denied on September 26, 1997. <u>Gray</u> was not decided until March 9, 1998.

The petitioner applied for a petition for writ of certiorari to the Supreme Court, relying on

<u>Gray</u>. His petition was denied on June 26, 1998. <u>Washington v. Pennsylvania</u>, 118 S.Ct.

2375 (1998). Five years later, the Pennsylvania Supreme Court found that <u>Gray</u> did not

change its previous decision because the court had already explained that any <u>Bruton</u>

error was harmless. <u>Commonwealth v. Washington</u>, 592 Pa. 698, 737 (2007).

---

[100] This standard even applies if the state court rejects a claim without explanation. <u>Weeks v. Angelone</u>, 528 U.S. 225 (2000); <u>Chadwick v. Janecka</u>, 312 F.3d 597 (3d Cir. 2002).

In Greene v. Palakovich, the Third Circuit held that "'clearly established [f]ederal law' for purposes of § 2254(d)(1) should be determined as of the date of the relevant state-court decision," that is, "the last state-court adjudication on the merits" of the petitioner's Confrontation Clause claim, not necessarily when the petitioner's claim would be considered "final." 606 F.3d 85, 106 (3d Cir. 2010). The Supreme Court affirmed this decision in Greene v. Fisher, 132 S.Ct. 38, 45 (2011). In Greene, like this case, the state court had addressed the petitioner's Bruton claim regarding a redacted co-conspirator statement on the merits just prior to Gray. The petitioner in that case, however, did not seek a writ of certiorari nor filed a PCRA petition on his Bruton claim in light of Gray. Greene, 132 S.Ct. at 45. The Court found that Gray did not apply in that case because Gray had not been decided by the time the state court had ruled on the petitioner's claim on direct appeal. Greene, 132 S.Ct. at 42-43.[101] Because the petitioner did not seek a writ of certiorari nor pursue his PCRA rights, this was the last state court adjudication on the merits. Id. at 45.

This petitioner's case is distinct from Greene because this petitioner *did* pursue his PCRA remedies in light of Gray. The Pennsylvania State Supreme Court *did* consider Gray on the petitioner's PCRA appeal, making that his last state-court adjudication on the merits. However, the court found that if there was error, it was harmless.[102] Though the

---

[101] The Pennsylvania Superior Court was the last court to rule on the issue because the Pennsylvania Supreme Court dismissed the appeal after granting it, as being improvidently granted. Greene, 132 S.Ct. at 43. Gray was decided between the time when the Superior Court had ruled on the appeal and Greene's appeal from the Superior Court was still pending in front of the Pennsylvania Supreme Court. Id.

[102] The Third Circuit's dicta regarding this petitioner's case in Greene supports my finding that Gray applies. In a footnote, the Third Circuit explained:

court is not explicit, it appears to find a violation of Gray but renders the error harmless nonetheless.[103] Commonwealth v. Washington, 592 Pa. 698, 737 (2007). The Pennsylvania Supreme Court considered Gray in its analysis of Washington's Bruton claim. Gray would be considered clearly established law at the time of the Pennsylvania Supreme Court's decision in Washington's PCRA appeal. See Greene, 132 S.Ct. at 44 ("[Section] 2254(d)(1) requires federal courts to 'focus on what a state court knew and did'...." (quotation marks and alteration omitted)). In fact, the Commonwealth concedes that Gray was applied by the Pennsylvania Supreme Court and, therefore, applies to this court's habeas review.[104]

---

The dissent's reliance on Commonwealth v. Washington, 592 Pa. 698, 927 A.2d 586 (2007), is similarly misplaced. There, the petitioner argued that Gray, which had been decided after his direct appeal to the Pennsylvania Supreme Court but before that court's decision became final, entitled him to relief under the PCRA. Id. at 608–09. The Pennsylvania Supreme Court found that the petitioner's Confrontation Clause claim had been previously litigated on the merits, but its conclusion was not based on the fact that it had already considered the petitioner's Bruton claim. Id. at 609. On direct review, the Court assumed arguendo that the petitioner's right to confrontation had been violated by the use of the word "blank" in a redacted statement and then held that the error was harmless and did not prejudice him. Id. In other words, it assumed that the rule later set forth in Gray existed and held that, despite the violation of that rule, the petitioner could not receive relief. In its PCRA review, the Court took note of Gray, which supported the proposition of law it had already assumed on direct appeal, and concluded that it had already considered the substance of that claim on direct review. Id. As such, Washington does not support the dissent's view that Gray and Bruton raise the same issue for purposes of PCRA review.
Greene v. Palakovich, 606 F.3d 85, 104 n. 12 (3d Cir. 2010).

[103] The Commonwealth cites back to its initial harmless error analysis in its direct appeal decision to support this claim. It does not discuss this area further, relying on the fact that the claim was "previously litigated" under the state PCRA. Even if this claim was previously litigated, my review would not be barred since the claim was brought and exhausted.

[104] Commonwealth's Response to Petitioner's Supplemental Authority and Argument, Doc. No. 128 at 2 ("Indeed, respondents have conceded that Gray, decided before petitioner's conviction became final, applies to his case, and that the redaction of co-defendant Teagle's statement substituting 'blank' for petitioner's name violated Gray."). In its original response to the habeas petition, the Commonwealth did not outright concede this point. However, it offered no legal argument to rebut the contention that the statement violated Gray. Instead, its argument focused on the harmlessness of the error in light of the "overwhelming direct evidence of petitioner's guilt" presented at trial. Commonwealth's Response to Habeas Petition, Doc. No. 32 at 82.

## b)　The Pennsylvania Supreme Court's Decision was Contrary to or an Unreasonable Application of <u>Gray</u>

The Commonwealth admits that Teagle's redacted statement violated <u>Bruton</u> under <u>Gray</u>. Commonwealth's Response to Petitioner's Supplemental Authority and Argument, Doc. No. 128 at 2 ("Indeed, respondents have conceded that <u>Gray</u>, decided before petitioner's conviction became final, applies to his case, and that the redaction of co-defendant Teagle's statement substituting "blank" for petitioner's name violated <u>Gray</u>."). The Commonwealth argues though that "any error in the admission of Teagle's redacted statement was harmless."[105]

It is clear that the use of Teagle's redacted statement, which replaced the petitioner's name with "blank," at a joint trial violated the petitioner's Confrontation Clause rights under <u>Bruton</u> and <u>Gray</u>.[106] The question then becomes whether this error was harmless as the Pennsylvania Supreme Court found.

---

[105] Commonwealth's Response to Habeas Petition, Doc. No. 32 at 79.

[106] Dicta in <u>Greene</u> regarding this case implies that the Third Circuit would agree that <u>Gray</u> applies. However, I would still find <u>Bruton</u> was violated even if <u>Gray</u> did not apply. On direct appeal, the Pennsylvania Supreme Court found that the petitioner's rights were not violated because the statement did not contain any *specific* references to the defendant and because a proper limiting instruction was given. This is an unreasonable application of <u>Richardson</u>, which was clearly established at the time of the direct appeal. Statements that passed muster under <u>Richardson</u> are ones in which "not only the defendant's name, but any reference to his or her existence" were redacted, when a proper limiting instruction was also given. <u>Richardson</u>, 481 U.S. at 211. See <u>Eley v. Erickson</u>, 712 F.3d 837, 859 (3d Cir. 2013) ("<u>Richardson</u>'s holding is explicitly limited to a confession that is redacted *to eliminate ''not only the defendant's name, but any reference to his ... existence.*" (quoting <u>Richardson</u>, 481 U.S. at 211 (emphasis added))). <u>Richardson</u> specifically noted in its holding that confessions " in which the defendant's name has been replaced with a symbol or neutral pronoun" did not necessarily fall within the purview of <u>Richardson</u>. <u>Id.</u> at 211 n. 5. Furthermore, the adoption of such a bright-line rule is an unreasonable application of clearly established federal law under <u>Bruton</u> and its progeny. See <u>Eley</u>, 712 F.3d at 861 (discussing how the Pennsylvania Supreme Court's "bright-line rule that when terms like 'my boy,' the 'other guy,' or the 'other man' are used to substitute for an actual name…there cannot be a <u>Bruton</u> violation," from <u>Commonwealth v. Travers</u>, 768 A.2d 845 (Pa. 2001), was an unreasonable application of clearly established federal law under <u>Bruton</u>).

Teagle's statement expressly implicated one other person and only one other person was on trial with him. See <u>Eley</u>, 712 F.3d at 860-61. This statement was also contained at least *fifty-one* references to the petitioner as "blank" and included questions and answers specifically about "blank." Some of the information in the statement—i.e. the

### c)      Was This Really Harmless Error?[107]

For the harmless error analysis of the AEDPA, district courts must determine if the error had a "substantial and injurious effect" on the outcome of the trial. <u>Fry v. Pliler</u>, 551 U.S. 112, 121-22 (2007).[108] This standard was set forth in <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993).[109] District courts were instructed to use the <u>Brecht</u> standard "whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in <u>Chapman</u>."[110] <u>Fry</u>, 551 U.S. at 121-22. Under the <u>Brecht</u> standard, "an error is harmless unless it 'had substantial and injurious effect or influence in determining the jury's

---

information which was material to who was the shooter—was not corroborated by other evidence presented at trial. This is exactly the sort of "facially incriminating" statement that <u>Bruton</u> warned against and <u>Richardson</u> clarified would violate a defendant's Confrontation Clause rights. For these reasons, I would still find constitutional error and would move on to determine if the error was harmless.

[107] The Commonwealth would like me to interpret the denial of the petitioner's writ of certiorari as the Supreme Court's determination that his <u>Bruton</u> error was not harmless. I cannot agree that this denial of the writ was the Supreme Court's determination that that error was harmless because the petitioner had not exhausted his PCRA rights. The Court noted that both the writ of certiorari and PCRA proceedings were ways it considered errors to be rectified in light of <u>Gray</u>. <u>See</u> <u>Greene v. Fisher</u>, 132 S.Ct. at 45. Under that rationale, the Court may have declined to grant the writ in order to give the state court the opportunity to address the error during the PCRA proceedings.

[108] Until recently, the "harmless error" standard under the AEDPA was unclear. Some courts had been using the "substantial and injurious effect" standard found in <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993), while others had been using also the "harmless beyond a reasonable doubt" standard found in <u>Chapman v. California</u>, 386 U.S. 18, 87 (1967), after the passage of AEDPA. The Supreme Court settled this issue in <u>Fry v. Pliler</u>, 551 U.S. 112 (2007). <u>Fry</u> held that federal habeas courts need apply only <u>Brecht</u>, because the <u>Brecht</u> test "obviously subsumes" the <u>Chapman</u>/§ 2254(d) analysis. <u>Fry</u>, 551 U.S. at 119-20.

[109] In <u>Brecht</u>, the Supreme Court held that the "substantial and injurious effect" standard taken from <u>Kotteakos v. United States</u>, 328 U.S. 750, 776 (1946), was more appropriate on habeas review than <u>Chapman</u>'s "harmless beyond a reasonable doubt" standard. <u>Brecht</u>, 507 U.S. at 622-23. Courts began applying both <u>Brecht</u> and <u>Chapman</u> after the enactment of AEDPA. <u>Fry</u>, however, clarified that this was duplicative and unnecessary. <u>Fry</u>, 551 U.S. at 120. Only <u>Brecht</u> need be used. <u>Id.</u> at 121-20. For this reason as well, a court is not required to "separately 'review the state court's harmless error analysis under the AEDPA standard.'" <u>Bond v. Beard</u>, 539 F.3d 256, 275–76 (3d Cir. 2008) (citing <u>Fry</u>, 551 U.S. at 121).

[110] <u>Brecht</u> had already established that the "substantial and injurious effect" standard would apply in all § 2254 cases, regardless of what standard the state court used. <u>Fry</u> reaffirmed this point post-AEDPA. <u>See</u> <u>Fry</u>, 551 U.S. at 117 ("The opinion in <u>Brecht</u> clearly assumed that the <u>Kotteakos</u> standard would apply in virtually all § 2254 cases.").

verdict.'" <u>Brecht</u>, 507 U.S. at 623 (quoting <u>Kotteakos v. United States</u>, 328 U.S. 750, 776 (1946))(quotation marks omitted).

The <u>Brecht</u> standard allows courts to do a plenary review of the petitioner's constitutional claims. Habeas relief based on trial error is not warranted unless a petitioner can establish that the error resulted in "actual prejudice." <u>Brecht</u>, 507 U.S. at 637-38. <u>See</u> <u>Sanders v. Klem</u>, 341 Fed. Appx. 839, 843 (3d Cir. Aug. 6, 2009)("Under the <u>Brecht</u> standard, 'habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in actual prejudice.'")(quoting <u>Bond v. Beard</u>, 539 F.3d 256, 276 (3d Cir. 2008)(citation and quotation marks omitted)).

A court must determine whether, in light of the error, the State met its burden of proving the defendant guilty of the charged crime beyond a reasonable doubt. <u>Brecht</u>, 507 U.S. at 638.[111] <u>See also</u> <u>Fogg v. Phelps</u>, 414 Fed.Appx. 420, 425 (3d Cir. Jan. 6, 2011)("Critically, when constitutional error precipitates the admission of evidence without which the State would be unable to maintain the 'necessary minimum evidence legally sufficient to sustain [a] conviction,' such prejudice is 'necessarily ... substantial.'" (quoting <u>Kotteakos v. United States</u>, 328 U.S. 750, 763–64 & n. 18 (1946)); <u>Ditch v. Grace</u>, 479 F.3d 249, 256 (3d Cir. 2007)("In making the harmless error determination,

---

[111] After the Court in <u>Brecht</u> determined that <u>Kotteakos</u> was the appropriate standard, the Court went on to look at the merits of the claim. In doing so, the Court considered the principal question then to be "whether the State met its burden in proving beyond a reasonable doubt" that all of the elements of the crime charged were met. <u>See</u> <u>Brecht</u>, 507 U.S. at 638. <u>See also</u> <u>Schneble v. Florida</u>, 405 U.S. 427, 432 (1972)("A <u>Bruton</u> violation will not result in reversal where independent, 'properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the co-defendant's admission so insignificant by comparison, that it is clear beyond a reasonable doubt that the improper use of the admission was harmless error.'"); <u>Brown v. United States</u>, 411 U.S. 223 (1973)(rejecting notion that <u>Bruton</u> error can never be harmless).

34

'the crucial inquiry is the impact of the error on the minds of the jurors in the total setting.'" (citing Hassine v. Zimmerman, 160 F.3d 941, 955 (3d Cir. 1998)). Serious doubts about whether an error influenced a jury's decision are resolved in favor of the petitioner. "When a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict, that error is not harmless." Bond v. Beard, 539 F.3d 256, 276 (3d Cir. 2008)(quoting O'Neal v. McAninch, 513 U.S. 432, 436 (1995))(quotation marks omitted).

The Commonwealth claims that any Bruton error was harmless because there was "overwhelming direct evidence of petitioner's guilt" presented at trial.[112] After reviewing the petitioner's claim *de novo*, I cannot agree that the other evidence presented at the joint trial was so indicative of the petitioner's guilt as the shooter to render the admission of Teagle's redacted statement at the joint trial harmless.

There was evidence presented at trial that would support a finding that Washington was the shooter. Officer Smith positively identified the petitioner as the shooter in a photo array on March 10, 1993, at a court-ordered lineup on November 10, 1993, at the preliminary hearing on December 2, 1993, and at trial.[113] Martha and Melissa Harrington testified that the petitioner confessed the murder and robbery to them.[114]

---

[112] Commonwealth's Response to Habeas Petition, Doc. No. 32 at 82.

[113] N.T. 10/3/94, 63, 91-93 (Smith Testimony); N.T. 10/6/94, 23-25 (Officer Wynn Testimony). See N.T. 10/6/94, 3-38 (Officer Wynn Testimony). N.T. 10/3/94, 69, 93-95 (Smith Testimony)(trial ID); N.T. 12/2/93, 13 (Smith Preliminary Hearing Testimony) (preliminary hearing ID). N.T. 10/3/94, 84, 89-91 (Smith Testimony).

[114] N.T. 10/4/94, 7-13, 19 (Martha Harrington Testimony);  N.T. 10/4/94, 36-37, 56-57 (Melissa Harrington Testimony).

David Cooper, who observed the two robbers fleeing from the Save-A-Lot, testified that the taller of the two robbers had a silver gun.[115] The petitioner would be the taller of two defendants, which would corroborate Teagle's statement.

There was also evidence supporting a finding that the petitioner was involved in the robbery. The petitioner's brother Elijah testified that the petitioner told him he couldn't drive Teagle home the night of the robbery because the police might be after his brother and Teagle.[116] Martha Harrington testified that the petitioner owned a three-

---

[115] N.T. 9/30/94, 111-14, 119, 133, 135, 139-40 (Cooper Testimony). The only description of the robbers that Cooper could give was that they were black males and that one was taller than the other and one was shorter than the other. N.T. 9/30/94, 112-13 (Cooper Testimony).

[116] N.T. 10/5/94, 30-34, 42-43, 89-90 (Elijah Washington testimony). The testimony surrounding what was said by Elijah was a bit convoluted. At one point, Elijah testified that the petitioner told him the police might be looking for "them," which would seem to be him and Teagle. However, the prosecutor then began focusing on the fact that the police were looking for "him." Who "him" referred to, however—either the petitioner or Teagle—is not always clear in the testimony.   The testimony reads as follows:

> Q. Mr. Washington, when you went into your brother's house, did you ask your brother what was happening?
> A. I asked him what he beeped me for, yeah.
> Q. What did he tell you?
> A. He told me to take Derrick home.
> Q. Did he tell you why he wanted you to take Derrick home?
> A. Not at that time, no. He told me that the cops might be looking for *them* and I asked him why.
> Q. He told you the cops might be looking for *him*?
> A. Yes.
> Q. And you asked him why and what did he say?
> A. He didn't say anything after that.

Id. at 42-43. Later in the testimony the same point was reiterated:

> Q. All right. And Anthony asked  to you give [sic] Derrick a ride home; is that correct?
> A. Yes.
> Q. And he told you why he couldn't give him a ride home?
> A. He didn't want him to take him anywhere.
> Q. I – do you recall testifying on direct that the cops might be looking for *him*?
> A. Yes.
> Q. Did he say that to you?
> A. Yes.

Id. at 87-88. Elijah went on to testify that Teagle told him in the car that "they had got in a little trouble with something that they did something, but he didn't tell me exactly what." Id. at 89-90. Elijah then went back to the

quarter length green leather jacket.[117] One of the robbers was described as wearing this type of jacket.[118] Juana Robles identified the petitioner as being one of the robbers and testified he was the robber with the gun.[119]

However, there was also substantial evidence presented to undercut a finding that the petitioner was the shooter. The defense offered evidence that Smith only saw the shooter from a distance for a few seconds while he was running through a lot of parked cars.[120] The defense attorney also questioned Smith about the fact that he too fired a shot

---

petitioner's home and asked his brother what happened. He testified that his brother "didn't tell me anything." Id. at 90. Neither defense attorney cross-examined Elijah. Id. at 95. Ultimately, it appears that Elijah implicated both his brother and Teagle in the robbery through his testimony, though he did not speak to which was the shooter.

Elijah had given a statement to police which indicated that Teagle was the shooter; however, the statement was only signed on the first page. Elijah testified that what was in the statement was not necessarily what he told police. See Commonwealth's Response to Habeas Petition, Doc. No. 31, Ex. 15; N.T. 10/5/94, 38-42 (Elijah Washington Testimony).

The Pennsylvania Supreme Court decision on appeal and on appeal of the petitioner's PCRA conviction stated that Elijah testified that "the police might be looking for [the petitioner] and Teagle." 592 Pa. 698, 709-10 (2007). The court considered this evidence in its Bruton harmless error analysis.

[117] N.T. 10/4/94, 19 (Martha Harrington Testimony).

[118] N.T. 9/30/94, 43 (Rodriguez Testimony); N.T. 9/30/94, 83 (Phongsak Testimony). See also Commonwealth v. Washington, 700 A.2d 400, 405 (Pa. 1997).

[119] N.T. 9/29/94, 108-114 (Robles Testimony). There was also evidence presented that the petitioner claimed he was not Anthony Washington when police came to arrest him. However, once the police showed him a picture of the person they were seeking, he conceded it was he. N.T. 10/6/94, 52-55 (Officer Permint Testimony). While the state court considered this to be evidence of guilt, it does little to help the analysis of whether the petitioner was the shooter and not just simply one of the robbers. For this reason, it is less important to this claim as it relates to the petitioner's first-degree murder conviction. As I've noted previously, use of Teagle's statement itself also may have prevented the petitioner from offering counter evidence to this point. Teagle indicated in his statement that his co-conspirator went by two different names.

[120] Judge Ronald Merriweather's comments at the preliminary hearing on this point were telling. In ordering Officer Smith to attend a line-up, he said:

> But the officer was unprepared for this. But right away he goes into his policeman's mentality. He sees a robbery existing….He responds, and engages in a gun battle. He is not looking at anybody's face. He is ducking the bullets that are shooting at him, boom, boom, boom. The guy gets away.

during the altercation, though other evidence showed his gun did not fire the fatal shot. This evidence may have impeached his identification testimony. The defense attorney also cross-examined the Harrington sisters on their potential bias against the petitioner.[121] Melissa was the petitioner's former girlfriend and their relationship had ended on bitter terms.[122] She also admitted to having a history of addiction and mental health illness that may have served as impeachment evidence.[123]

Apart from Teagle's statement, the evidence placing Washington at the scene was ambivalent. None of the witnesses in the store could positively identify the petitioner as one of the robbers in a line-up.[124] Cross-examination of Elijah showed that the

---

Do you want to tell me now that is a valid identification? That is two days later, and he is now where, Northwest Detectives, or South Central, and he is looking at these mug shots, and he says, "There he is."

Mr. Gilson, I used to be an agent. Let me tell you something: You are not looking when you are ducking heads. You are not looking at I.D.'s. You are ducking, you are covering, you are firing slugs. You are ducking bullets, you are shooting. I am assuming that is what happened, boom, boom, boom. You are not looking at no I.D.'s. You are trying to duck bullets, and hope one of the bullets won't hit you.

The guy is not standing still for you to look in his face. So two days later you are standing in some District or at the PAB, and you are looking and you say, "Yeah, that looks like the guy."

No, I will order a lineup. If you want me to make an independent ruling, I will order a lineup, unless you can come up with something better. When they started shooting bullets at each other, I don't think his mind was focused on identifying the guy.

N.T. 9/2/93, 25-26 (Preliminary Hearing).

[121] N.T. 10/4/94, 25-30 (Martha Harrington Testimony); N.T. 10/4/94, 42-56, 58-59 (Melissa Harrington Testimony).

[122] N.T. 10/4/94, 42-48 (Melissa Harrington Testimony).

[123] N.T. 10/4/94, 42, 48-56 (Melissa Harrington Testimony).

[124] Buchanan, Rodriguez, Phongsak, and Robles also attended the lineup. N.T. 9/29/94, 112-27 (Robles Testimony); N.T. 9/30/94, 16 (Buchanan Testimony); N.T. 9/30/94, 44-45, 53-59 (Rodriguez Testimony)(about misidentifying the assailants at both the petitioner's and Teagle's lineup); N.T. 9/30/94, 102-04 (Phongsak Testimony); N.T. 10/6/94, 4-5, 18, 16-23 (Officer Wynn Testimony). See N.T. 10/6/94, 3-38 (Officer Wynn Testimony)(explaining the line-up procedure).

petitioner's statement about who exactly the police were after was ambiguous.[125] The "him" could have meant Teagle or the petitioner in context, and Elijah testified that his brother would not clarify this statement when asked about it.[126]

On the other hand, there was substantial evidence showing Teagle was involved in the robbery and that Teagle had a gun. Suphea Phongsak positively identified Teagle and said he had a gun.[127] His fingerprint was found on a potato chip bag, which one of the suspects had left on the cashier's counter.[128] Rodriguez's description of the person who left that bag on the counter matched Teagle.[129] Rodriguez also testified that a man fitting Teagle's description was the only one she saw with a gun.[130] None of the other witnesses saw the second robber with a gun.[131] It was clear that Teagle was at the scene of the robbery.

---

[125] See N.T. 10/5/94, 30-34, 38-42, 42-43, 89-90 (Elijah Washington testimony).

[126] See id.

[127] N.T. 9/30/94, 78-81 (Phongsak Testimony). She also identified Teagle in court and the description she gave to police of the man who pointed the gun at her matched that of Teagle. N.T. 9/30/94, 79, 81-83 (Phongsak Testimony). See N.T. 10/6/94, 3-38 (Officer Wynn Testimony).

Phongsak had described the first robber as being a "[y]oung black male, in his 20s, dark skinned, slim, about five six, five seven" and that "[h]e wore a leather brown jacket, three [fourth] quarters length." N.T. 9/30/94, 81-82 (Phongsak Testimony). She described the gun as being "silver and automatic." N.T. 9/30/94, 82 (Phongsak Testimony).

[128] N.T. 10/5/94, 19, 10, 13-19 (Forrest Gorodetzer Testimony). See N.T. 10/4/94, 67-69 (Officer McIver Testimony); N.T. 10/4/94, 73-77, 94-106 (Jeffrey Parker Testimony).

[129] N.T. 9/30/94, 29, 40-43, 49, 62-64 (Rodriguez Testimony). See also N.T. 9/30/94, 77-78, 94-95 (Phongsak Testimony).

[130] See id.

[131] While Robles identified the petitioner as being the robber with the gun, it was not clear whether the person she saw was the robber near the cash register or the robber near the safe. See N.T. 9/29/94, 107-111 (Robles Testimony). She was not a part of the initial events related to the robbery when the two robbers came in. Rodriguez, who was present during the whole robbery, confirmed that it was the robber with the gun near Phongsak who also pointed the

I have grave doubts about whether the use of the statement was "harmless." Beyond Officer Smith's positive identification of the petitioner as the shooter, there was no other direct evidence to support the petitioner's first-degree murder conviction.[132] Teagle's statement, however, not only confirms that the "blank" was there, but also that "blank" had a gun, the only working gun between them. It is a legal fiction to think that the jury could act as if the "blank" in Teagle's statement referred to anyone other than Anthony Washington. Bruton and Gray require us to find, under the circumstances, that a reasonable jury would have filled the "blank" with "Anthony Washington." The Third Circuit succinctly explains: "The juror 'need only lift his eyes to the [defendant] sitting at counsel table' to determine to whom the deletion refers." United States v. Richards, 241 F.3d 335, 341 (3d Cir. 2001) (quoting Gray, 523 U.S. at 193). This statement was read to the jury and contained at least fifty-one references to the petitioner as "blank." That

---

gun at Robles, not the second robber near the safe. See N.T. 9/30/94, 29, 34 (Rodriguez Testimony). Her testimony was also corroborated by testimony given by Suphea Phongsak and by a finding of Teagle's fingerprints on the potato chip bag, a bag which Rodriguez testified this man placed on the cashier counter. N.T. 9/30/94, 49-51, 61-64 (Rodriguez Testimony); N.T. 10/5/94, 19, 10, 13-19 (Forrest Gorodetzer Testimony). See N.T. 10/4/94, 67-69 (Officer McIver Testimony); N.T. 10/4/94, 73-77, 94-106 (Jeffrey Parker Testimony). Buchanan's testimony further corroborated that the man near Phongsak was the one with the gun. N.T. 9/30/94, 6-9 (Buchanan Testimony).

Murphy only saw one of the robbers and that robber had a gun. N.T. 10/4/94, 123 (Murphy Testimony). Office Smith only saw one robber; that robber had a gun. N.T. 10/3/94, 60, 96, 153 (Smith Testimony). David Cooper saw two men but only saw one with a gun. N.T. 9/30/94, 107-114, 119, 140 (Cooper Testimony).

[132] In fact, the prosecutor himself admitted this much during a sidebar about the use of the petitioner's mugshot during trial. In arguing for the use of the photo, he said, "As to on-the-scene evidence, eyewitness, [Smith's] the only one I have. I don't have any other evidence linking Washington as the shooter." N.T. 10/3/94, 88 (sidebar regarding objection to use of photo during Smith Testimony).

The Pennsylvania Supreme Court found that Robles had identified the petitioner as the shooter and considered this evidence to support its harmless error analysis. See Commonwealth v. Washington, 700 A.2d at 407. The record contradicts this point. While Robles also identified the petitioner in court as having a gun, she did not witness the shooting. Her identification would do little to bolster the first-degree murder conviction. David Cooper identified the taller of the two assailants as being the robber with the gun; however, he did not actually see the shooting and he failed to identify the petitioner as being the other robber (as explained below). See N.T. 9/30/94, 113-14, 133-35 (Cooper Testimony). This evidence also adds little to the analysis.

repetition alone would emphasize "blank's" role in the robbery such that no curative instruction could "cure."[133] Under these circumstances—with evidence showing that Teagle clearly was at the scene and little evidence establishing that petitioner was there with a gun—it would only make sense that the jury would infer from Teagle's redacted statement that the petitioner was the shooter.[134]

For these reasons, I find that the use of the statement at the joint trial had a "substantial and injurious effect" on the outcome. I must find that the use of Teagle's redacted statement was an error, and with this substantial and injurious effect, it most certainly was not harmless. See Eley v. Erickson, 712 F.3d 837, 861 (3d Cir. 2013)(finding that the trial court's violation of Bruton in not severing the trial was not harmless).

## B. Claim 3: Did the Prosecutor's Closing Argument Violate Bruton?

Claim 3 also asserts a violation of Bruton and the Confrontation Clause. The petitioner argues that the prosecutor's improper use of Teagle's redacted statement during his closing argument violated his constitutional rights.[135] The same legal principles of

---

[133] The mere substitution of the petitioner's name with "blank" expressly implicated the petitioner as co-defendant's accomplice. Under these circumstances, the trial court should have redacted "any reference to existence" as required by Richardson v. Marsh, 481 U.S. 200, 211 (1987). In fact, as Bruton and Gray explained, the curative instruction may have bolstered the logical inference that "blank" was the petitioner. See Bruton, 391 U.S. at 135; Gray, 523 U.S. at 192-93.

[134] I will also note that Martha Harrington also testified that the petitioner said that "Derrick" committed the robbery with him—testimony to which she appeared to be led by the prosecutor's line of questioning. N.T. 10/4/94, 13 (Martha Harrington Testimony). Teagle's defense counsel objected to this statement as being a statement made by a co-defendant after the conspiracy had ended. N.T. 10/4/94, 14-17 (Martha Harrington Testimony). The judge gave a curative statement in regards to Ms. Harrington's statement. N.T. 10/4/94, 18 (Martha Harrington Testimony). While this error in itself was harmless, it also added to the prejudice that came from the use of the redacted statement.

[135] N.T. 10/7/94, 94-96 (Commonwealth's Closing Argument).

Bruton and its progeny apply to this claim as well.[136] The Brecht harmless error standard

is also used in deciding if a prosecutor's closing remarks violated Bruton.[137]

### 1. In His Closing, the Prosecutor Referred to Teagle's Statement and Specifically to Washington

The prosecutor used Teagle's statement during his closing argument to implicate

both Teagle and the petitioner.[138] During this part of the argument, the prosecutor filled in

the "blank" in Teagle's statement, violated this redaction, and referred to Teagle's

accomplice as the petitioner twice. He stated:

> Teagle's suggested it's fair not to find him guilty of any murder, and I ask you is that fair? Is that fair? Because one of them has the gun that works, and I'm not even suggesting that Derrick's gun doesn't work . . . but I'm suggesting that **Anthony Washington is the shooter**. Is it fair then that Derrick Teagle is not responsible, some way, shape or form for what went on that night?
>
> * * *
>
> What does Derrick Teagle know that night? Even according to his own statement. He knows the gun works, he knows it's loaded. He knows it's ready to go . . . . He goes in to commit the armed robbery **with this man here**, then he's shocked that somebody got hurt . . . In his statement Derrick Teagle says when asked the question, about taking the gun, he said he took the gun because he didn't want someone to get hurt. He didn't want someone to get hurt. But read the statement, Ladies and Gentlemen. On that night his accomplice didn't give him the broken gun. He didn't give him. He said I'm taking the gun, one that works, you take the one that's broken. He gives him a choice of guns and that says something right there, doesn't it? Here is the choice, Derrick. One works, one doesn't. What does Derrick say? I'm taking the one that doesn't work. You take the one–

---

[136] See Lee v. Smeal, 447 Fed.Appx. 357, 360 (3d Cir. Oct. 6, 2011)(explaining that Bruton applies to prosecutor's remarks about co-conspirator statement); Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)(explaining how standard related to "specific right" governs prosecutorial misconduct).

[137] See Lee, 447 Fed.Appx. at 361.

[138] See N.T. 10/7/94, 61-107 (Commonwealth's Closing Argument).

N.T. 10/7/94, 94-96 (Commonwealth's Closing Argument)(emphasis added).

At that point, defense counsel objected, requested a sidebar, and moved for a

mistrial. Judge Poserina denied the motion but admonished the prosecutor. He issued the

following cautionary instruction to the jury:

> Members of the jury, I have to make something abundantly clear to you. You have
> been told before that when a person makes a statement and that statement is read
> to you that it's evidence only against that person. That means that if the District
> Attorney is making a closing argument and he refers to a statement by Mr. Teagle,
> anything in that statement or any inferences from that statement can only be used
> against Teagle. That means that if the next bit of argument talks about the other
> Defendant, you're not to infer that by any means or stretch of the imagination that
> the person who is blanked out happens to be the other one just because the way the
> arguments are being presented to you. Because you're not allowed to infer from
> the statement who Blank is.

Id. at 98.

The prosecutor continued his argument. He again ignored the redactions and made

several improper references to Washington based on Teagle's statement:

> Teagle made the statement in his closing that whoever it was who shot Tracey
> Lawson in the parking lot did it on his own. Ladies and Gentlemen, stop here for a
> minute. **If Derrick Teagle does not agree to go along with Anthony
> Washington and do this robbery, does Anthony Washington do it himself or
> does he need someone to go with him?** Use your common sense on that one. This
> doesn't happen, none of it happens, we're not here **if Derrick Teagle doesn't say,
> Anthony, I'm in.** Count me in. None of it happens. None whatsoever.
> Teagle is given a choice of guns, as I said, and that says something right there. The
> accomplice doesn't say I'm taking the one that works, you take the one that doesn't
> work, he says here's your choice, which is it going to be. One of them works. It's
> loaded, it's ready to go.

Id. at 99 (emphasis added).

Defense counsel again objected and moved for a mistrial. Id. at 99-102. The judge warned the prosecutor at sidebar that he was "on the verge of having a mistrial." Id. at 100-02. Judge Poserina denied the motion and gave a second cautionary instruction. Id. at 99-101.

### 2. The Pennsylvania Supreme Court Addressed This Issue Directly

The petitioner raised this claim on direct appeal. The Pennsylvania Supreme Court found no error in the prosecutor ignoring the redaction in his closing argument. Because "[t]he prosecutor is allowed to vigorously argue his case so long as his comments are supported by the evidence or constitute legitimate inferences arising from that evidence," the court found the petitioner's claim to be "without merit." Washington, 700 A.2d at 407. For several reasons, that was wrong. The prosecutor's argument was not supported by the evidence. In fact, the prosecutor was arguing "evidence" that had been excluded: the identity of Anthony Washington in the Teagle statement. The Pennsylvania Supreme Court mistakenly, it appears, viewed this as a prosecutorial misconduct issue, not a Bruton issue. Id. The court assumed that the prosecutor's use of the statement was not constitutional error because admission into evidence of the statement itself was constitutional under Richardson. 700 A.2d at 408. The Pennsylvania Supreme Court did not address whether the prosecutor's behavior was a violation of Washington's constitutional rights under the Confrontation Clause as interpreted by Bruton.[139]

---

[139] The state court appeared to rely on the standard set forth in Donnelly, which requires a court to look at a prosecutor's improper remarks within the context of the entire closing argument and prosecutor's conduct as a whole. Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)("[T]he claim is only that a prosecutor's remark about respondent's expectations at trial by itself so infected the trial with unfairness as to make the resulting conviction a denial of due process."). Not all claims of prosecutorial misconduct are judged by the Donnelly standard. When the prosecutor's arguments or statements tend to prejudice the exercise of "a specific right," the more exacting standard must be applied. Id. For this reason, analysis under Bruton, and not Donnelly, is more appropriate since the petitioner's Confrontation Clause right is implicated.

The state court explained that the improper remarks, viewed in the context of the closing argument as a whole along with the properly admitted evidence which independently showed the petitioner's guilt, were not so prejudicial that the jury could not render a true verdict. Id. at 408-09. The state court went on to find that the trial court's curative instructions purged any taint these arguments may have created. Id. at 409. The petitioner did not raise this claim in his PCRA appeal.

### 3.      This Claim is Exhausted for AEDPA Purposes

The petitioner would be entitled to federal habeas review of this claim if the claim is exhausted. See O'Sullivan v. Boerckel, 119 S. Ct. 1728, 1731 (1999)(addressing exhaustion requirement); 28 U.S.C. § 2254(b)(1)(A) (same); 28 U.S.C. § 2254(d)(1)-(2)(addressing merits review). This standard even applies if the state court rejects a claim without explanation or fails to cite federal law. See Weeks v. Angelone, 528 U.S. 225 (2000); Early v. Packer, 123 S.Ct. 362, 365 (2002).

Claim 3 was presented on direct appeal, was analyzed on the merits, and is exhausted. [140] As explained above, Gray v. Maryland had not been decided at the time the state court rendered its decision on the petitioner's direct appeal. That was the last state court adjudication of this claim on the merits. Gray would not be considered clearly established law for the purposes of Claim 3. See Greene v. Fisher, 132 S.Ct. 38, 45 (2011).

---

[140] See Commonwealth v. Washington, 700 A.2d 400, 407-09 (Pa. 1997)(direct appeal decision reviewing Bruton claim).

### 4. The Pennsylvania Supreme Court's Decision on This Issue was Contrary to Federal Law

When the state court does not address the controlling federal law outright, the key inquiry is whether the state court's decision is consistent with U.S. Supreme Court precedent. <u>See</u> <u>Woodford v. Visciotti</u>, 123 S.Ct. 357, 360 (2002)(explaining that the state court examining its reasoning in light of federal law is key); <u>Early v. Packer</u>, 123 S.Ct. 362, 365 (2002)(explaining that AEDPA "does not require citation of [Supreme Court] cases" nor does it "even require *awareness* of [Supreme Court] cases" but neither the reasoning nor the result should contradict Supreme Court precedent (emphasis in original)); <u>Priester v. Vaughn</u>, 382 F.3d 394, 397-98 (3d Cir. 2004)("[W]e hold that the deferential standard of AEDPA applies even if the state court does not cite to any federal law as long as the state court decision is consistent with federal law.")(discussing <u>Woodford</u> and <u>Early</u>). I find the Pennsylvania Supreme Court's decision is not consistent with <u>Bruton</u> and <u>Richardson</u>.

This is not exactly a subtle point. The prosecutor relied on an inference that Washington was identified in Teagle's statement as one of the gun-toting robbers. In fact, to call this an "inference" is a huge understatement. This is precisely the kind of "inference" or identification that <u>Bruton</u> protects against. The whole point of redacting Teagle's statement in the first place was to guard against the jury inferring that it implicated the petitioner. To say that these redactions could somehow be undone or overlooked or, more accurately, trashed by the prosecutor in his closing argument goes

against <u>Bruton</u> and <u>Richardson</u>.[141] The prosecutor's ignoring the redactions not once but *four different times* had the effect of presenting Teagle's statement to the jury without any redactions and with Washington featured as the other robber and, most likely, the shooter.[142] These comments "expressly implicated" the petitioner as Teagle's accomplice and were not simply arguments that linked the petitioner through other evidence.[143] See <u>Richardson</u>, 481 U.S. at 208 (citing <u>Bruton</u>, 391 U.S. at 124 n. 1).

    The Pennsylvania Supreme Court found that the trial judge's instructions to the jury cured any error. <u>Commonwealth v.</u> <u>Washington</u>, 700 A.2d 400, 409 (Pa. 1997). Against the legal backdrop of <u>Bruton</u> and <u>Richardson</u>[144] and in the context of four (4) references to Washington as the other man in Teagle's statement, two (2) motions for a mistrial, and at least three (3) "curative" instructions by the trial judge, this is tantamount to the wizard telling Dorothy to pay no attention to the man behind the curtain.

---

[141] <u>See</u> <u>Richardson</u>, 481 U.S. at 211 ("In the present case, however, the prosecutor sought to undo the effect of the limiting instruction by urging the jury to use Williams' confession in evaluating respondent's case….On remand, the court should consider whether…the error can serve as the basis for granting a writ of habeas corpus.").

[142] <u>Compare</u> <u>Brown v. Folino</u>, No. 2:09–CV–3970, 2014 WL 1489464, at *13 (E.D. Pa. Apr. 16, 2014)(finding no <u>Bruton</u> violation when prosecutor made a single comment implicating defendant via co-defendant's statement).

[143] In order for the prosecutor's statements to have been appropriate, he would have had to argue that the petitioner was the shooter without also crediting Teagle's rendition of the robbery events. He simply did not do this. He argued that both the petitioner and Teagle had guns at the robbery which is not corroborated by the other evidence. Furthermore, he credited Teagle's statement that "blank" was the shooter and indicated that "blank" was the petitioner. <u>See</u> N.T. 10/7/94, 94-96 (Commonwealth's Closing Argument)("Because one of them has the gun that works, and I'm not even suggesting that Derrick's gun doesn't work . . . but I'm suggesting that Anthony Washington is the shooter….What does Derrick Teagle know that night? Even according to his own statement. He knows the gun works, he knows it's loaded. He knows it's ready to go . . . . He goes in to commit the armed robbery with this man here, then he's shocked that somebody got hurt.").

[144] <u>See</u> <u>Bruton</u>, 391 U.S. at 137 ("Despite the concededly clear instructions to the jury to disregard Evans' inadmissible hearsay evidence inculpating petitioner, in the context of a joint trial we cannot accept limiting instructions as an adequate substitute for petitioner's constitutional right of cross-examination. The effect is the same as if there had been no instruction at all."); <u>Richardson</u>, 481 U.S. at 211 ("In the present case, however, the prosecutor sought to undo the effect of the limiting instruction by urging the jury to use Williams' confession in evaluating respondent's case.").

The state court's decision is inconsistent with the U.S. Supreme Court precedent in Bruton and Richardson, and federal habeas relief is appropriate. The prosecutor's ignoring the redactions in Teagle's statement in his closing argument is a violation of Bruton and Richardson. See Lee, 447 Fed.Appx. at 360 ("[T]here is no doubt that the use of [the co-defendant's redacted] statements in the prosecutor's closing argument was a clear Bruton violation in that the statements were definitely used to incriminate Lee.").

## 5.    This Constitutional Violation Was More than Harmless Error

I find that this error was not harmless. Constitutional errors under Bruton are analyzed under Brecht's "substantial and injurious effect" standard. Fry v. Pliler, 551 U.S. 112, 121-22 (2007).  The Pennsylvania Supreme Court ruled the prosecutor's remarks were essentially "harmless" because the prosecutor's statements about the petitioner's culpability were based on "properly admitted, independent" evidence. Commonwealth v. Washington, 700 A.2d 400, 409 (Pa. 1997).[145] This is not the case. The prosecutor's arguments that both men were armed, that the petitioner provided these guns, and that the petitioner was Teagle's accomplice drew directly from Teagle's statement. There was no other evidence that both Teagle and the petitioner were armed.[146]

---

[145] The Pennsylvania Supreme Court analyzed this potential error under a standard for prosecutorial misconduct, not under Bruton. The court did not analyze the breaking of redaction as a "harmless error" per se but instead found that "the prosecution's breaking of redaction was not so prejudicial that its unavoidable effect was to negate the jury's ability to render a true verdict." Commonwealth v. Washington, 700 A.2d 400, 409 (Pa. 1997)(citing Pennsylvania Supreme Court cases Commonwealth v. LaCava, 666 A.2d 221 (Pa. 1995), and Commonwealth v. Bond, 652 A.2d 308 (Pa. 1995)).

[146] See N.T. 9/30/94, 6-8, 144 (Buchanan Testimony); N.T. 9/30/94, 29, 31-33, 33-34, 36-37, 61 (Rodriguez Testimony); N.T. 9/29/94, 111 (Robles Testimony)(identifying one robber with a gun); N.T. 10/4/94, 123 (Murphy Testimony)(seeing only one robber and that robber had a gun);  N.T. 10/3/94, 60, 96, 153 (Smith Testimony)(seeing one robber who was armed); N.T. 9/30/94, 107-114, 119, 140 (Cooper Testimony)(seeing two robbers but only one with a gun).

In fact, a fair reading of the evidence pointed to Teagle as the only person carrying a gun. There was little direct evidence implicating the petitioner as the shooter.[147] To allow the prosecutor to argue this point—using Teagle's redacted statement in one breath and "suggesting" that the petitioner is the shooter in the next—would most certainly have a "substantial and injurious effect" on the outcome of the case.

The petitioner is entitled to habeas relief on this claim as well.[148]

---

[147] The prosecutor himself admitted this much during one sidebar discussion, saying: "As to on-the-scene evidence, eyewitness, [Smith's] the only one I have. I don't have any other evidence linking Washington as the shooter." N.T. 10/3/94, 88 (sidebar regarding objection to use of photo during Smith Testimony). From this statement, the prosecutor was well-aware of this point and was reminded again of it when the judge warned him during the first objection to these arguments. Nonetheless, he persisted in arguing from Teagle's statement as a way to implicate the petitioner.

Prosecutors are expected not simply to win cases but to ensure justice is served. Berger v. United States, 295 U.S. 78, 88 (1935). See United States v. Modica, 663 F.2d 1173, 1181 (3d Cir. 1981). Jurors are predisposed to give great deference to the prosecutor's words. For this reason, improper prosecutorial arguments "are apt to carry much weight against the accused when they should properly carry none." Berger, 295 U.S. at 88.

[148] I ruled on Claims 2 and 3 separately because of the difference in "clearly established law" which applied to each claim and because the Pennsylvania Supreme Court ruled on each separately.

Even if I were to have found that one or both of these errors was harmless in its own right, the cumulative effect of these errors together would not be harmless. While the Pennsylvania Supreme Court does not recognize "cumulative error" as a means of relief, federal courts do recognize that multiple errors can undermine a petitioner's due process rights. See Commonwealth v. Washington, 592 Pa. 698, 750-51 (2007)("[A]s this Court has repeatedly held, no number of failed claims may collectively warrant relief if they fail to do so individually."(citing Commonwealth v. Williams, 896 A.2d 523, 548 (Pa. 2006); Commonwealth v. Rollins, 738 A.2d 435, 452 (Pa. 1999); and Commonwealth v. Williams, 615 A.2d 716, 722 (Pa. 1992))); Taylor v. Kentucky, 436 U.S. 478, 487-88 & n. 15 (1978)("The prosecutor's description of those events was not necessarily improper, but the combination of the skeletal instructions, the possible harmful inferences from the references to the indictment, and the repeated suggestions that petitioner's status as a defendant tended to establish his guilt created a genuine danger that the jury would convict petitioner on the basis of those extraneous considerations, rather than on the evidence introduced at trial."). Viewing both the error to admit the redacted statement at the joint trial and the prosecutor's errors together, there is no doubt that the petitioner's Confrontation Clause rights were violated and these errors had a "substantial and injurious effect" on the outcome. See Lee, 447 Fed.Appx. at 360 ("While the introduction of the redacted statements alone may not have been clearly prohibited under the caselaw at that time, there is no doubt that the use of Cox's statements in the prosecutor's closing argument was a clear Bruton violation in that the statements were definitely used to incriminate Lee.").

## C. Claim 1: Washington Claims He is "Innocent" Because Newly Discovered Evidence Shows He Was Not the Shooter[149]

The petitioner's first claim of factual innocence is an amalgamation of claims: newly discovered evidence, ineffective assistance of counsel, and <u>Brady</u> violations.[150] The petitioner has offered several pieces of "newly discovered evidence." However, I will focus my review on only the four pieces of evidence that were not presented to the state court to determine if their non-production to the petitioner at the time of trial violated his constitutional rights under <u>Brady</u>.[151]

---

[149] Because I have found the petitioner's claims under <u>Bruton</u> warrant habeas relief, I do not necessarily have to review the petitioner's remaining claims. I will, however, analyze Claim 1 because my previous rulings address this claim and the claim is specifically related to evidence regarding the petitioner's first-degree murder conviction, like Claims 2 and 3. However, I will not address the petitioner's remaining claims for the sake of efficiency.

[150] See <u>Brady v. Maryland</u>, 373 U.S. 83 (1968). In <u>Brady</u>, the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." <u>Id.</u> at 87.

I previously found that the petitioner's freestanding claim of actual innocence was not decided on the merits by the state court and the state court's reasoning regarding this claim was not clearly consistent with Supreme Court precedent found in <u>Herrara v. Collins</u>, 506 U.S. 390 (1993) or <u>House v. Bell</u>, 126 S.Ct. 2064 (2006). Memorandum on Motion in Limine regarding <u>Cullen v. Pinholster</u>, March 28, 2012, Doc. No. 99 at 9. The state court reviewed the evidence supporting the actual innocence claim and determined that the evidence would not have changed the outcome of trial, but did not examine the evidence in light of a freestanding actual innocence claim. <u>Commonwealth v. Washington</u>, 592 Pa. 698, 714-718 (Pa. 2007). I granted an evidentiary hearing on Claim 1, <u>inter alia</u>, but limited it in line with <u>Cullen v. Pinholster</u>, 131 S.Ct. 1388 (2011). See <u>Washington v. Beard</u>, No. 07–3462, 2012 WL 1033526 (E.D. Pa. Mar. 28, 2012). Following that hearing which was held on May 24, 2012, I ordered the parties to submit supplemental briefs on this claim alone. See Doc. No. 106.

[151] The petitioner also offered five additional pieces of evidence which he claimed were "newly discovered evidence:" 1) an affidavit of Derrick Teagle admitting to being the shooter; 2) an affidavit of Meshe Miller, the petitioner's girlfriend at the time of the robbery, stating that Teagle confessed to the crime to her; 3) an affidavit by Martha Harrington stating that Teagle was actually the shooter; 4) an affidavit from Melissa Harrington saying she also lied about the petitioner's confession; and 5) an affidavit of LaVaughn Robinson, who claims the petitioner never admitted he shot Lawson.

I previously ruled that petitioner's claim regarding Ms. Miller's statement to the police and his claims of ineffective assistance of counsel for failing to investigate Ms. Harrington, Ms. Miller, and Mr. Robinson were all rejected by the state court on the merits. <u>Washington v. Beard</u>, No. 07–3462, 2012 WL 1033526, at *3-4 (E.D. Pa. Mar. 27, 2012). The state court's resolution on these claims does not appear to be either contrary to or an unreasonable application of clearly established federal law, therefore, review of these claims is barred. See <u>Commonwealth v. Washington</u>, 592 Pa. 698, 718-22 (2007).

# 1.     AEDPA § 2254(d) Does Not Apply

Because Mr. Teagle invoked his Fifth Amendment rights at the evidentiary hearing, I am confined to the evidence presented to the state court. From the state court's ruling on this matter, I cannot say it is contrary to or an unreasonable application of clearly established federal law. See Commonwealth v. Washington, 592 Pa. at 715-18.

In regards to Meshe Miller's declaration, the court found that petitioner failed to show counsel did not have a reason for not calling her as a witness. Miller's statement puts the petitioner at the scene but not as the shooter. Commonwealth's Response to Habeas Petition, Doc. No. 31, Ex. 7. The Pennsylvania Supreme Court reasoned that counsel's failure to interview Miller could have been part of defense strategy because the petitioner denied any involvement.

Regarding the Brady claim related to this statement, the state court found that the Commonwealth did in fact disclose the statement to defense counsel, based on a December 15, 1993 letter. See Commonwealth v. Washington, 592 Pa. at 720.The petitioner's contention is that Miller's statement about Teagle being the shooter was omitted from the police report. See Commonwealth's Response to Habeas Petition, Doc. No. 31, Ex. 29 (State Court Docket) at 13, ¶ 38 ("The information given to the police by Miller, but omitted from the police report and withheld from the defense, was the type of material exculpatory evidence that the Commonwealth is constitutionally required to disclose to the defense.").

The petitioner argues that this is an unreasonable determination of the facts in the record developed by the state court. I do not agree. I must presume that the state court's findings of fact are correct. The petitioner must rebut that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). The petitioner has failed to do so. There is no indication that the information was omitted from the police report. Under the AEDPA, I am precluded from reviewing the merits of this claim.

Regarding LaVaughn Robinson's declaration, the court found that the petitioner could not establish Robinson would be available at trial because he had fled. The petitioner also offers an affidavit by LaVaughn Robinson. Robinson had given a statement to police at the time of the murder, saying that the petitioner had confessed to shooting Lawson. Robinson was dating Martha Harrington at the time. Robinson never testified at trial because he could not be found. In his affidavit, Robinson claims he lied to police about the petitioner's confession and that, in fact, petitioner told him he had not killed Lawson. He was not available at trial because he fled the area. He did not want to testify against the petitioner. See Commonwealth's Response to Habeas Petition, Doc. No. 31, Ex. 9. The state court reviewed this claim on the merits during the PCRA phase. It found that the petitioner's claim that counsel was ineffective for not interviewing Robinson was meritless because Robinson's fleeing the area would have made this interview impossible. The petitioner does not explain why the state court's determination was unreasonable. I do not find it to be such. Under AEDPA, the declaration would be precluded from habeas review. See Commonwealth v. Washington, 592 Pa. at 722-23.

With regards to the Harrington sisters' statements, the Pennsylvania Supreme Court affirmed the lower court's dismissal without benefit of an evidentiary hearing and stated that, without benefit of hearing trial counsel testify, that "under the facts of this case, we find that [Petitioner's] counsel had ample reason to believe that an independent interview with Harrington was unnecessary and, in fact, would have proved fruitless." Commonwealth v. Washington, 592 Pa. at 719. This is not an unreasonable determination of the facts. While Ms. Harrington states in her affidavit after the fact that she would have spoken to a lawyer or investigator and told the truth if she had been contacted, this contention seems rather unlikely, in view of the facts. See Commonwealth's Response to Habeas Petition, Doc. No. 31-9, Ex. 7 (Affidavit of Martha Harrington) at ¶ 10. If Ms. Harrington was not persuaded to tell the truth under oath on the witness stand, it seems unlikely that an attorney or investigator, working for the petitioner against whom she admits she had some bias, would have persuaded her to act differently. For this reason, the recantations of both Ms. Harringtons are precluded from habeas review.

AEDPA's deferential standard of review found in § 2254(d) only applies to state adjudications on the merits.[152] Because the Pennsylvania Supreme Court did not rule on the merits of the petitioner's claim regarding these four pieces of "newly discovered evidence," his claims regarding these four pieces of evidence are not subject to §2254(d)'s deferential standard of review. Instead, they are reviewed under pre-AEDPA caselaw, specifically Wainwright v. Sykes, 433 U.S. 72 (1977).[153]

The first step is to determine if these "new evidence" claims are defaulted. Under Sykes, if "a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman v. Thompson, 501 U.S. 722, 750 (1991). If the second and third prongs of Brady are met, i.e. there is cause

---

[152] AEDPA § 2254(d) states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court *shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings* unless the adjudication of the claim—
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2)(emphasis added).

[153] See Appel v. Horn, 250 F.3d 203, 210 (3d Cir. 2001)("[B]y its own terms § 2254(d) applies only to claims already 'adjudicated on the merits in State court proceedings.' It follows that when, although properly preserved by the defendant, the state court has not reached the merits of a claim thereafter presented to a federal habeas court, the deferential standards provided by AEDPA and explained in Williams do not apply."); Johnson v. Folino, 705 F.3d 117, 127 (3d Cir. 2013)("In this case, the state court did not reach the merits of Johnson's final PCRA petition. Therefore, 'the deferential standards provided by AEDPA ... do not apply,' and we 'must conduct a de novo review over pure legal questions and mixed questions of law and fact, as a court would have done prior to the enactment of AEDPA." (citations and quotation marks omitted)).

"However, the state court's factual determinations are still presumed to be correct, rebuttable upon a showing of clear and convincing evidence." Appel, 250 F.3d at 210 (citing 28 U.S.C. § 2254(e)(1)).

and prejudice, this will excuse a procedurally defaulted habeas claim. See Banks v. Dretke, 540 U.S. 668, 692 (2004). The suppression of evidence by the State would be adequate "cause," while the non-disclosure of "material" evidence would prejudice the petitioner. "Thus, if [the petitioner] succeeds in demonstrating 'cause and prejudice,' he will at the same time succeed in establishing the elements of his [Brady] due process claim." Banks, 540 U.S. at 691.

### 2.     PCRA Waiver Rule is "Adequate" in Petitioner's Case

The PCRA court found several of the petitioner's claims had been waived because they were not raised to that court in a timely manner. Specifically, the PCRA court found that it could not review the merits of the petitioner's "newly discovered evidence" because this evidence was not timely presented to the PCRA court based on 42 Pa.C.S.A. § 9545(b).[154] The Pennsylvania Supreme Court affirmed the PCRA court on this denial of

---

[154] This provision states:
    (b) Time for filing petition.--
    (1) Any petition under this subchapter, including a second or subsequent petition, shall be filed within one year of the date the judgment becomes final, unless the petition alleges and the petitioner proves that:
        (i) the failure to raise the claim previously was the result of interference by government officials with the presentation of the claim in violation of the Constitution or laws of this Commonwealth or the Constitution or laws of the United States;
        (ii) the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence; or
        (iii) the right asserted is a constitutional right that was recognized by the Supreme Court of the United States or the Supreme Court of Pennsylvania after the time period provided in this section and has been held by that court to apply retroactively.
    (2) Any petition invoking an exception provided in paragraph (1) shall be filed within 60 days of the date the claim could have been presented.
    (3) For purposes of this subchapter, a judgment becomes final at the conclusion of direct review, including discretionary review in the Supreme Court of the United States and the Supreme Court of Pennsylvania, or at the expiration of time for seeking the review.
    (4) For purposes of this subchapter, "government officials" shall not include defense counsel, whether appointed or retained.
42 Pa.C.S.A. 9545(b).

merits review based on Pennsylvania Rule of Appellate Procedure 302.[155] The Pennsylvania Rules of Appellate Procedure and PCRA's 1 year statute of limitations are typically considered "independent and adequate state grounds" to procedurally bar review of a claim during PCRA proceedings. These "independent and adequate state grounds" would then bar federal habeas review of these defaulted claims. See, e.g., Griggs v. DiGugliemlmo, No. 06-1512, 2007 WL 2007971, at *5 (E.D. Pa. July 3, 2007).

The petitioner argues that the PCRA court's dismissal of his claims for procedural reasons was not based on an "independent and adequate state ground" because the Pennsylvania Supreme Court still operated under what was termed the "relaxed waiver rule"—that the State Supreme Court may overlook a petitioner's failure to comply with procedure rules in capital cases. Essentially, the use of the "relaxed waiver rule" meant that Pennsylvania procedural rules, like the PCRA 1 year statute of limitations in 42 Pa.C.S.A. § 9545(b), may not be regularly followed or consistently enforced in capital cases.[156] The court ended the use of the "relaxed waiver rule" in November 1998 in the context of PCRA appeals.[157] See Commonwealth v. Albrecht, 720 A.2d 693 (Pa. Nov.

---

[155] Rule 302. Requisites for Reviewable Issue, states:
 (a) General rule. Issues not raised in the lower court are waived and cannot be raised for the first time on appeal.
 (b) Charge to jury. A general exception to the charge to the jury will not preserve an issue for appeal. Specific exception shall be taken to the language or omission complained of.

[156] See Bronshtein v. Horn, 404 F.3d 700, 707-08 (3d Cir. 2005).

[157] The Pennsylvania Supreme Court's use of Pa. R.A.P. 302 in its ruling is a bit confusing. In looking at the court's reliance on that rule alone, it might appear that the court is faulting the petitioner for not raising this claim on direct appeal. However, the court's additional cite to Commonwealth v. Zillgitt, 413 A.2d 1078 (Pa. 1980), along with its explanation that the claim was not raised until after the PCRA was dismissed, add an important nuance. Zillgitt discusses how the court's appellate waiver rule could also be applied in the PCRA context. 413 A.2d at 1080 n.3. By reference it would seem that Pa. R.A.P. 302 rule relates to the petitioner's claim on appeal *from his PCRA decision*, a decision which relied on the PCRA timeliness rule itself.

1998)(ending the historic practice of the relaxed waiver rule).[158] Because 42 Pa.C.S.A. §

9545(b) (the PCRA 1 year statute of limitations) was not applied consistently until after

the Pennsylvania Supreme Court ended its practice of using the "relaxed waiver rule," the

Third Circuit found that 42 Pa.C.S.A. § 9545(b) was "inadequate" to default a claim

during the time the "relaxed waiver rule" was in place. See Bronshtein v. Horn, 404 F.3d

700, 707-10 (3d Cir. 2005); Jacobs v. Horn, 395 F.3d 92, 117-18 (3d Cir. 2005).

The petitioner's PCRA proceedings span close to ten years—from the time he first

filed his PCRA petition to the time the Pennsylvania Supreme Court affirmed the

dismissal of his amended PCRA petition.[159] When he filed his initial *pro se* PCRA

---

If the court had simply found that the claim was waived because it was not raised on direct appeal, this would change the analysis. The Pennsylvania Supreme Court did not stop using the "relaxed waiver rule" in the context of direct appeals until Commonwealth v. Freeman, 827 A.2d 385, 403 (2003). Under the latter scenario, the "relaxed waiver rule" would still have applied to the petitioner's case because Freeman was decided in 2003 and the petitioner's direct appeals ended long before that time. In that case, it would be considered "inadequate" as having not been consistently applied at the time the petitioner's direct appeal became final. See, e.g., Jacobs v. Horn 395 F.3d 92, 117-18 (3d Cir. 2005).

[158] See also Szuchon v. Lehman, 273 F.3d 299, 326 (3d Cir. 2001)(state court finding of waiver for failure to object at trial not adequate and independent and does not bar review); Carpenter v. Vaughn, 296 F.3d 138, 147 (3d Cir. 2002)(petitioner's failure to raise claim on direct appeal or in first round of collateral attack did not preclude federal merits review); Laird v. Horn, 414 F.3d 419, 425 & n.7 (3d Cir. 2005).

[159] Commonwealth v. Washington, 592 Pa. 698, 710 (2007); Judge Poserina PCRA Opinion, Doc. No. 31-3, Ex. 4 at 1. On July 7, 1998, the petitioner filed a *pro se* petition for relief under Pennsylvania's Post-Conviction Relief Act (PCRA). Commonwealth v. Washington, 592 Pa. at 714-15. Judge Poserina, the trial judge, dismissed the petition on July 28, 1998. On July 31, 1998, the Federal Habeas Unit of the Philadelphia Defender Association filed an appeal as petitioner's new counsel. Id. at 710; Judge Poserina PCRA Opinion, Doc. No. 31-3, Ex. 4 at 1-2. On August 10, 1998, the Pennsylvania Supreme Court granted the petitioner's emergency motion for stay of execution, vacated the PCRA court's order dismissing the petition, and remanded the case to the Philadelphia Court of Common Pleas. Commonwealth v. Washington, 592 Pa. at 710 n. 6; Commonwealth's Response in Opposition to Habeas Petition, Doc. No. 32 at 10.

On March 31, 2000, the petitioner filed an amended PCRA petition. Commonwealth's Response to Habeas Petition, Doc. No. 31, Ex. 29 (State Court Docket) at 13. On February 5, 2001, Judge Poserina issued to the petitioner a notice of intent to dismiss the petition without a hearing, under Pa. R. Crim. P. 1507. Id. On June 6, 2001, the petitioner filed a supplemental amended petition, without first being granted leave to do so. Id. at 14. Judge Poserina dismissed the petition on June 26, 2001 and then denied the petitioner's motion for reconsideration on July 25, 2001. Id.; Commonwealth v. Washington, 592 Pa. at 710. On July 18, 2007, the Pennsylvania Supreme Court affirmed the dismissal. Commonwealth v. Washington, 592 Pa. 698 (2007).

petition in July 1998, the "relaxed waiver rule" was still being used. However, by the time his PCRA proceedings ended, the rule had long been abandoned by the Pennsylvania Supreme Court.

The adequacy of a procedural rule is judged at the time the petitioner violated the procedural rule, that is, when the claims themselves became defaulted. See Brohnstein, 404 F.3d at 708.[160] For the petitioner, this trigger date would have been in June 1999. According to Pennsylvania's PCRA, a defendant may file a petition for post-conviction relief within one year of his conviction becoming final. See id. at 708. The petitioner applied for a writ of certiorari with the U.S. Supreme Court. His conviction became final on June 26, 1998, the date the United States Supreme Court denied his petition for the writ. The PCRA's statute of limitation would then run one year later, June 26, 1999. Any claim filed after June 26, 1999 would be considered waived or defaulted.

The question then becomes whether the PCRA procedural rule was regularly followed at the time the petitioner would have violated that rule, i.e. June 26, 1999. The enforcement of a rule should be firmly established such that it gives the petitioner fair notice of what it required. Id. at 709. The Pennsylvania Supreme Court had firmly established the end of the "relaxed waiver rule" in the PCRA context at the latest in March of 1999.[161] Because the petitioner's procedural rights under the PCRA had not

---

[160] See also Szuchon v. Lehman, 273 F.3d 299, 325-26 (3d Cir. 2001)("Szuchon allegedly defaulted the Witherspoon claims at trial in 1981. At that time, and indeed to this day, the Pennsylvania Supreme Court has employed a doctrine of 'relaxed waiver' whereby it will reach the merits of a claim on a direct appeal in a capital case even if the claim would otherwise be waived by the failure to raise it at the trial level.").

[161] The Pennsylvania Supreme Court itself has cited Albrecht as the end of the rule in the PCRA context. See Commonwealth v. Smith, 17 A.3d 873, 883 (Pa. 2011)("Pursuant to Commonwealth v. Albrecht, 554 Pa. 31, 720 A.2d 693 (1998), the relaxed waiver rule is no longer applicable to PCRA appeals…"); Commonwealth v. Steele,

expired until June 26, 1999, he had fair notice that the "relaxed waiver rule" was no longer in effect and would not excuse his late-filed PCRA claims.[162] In the case of the petitioner, the PCRA rule would be considered "adequate" to default Claim 1.[163]

### 3. Exhaustion and Procedural Default

A state prisoner must exhaust available state court remedies before he may obtain federal habeas review of his conviction. See O'Sullivan v. Boerckel, 119 S. Ct. 1728, 1731 (1999); 28 U.S.C. § 2254(b)(1)(A); Lambert v. Blackwell, 387 F.3d 210, 232-34 (3d Cir. 2004). "The exhaustion requirement is deemed satisfied when a petitioner has presented his claims to the state courts but the state courts have refused to consider the claims on the merits based on an independent and adequate state procedural rule." Evans v. Secretary Pennsylvania Dept. of Corrections, 645 F.3d 650, 657 (3d Cir. 2011)(citing

---

961 A.2d 786, 796 (Pa. 2008)("Further, we no longer apply the relaxed waiver doctrine in capital PCRA appeals. Commonwealth v. Albrecht, 554 Pa. 31, 720 A.2d 693, 700 (1998).")); Commonwealth v. Spotz, 47 A.3d 63, 96 n. 25 (Pa. 2012)("Although the relaxed waiver doctrine was abrogated with respect to PCRA appeals and direct appeals in, respectively, Commonwealth v. Albrecht, 554 Pa. 31, 720 A.2d 693 (1998), and Commonwealth v. Freeman, 573 Pa. 532, 827 A.2d 385, 403 (2003), at the time of Appellant's trial, the doctrine was in effect.").

The Third Circuit interpreted Pennsylvania Supreme Court precedent to have ended the "relaxed waiver rule" "unequivocally" six months later in Commonwealth v. Banks, 726 A.2d 374, 376 (Pa. March 2, 1999). Bronshtein v. Horn, 404 F.3d 700, 709 (3d Cir. 2005) (firmly established the end of the relaxed waiver rule). Noting that the actual end date is unclear, the Circuit did not reach the question of which was the appropriate date on which the rule would be considered "adequate." Id. I, too, will not need to decide this point because the petitioner's claims had not defaulted by the time Banks, the later of the cases, was decided.

[162] It is also worth noting that the petitioner's amended PCRA was filed on March 31, 2000. The July 1998 PCRA petition had been vacated by the Pennsylvania Supreme Court and remanded to the PCRA court. The motion for reconsideration, which presented the PCRA court with the "newly discovered" evidence at issue in Claim 1, was filed in June 2001. The Pennsylvania Supreme Court's decision affirming the petitioner's procedural defaults under the PCRA waiver rule came in July 2007. All of these are long after the "relaxed waiver rule" ended in 1998.

[163] Compare Thomas v. Horn, 570 F.3d 105, 117 n. 4 (3d Cir. 2009)("Additionally, there is no procedural bar on federal habeas review. Since Thomas filed his PCRA petition before the Pennsylvania Supreme Court abandoned its "relaxed waiver" doctrine for capital cases in Commonwealth v. Albrecht, 554 Pa. 31, 720 A.2d 693 (1998), the Pennsylvania Supreme Court's dismissal of Thomas' claims as waived 'is not adequate to support the judgment for the purpose of finding a procedural default under federal habeas law.' Jacobs v. Horn, 395 F.3d 92, 117–18 (3d Cir.2005).").

Holland v. Horn, 519 F.3d 107, 112 (3d Cir. 2008)). See Coleman v. Thompson, 501 U.S. 722, 731-32 (1991). In this instance, a claim may be exhausted but also considered procedurally defaulted under state law. See Evans, 645 F.3d at 650; Coleman, 501 U.S. at 732 ("A habeas petitioner who has defaulted his federal claims in state court meets the technical requirements for exhaustion; there are no state remedies any longer 'available' to him.").

The exhaustion rule requires a petitioner to "fairly present" his claims to the state courts in order to give the state courts a meaningful opportunity to pass upon and correct alleged violations of the petitioner's federal constitutional rights. Duncan v. Henry, 513 U.S. 364, 365 (1995)(citing Picard v. Connor, 404 U.S. 270, 275 (1971)). To "fairly present" a claim, a prisoner must "use the State's established appellate procedures before he presents his claims to a federal court," O'Sullivan, 119 S.Ct. at 1733, and "must present a federal claim's factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being assessed." McCandless v. Vaughn, 172 F.3d 255, 261 (3d Cir. 1999).

When a petitioner has not presented claims to state courts, but no state remedy remains available to him to present those claims, these claims are considered procedurally defaulted. Review of the merits of these claims is procedurally barred under AEDPA. O'Sullivan, 119 S.Ct. at 1734, 1737. See also Hull v. Kyler, 190 F.3d 88, 97 (3d Cir. 1999)("If state avenues of relief, including post-conviction proceedings, have been exhausted, but the petitioner has failed to raise the alleged grounds for error, the claim is procedurally defaulted and may not be raised in federal court."); Coleman, 501 U.S. at

732. The procedural default doctrine "applies to bar federal habeas review when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement" that is "independent of the federal question and adequate to support the judgment." Coleman, 501 U.S. at 729-30.

The police teletype, handwritten note, and the radio message were presented to the state courts in the PCRA context. The police activity sheet was produced to the petitioner in federal discovery but was not presented to the state court in a PCRA petition. The Commonwealth argues that all the claims are procedurally defaulted.[164] I agree.

### a) Exculpatory Evidence Presented During State Collateral Review

The petitioner's Brady claims regarding the police teletype, the general radio message, and the handwritten note were not raised in the petitioner's amended or supplemental amended PCRA petition.[165] After the PCRA court dismissed his petition, the petitioner filed a motion for reconsideration on July 24, 2001 and attached these

---

[164] See Commonwealth's Post-Hearing Memorandum, Doc. No. 114 at 5-10.

[165] The Commonwealth contends that the police teletype was not presented to the state court and was only produced during federal discovery. The petitioner contends that he did attach a copy of this teletype to the amended PCRA but that the attached copy was not as good as the copy that was produced during federal discovery. The attached copy had the left margin cut off. The Commonwealth contends this was not the same document, while the petitioner claims it is. Essentially, the Commonwealth is arguing that the teletype was not "fairly presented" to the PCRA court. This argument is ridiculous. The whole reason the petitioner was unable to get a clear copy was because the Commonwealth did not produce it in the first place. To now claim it was not "fairly presented" in fact further bolstered the idea that it was suppressed. The teletype does appear to be the same one that was presented to the PCRA court though not as clear as the one produced in federal discovery. Furthermore, the court refused to consider the police teletype because it had not been presented to the lower court until a motion for reconsideration, and it found it was not newly discovered evidence. In any event, whether the teletype is newly discovered evidence from federal discovery or was presented to the court previously, any claim related to it would be procedurally defaulted (with lack of exhaustion excused) as I explain below related to the police activity sheet. See Doc. No. 114 at 8-10, 122, 123, 124.

documents.[166] The PCRA court found that the alleged after-discovered evidence was based on police records from the time of the crime. The court found these records "were certainly available and could have been ascertained by the exercise of due diligence over sixty days before July 23, 2001"—the date on which his motion for reconsideration of the dismissal of the petitioner's PCRA petition was due. The trial court found that the claims were time-barred under the PCRA. 42 Pa.C.S.A. § 9545(b)(1)(ii).[167]

On appeal from the PCRA dismissal, the Pennsylvania Supreme Court found this claim to have been waived because it was not presented to the PCRA court before the PCRA petition was dismissed. Commonwealth v. Washington, 592 Pa. 698, 723 (2007). The court cited Pennsylvania Rule of Appellate Procedure 302, which requires that

---

[166] Commonwealth's Response to Habeas Petition, Doc. No. 31, Ex. 7.

[167] Doc. No. 31-3, Ex. 4, Judge Poserina PCRA Opinion, at 2 n. 1, No. 1037-1055 (PCRA)(Phila. Co. Ct. Common Pleas Oct. 24, 2001).

The Pennsylvania PCRA provision the trial court cited states:
    (b) Time for filing petition.--
    (1) Any petition under this subchapter, including a second or subsequent petition, shall be filed within one year of the date the judgment becomes final, unless the petition alleges and the petitioner proves that:
        (i) the failure to raise the claim previously was the result of interference by government officials with the presentation of the claim in violation of the Constitution or laws of this Commonwealth or the Constitution or laws of the United States;
        (ii) the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence; or
        (iii) the right asserted is a constitutional right that was recognized by the Supreme Court of the United States or the Supreme Court of Pennsylvania after the time period provided in this section and has been held by that court to apply retroactively.
    (2) Any petition invoking an exception provided in paragraph (1) shall be filed within 60 days of the date the claim could have been presented.
42 Pa.C.S.A. 9545(b)(1).

Judge Poserina only considered the evidence under 42 Pa.C.S.A. § 9545(b)(1)(ii) and not under § 9545(b)(1)(i), which deals with claims previously not raised due to government suppression. This ruling is a bit odd since the evidence was solely in the possession of the government and defense counsel had no legal right of access to it. See Commonwealth's Response to Habeas Petition, Doc. No. 31 at 68 n. 26, Ex. 19, Ex. 20.

"[i]ssues not raised in the lower court are waived and cannot be raised for the first time on appeal."

The petitioner's claim regarding these three documents is procedurally defaulted because the petitioner failed to comply with the state PCRA and/or appellate procedural rules. See Coleman, 501 U.S. at 729-30.The claim is also exhausted because it has been presented to the state courts but rejected on procedural grounds. See Evans, 645 F.3d at 650; Coleman, 501 U.S. at 732.

### b)   Exculpatory Evidence Produced During Federal Discovery

During federal discovery, the Commonwealth disclosed a police activity sheet, which indicated that three witnesses to the robbery did not identify the petitioner during a photo array conducted shortly after the robbery. The Commonwealth admits this sheet was not turned over to defense counsel before the trial, which the petitioner believes is a Brady violation. The Commonwealth argues that this claim is also procedurally defaulted because the petitioner could have raised it to the state court under the newly-discovered evidence exception of the Pennsylvania PCRA but did not.[168]

Under 42 Pa.C.S.A. § 9545(b), a petitioner may raise claims that would otherwise be time-barred in a PCRA petition if the petitioner can show that "the failure to raise the claim previously was the result of interference by government officials…" or that "the facts upon which the claim is predicated were unknown to the petitioner and could not

---

[168] See Commonwealth's Post-Hearing Memorandum, Doc. No. 114 at 8-9.

have been ascertained by the exercise of due diligence."[169] Because the petitioner failed

to file a PCRA petition addressing this "newly-discovered evidence" claim within sixty

days of receiving it, the petitioner's claim as to this evidence is procedurally defaulted.[170]

The claim is unexhausted but excused under 28 U.S.C. § 2254(b)(1)(B). Slutzker v.

Johnson, 393 F.3d 373, 380 (3d Cir. 2004).[171]

---

[169] The PCRA also provides a third exception which allows for an out-of-time petition when the right asserted is a newly-recognized constitutional right made retroactive. The provision clearly does not apply in this case. See 42 Pa.C.S.A. § 9545(b)(iii).

[170] The exact date on which petitioner received the activity sheet is unknown. However, it would have been after either March 9, 2010 and February 22, 2010 when the Criminalistics Laboratory file and the other materials were mailed to the petitioner. No PCRA petition addressing this new evidence was filed within 60 days of either of those dates, which is required by 42 Pa.C.S.A. § 9545(b)(2). Therefore, this remedy is no longer available to the petitioner.

[171] In Slutzker, the petitioner did not return to Pennsylvania state court to file a second PCRA petition after receiving undisclosed information in federal discovery. 393 F.3d 373, 379 (3d Cir. 2004). The Third Circuit found that this failure to exhaust his claim as to this new material was excused under 28 U.S.C. § 2254(b)(1)(B) because no State corrective process existed after the 60-day time limit for filing PCRA claims with "newly discovery evidence." Id. at 380. Slutzker is somewhat distinct from this case because Slutzker did not present a Brady claim at all in state court. Id. at 377.

One may argue that the petitioner's Brady claim is in fact exhausted because the petitioner "fairly presented" to the state court that evidence in his police file, which the prosecutor should have disclosed, had not be produced to him pre-trial in violation of Brady. His Brady claim raised in his supplemental PCRA would have, in the least, put the state court on notice of the legal basis of his claim regarding non-disclosed evidence. See Commonwealth's Response to Habeas Petition, Doc. No. 31, Ex. 10 (Petitioner's Motion for Reconsideration Based on Brady Evidence). On the other hand, the police activity sheet produced in federal discovery could be viewed as a providing a different *factual* basis for the petitioner's Brady claim than the previously presented "descriptions." See McCandless v. Vaughn, 172 F.3d 255, 261 (3d Cir. 1999)(explaining how exhaustion requires a petitioner to "present a federal claim's factual *and* legal substance to the state courts in a manner that puts them on notice that a federal claim is being assessed." (emphasis added)). For this reason, I find that the petitioner's claim is unexhausted but excused in line with Slutzker. I will consider the fact that the petitioner already presented his Brady claim to the state court under the "cause" analysis.

Either way, it appears clear that the petitioner's pursuit of state remedies related to the police activity sheet would be futile and unnecessary under the circumstances of this case. See Slutzker, 393 F.3d at 381(explaining how petitioner's failure to avail himself of the state remedy results in the procedural default of the claim grounded in newly discovered evidence absent a showing of cause and prejudice or a miscarriage of justice); id. at 380 ("[E]xhaustion is not required where pursuit of state remedies would be futile." (citing § 2254(b)(1)(B))(other citations omitted)); § 2254(b)(1)(B)(explaining how exhaustion under AEDPA excused when "circumstances exist that render such process ineffective to protect the rights of the applicant."). No effective state processes would have been available to the petitioner regarding the police activity sheet.

## 4. The <u>Brady</u> case and Procedurally Defaulted Claims

The Due Process Clause of the Fourteenth Amendment to the United States Constitution requires a prosecutor to disclose favorable evidence to the accused that is material as to guilt or punishment. <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963).[172]

The Supreme Court has also outlined a three-part test to determine if a <u>Brady</u> violation has occurred. The evidence at issue must: 1) be favorable to the accused, either because it is exculpatory or because it is impeaching; 2) have been suppressed by the State, either willfully or inadvertently; and 3) prejudice must have ensued. <u>Banks v. Dretke</u>, 540 U.S. 668, 691 (2004)(quoting <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999)); <u>see</u> <u>Lambert v. Blackwell</u>, 387 F.3d 210, 252 (3d Cir. 2004). A prosecutor's duty to disclose exculpatory evidence is especially important in a capital case, as is this court's duty to review claims of non-disclosure.[173]

The petitioner argues that the prosecution failed to disclose exculpatory evidence in violation of <u>Brady</u>. Specifically, petitioner introduced four documents: 1) a police teletype which included descriptions of the robbers recorded shortly after the robbery, 2) a handwritten note which also describes the robbery suspects, 3) a radio message dated January 24, 1993 with descriptions of the suspects, and 4) a police activity sheet which indicates that witnesses Robles, Cooper, and Judith Bonaparte failed to identify the

---

[172] <u>See also</u> <u>Banks v. Dretke</u>, 540 U.S. 668 (2004); <u>Giglio v. United States</u>, 405 U.S. 150, 153-56 (1972); <u>United States v. Bagley</u>, 473 U.S. 667, 676 (1985); <u>Kyles v. Whitley</u>, 514 U.S. 419, 437 (1995).

[173] <u>Kyles</u>, 514 U.S. at 422 (in assessing a <u>Brady</u> claim the court acknowledged that its "duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case"). <u>See also</u> <u>Beck v. Alabama</u>, 447 U.S. 625 (1980); <u>Ake v. Oklahoma</u>, 470 U.S. 68 (1985); <u>Caldwell v. Mississippi</u>, 472 U.S. 320 (1985); <u>Ford v. Wainwright</u>, 477 U.S. 399, 414 (1986)(each holding that a capital case requires heightened judicial review and enforcement of procedural safeguards).

petitioner from a photo array shown them in February 1993. The Commonwealth has stipulated that none of these documents were disclosed to the defense prior to trial.[174]

The petitioner argues that the Commonwealth's failure to disclose this exculpatory evidence violated his rights to due process and undermined the fairness of his trial. He argues that this evidence proves the only suspect armed with a weapon matches Teagle's description. The petitioner further argues that none of the documents adequately describe him, as he is taller and much lighter complected than any of the descriptions provide.[175] Finally, the petitioner argues that the Commonwealth's failure to inform the defense that Juana Robles failed to identify petitioner in a photo array was extremely important given her identification of the petitioner during the trial a year later.[176]

---

[174] Commonwealth's Post-Hearing Memorandum of Law, Doc. No. 114 at 3. Though not required to finding a Brady violation, it is worth noting that the record indicates that defense counsel made general and specific requests for discovery from the prosecution. See Commonwealth Response to Habeas Petition, Doc. No. 31, Ex. 12 (Discovery Letters dated 12/15/93, 07/13/94). See also United States v. Bagley, 473 U.S. 667, 682 (1985)(explaining that materiality of evidence does not necessarily hinge on whether defense requested discovery at all, generally, or specifically); Kyles, 514 U.S. at 433-34 ("Bagley held that regardless of request, favorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'"). Defense counsel Jack Myers is now deceased so he cannot confirm or deny what requests were actually made.

[175] The descriptions indicate that the second assailant (i.e. the one not matching the description of Teagle) was of "medium" or "brown" complexion. The petitioner asserts he is "light-skinned." Ms. Robles also described him in this way in court. In identifying him, she described him as "the light-skinned guy." N.T. 9/29/94, 110-11 (Robles Testimony). The police photo taken at the time of his arrest in April 1993 lists his height as 5' 11". The fugitive flyer published by police listed his height as 5' 9'' and his skin tone as "light brown." See Petitioner's Post-Hearing Memorandum, Doc. No. 114 at 8. Court History sheets provided by the Commonwealth also state his height to be 5' 10" and his weight to be 140 on October 19, 1994. See Commonwealth's Response to Habeas Petition, Doc. No. 31, Ex. 8.

In a related case, one of the witnesses had positively identified the petitioner as being at the scene of the crime. Prior to making this identification at a police line-up, this witness had described the assailant to police as being a "light-skinned guy with acne or facial hair coming down the sides of his face." See Washington v. Beard, No. 10-5371, Magistrate's Report and Recommendation, Doc. No. 38 at 6 n. 4.

[176] To establish the requisite fundamental miscarriage of justice, a petitioner must demonstrate "actual innocence," Schlup v. Delo, 513 U.S. 298, 324 (1995), i.e., "new reliable evidence," such as "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence," id.; Hubbard v. Pinchak, 378 F.3d 333, 339 (3d Cir. 2004) (addressing claim of actual innocence but rejecting it on the merits), that would make it more likely than not that "no juror, acting reasonably, would have voted to find [petitioner] guilty beyond a reasonable doubt." See

Even if his claims are procedurally defaulted, the petitioner argues that his claims should still be reviewed because cause and prejudice exists. Where a habeas petitioner has defaulted his Brady claim in the state court, he can still raise the claim if he shows "cause and prejudice" or a miscarriage of justice. See, e.g., Johnson v. Folino, 705 F.3d 117, 127 (3d Cir. 2013)(citing Holloway v. Horn, 355 F.3d 707, 715 n.3 (3d Cir. 2004) and Coleman v. Thompson, 501 U.S. 722, 750 (1991)). Cause and prejudice "parallel two of the three components of the alleged Brady violation itself." Banks, 540 U.S. at 691 (quoting Strickler, 527 U.S. at 282; Coleman, 501 U.S. at 750). "Corresponding to the second Brady component (evidence suppressed by the State), a petitioner shows 'cause' when the reason for his failure to develop facts in state-court proceedings was the State's suppression of the relevant evidence, coincident with the third Brady component (prejudice), prejudice within the compass of 'cause and prejudice' requirement exists when the suppressed evidence is 'material' for Brady purposes." Banks, 540 U.S. at 691 (citing Strickler, 527 U.S. at 282). Because the second and third elements of the petitioner's Brady claims and the analysis regarding "cause and prejudice" are substantially the same I will address those issues together.

### 5. The Commonwealth's Suppression of Evidence Establishes "Cause"

The Commonwealth admits that all four pieces of evidence that the petitioner presents were not disclosed to defense counsel prior to trial.[177] While Brady does not

---

Schlup, 513 U.S. at 329; House v. Bell, 547 U.S. 518 (2006). The petitioner has conceded that he cannot meet the Schlup gateway actual innocence standard without Teagle's testimony regarding his recantation.

[177] Commonwealth's Post-Hearing Memorandum of Law, Doc. No. 114 at 3.

require the prosecutor to disclose information which the defendant could have obtained himself, all the pieces of evidence at issue are ones which would have been in the sole possession of the police or the prosecutor.[178] See United States v. Pelullo, 399 F.3d 197, 213 (3d Cir. 2005); Gov't of Virgin Islands v. Martinez, 780 F.2d 302, 318 (3d Cir. 1985); United States v. Starusko, 729 F.2d 256, 262 (3d Cir. 1985). These were not pieces of evidence that the defense would have necessarily been able to obtain without cooperation from the Commonwealth.[179] Therefore, suppression by the state appears to be the reason the defendant could not have obtained the information prior to the time he did.[180] This satisfies the "cause" requirement and establishes the second prong of Brady.[181]

---

[178] Evidence held by police is also subject to Brady and its non-disclosure impugned back to the prosecutor. Kyles, 514 U.S. at 437 (explaining that the prosecutor is responsible for "any favorable evidence known to the others acting on the government's behalf, including the police."). See also id. at 438 (knowledge of favorable evidence "known ... to police investigators and not to the prosecutor" is imputed to the trial prosecutor).

Furthermore, actions taken by the Philadelphia Court of Common Pleas after defense counsel did obtain the three pieces of Brady evidence presented to the state court indicate that this information is not the type to which the petitioner or his counsel could have easily accessed. See Commonwealth's Response to Habeas Petition, Doc. No. 32 at 68 n. 26, Ex. 19, Ex. 20; Keogh Letter, February 8, 2002, Commonwealth's Response to Habeas Petition, Doc. No. 31, Ex. 19; Transcript of Hearing Regarding the Obtained Files, Commonwealth's Response, Doc. No. 21, Ex. 20.

[179] Though it is not clear why this evidence was not produced prior to trial, this point is to no avail. It does not matter whether the suppression of this evidence was intentional or inadvertent. See Banks, 540 U.S. at 691(quoting Strickler, 527 U.S. at 281-82). See also Brady, 373 U.S. at 87 (explaining that suppression violated due process "irrespective of the good faith or bad faith of the prosecution"). I will note that defense counsel had not received any discovery from the prosecution by the time the preliminary hearing was to be held in September 1993. N.T. 9/2/93, 32. At one point during trial, when defense counsel questioned whether he had received a police statement, the prosecutor stated that the defense "has full discovery." N.T. 10/4/94, 23-24 (Martha Harrington Testimony). Yet, counsel indicated later on in the record that he had not received a copy of a police report referred to by Officer Permint which indicated police had gotten an anonymous tip about the petitioner's whereabouts. See N.T. 10/6/94, 56 (Officer Permint Testimony)(petitioner's counsel asking for a break because "[t]his is the first time I saw this report.").

[180] According to the Commonwealth's response to the petitioner's habeas petition, "[p]etitioner's counsel obtained the documents (as well as petitioner's entire police homicide file) from the City Archives, where police homicide files were archived." The Commonwealth characterizes counsel's actions being "improper." Judge D. Webster Keogh, Supervising Judge, Criminal Division of the Court of Common Pleas, found that these actions were

improper. <u>See</u> Keogh Letter, February 8, 2002, Commonwealth's Response to Habeas Petition, Doc. No. 31, Ex. 19. <u>See also</u> Transcript of Hearing Regarding the Obtained Files, Commonwealth's Response, Doc. No. 21, Ex. 20. While I will not comment on the propriety of counsel's actions, I will note this information further shows that the "newly discovered evidence" was solely in the possession of the Commonwealth and would not be the type to which the petitioner himself would or could have had access.

[181] The Commonwealth argues that the petitioner cannot establish "cause" for the evidence he received in federal discovery. "[C]ause for a procedural default on appeal ordinarily requires a showing of some external impediment preventing counsel from constructing or raising the claim." <u>Murray v. Carrier</u>, 477 U.S. 478, 492 (1986). According to the Commonwealth, the petitioner was not impeded from raising his claim regarding the police activity sheet in the state PCRA court. The Commonwealth argues that the petitioner could have presented his <u>Brady</u> claim as to the evidence he received in federal discovery under 42 Pa.C.S.A. § 9545(b) which provides "exceptions" for out-of-time claims; the petitioner should have stayed this habeas petition to file a second PCRA petition under 42 Pa.C.S.A. § 9545(b) in order to exhaust his state remedies as to the police activity sheet received in federal discovery.

The Third Circuit addressed a similar argument in <u>Slutzker v. Johnson</u>. Like this case, Mr. Slutzker had received previously undisclosed police reports during federal discovery which served as the basis for his <u>Brady</u> claim. 393 F.3d 373, 378-79 (3d Cir. 2004). Unlike this case, however, Slutzker's <u>Brady</u> claim had never been presented to the state court; he had only presented sixteen issues related to ineffective assistance of trial counsel. <u>Id.</u> at 377. He did not return to state court to exhaust his PCRA remedies under the 42 Pa.C.S.A. § 9545(b) exceptions and was time-barred from pursuing this remedy after § 9545's 60-day deadline had passed. <u>Id.</u> at 380. The Third Circuit found that his <u>Brady</u> claim was procedurally defaulted and his failure to exhaust his remedies was excused. <u>Id.</u> at 380-81. When the court looked at whether "cause" existed to then excuse the default, the court entertained a similar argument by the Commonwealth—that the petitioner could have stayed his habeas proceeding and gone back to state court to exhaust his remedies. <u>Id.</u> at 382. The Third Circuit rejected this argument because the law was not made clear until <em>after</em> the petitioner's <u>Brady</u> claim would have been procedurally defaulted that the "stay-and-abeyance" procedure was available to the petitioner. <u>Id.</u> at 382-83, 385. The Third Circuit found that Slutzker has established "cause" because the Commonwealth had withheld the <u>Brady</u> evidence and the case law regarding the stay-and-abeyance procedure was unsettled at the time he could have exhausted his <u>Brady</u> claim. <u>Id.</u> at 385.

After <u>Slutzker</u>, the Supreme Court made clear in <u>Rhines v. Weber</u> that a petitioner may stay his federal habeas proceedings in order to exhaust his remedies in state court, in order to prevent a "mixed petition" (i.e. petition with both exhausted and unexhausted claims) from being dismissed. <u>Rhines v. Weber</u>, 544 U.S. 269, 2875-79 (2005). The Third Circuit has not been presented with a case exactly like <u>Slutzker</u> post-<u>Rhines</u>.

It is clear that the petitioner did not request a stay nor file a second PCRA petition in state court. Nonetheless, I agree with the petitioner that the suppression of the evidence by the Commonwealth would still be "cause" for the default.

The petitioner did not receive the police activity sheet until February or March 2010. This was over seventeen years after the robbery and shooting took place, almost nine years after Judge Poserina dismissed the petitioner's PCRA petition and denied the petitioner's motion for reconsideration on that petition, close to three years after the Pennsylvania Supreme Court affirmed that dismissal, and almost three years after these habeas proceedings began. Between the time the PCRA court dismissed the PCRA petition and the time it was affirmed, the Philadelphia Court of Common Pleas closed off access to its police files to counsel. <u>See</u> Petitioner's Memorandum of Law in Support of Habeas Petition, Doc. No. 20 at 17 n.11. It was not until I granted the petitioner's request for federal discovery that the police activity sheet's existence became known to the petitioner. <u>See</u> Doc. No. 53 (January 20, 2010). To think that he then must return to the state to exhaust a claim which was created by the Commonwealth's own error is preposterous. Requiring him to do so would further delay the finality of his conviction and would contravene the purposes of the exhaustion requirement. <u>See</u> <u>Rhines</u>, 544 U.S. at 277 (explaining how AEDPA's goals of finality are contravened by the overuse of the stay-and-abeyance procedure).

Even if the petitioner were to have stayed his petition here and filed a second PCRA petition in state court with the claim on the police activity sheet, it is highly likely that his PCRA petition would have been dismissed on procedural grounds. The petitioner had already presented a claim to the PCRA court that the Commonwealth had

### 6. When Considered Together, the Suppressed Documents Were Material and The Commonwealth's Failure to Disclose Them Was Prejudicial

The Commonwealth argues that there is no prejudice because the withheld evidence was "cumulative" to other evidence available to the petitioner at the time of trial and immaterial under Brady.[182] "To demonstrate prejudice excusing the procedural default of a Brady claim, a habeas petitioner must show that the undisclosed evidence is material." Folino, 705 F.3d at 128. "[E]vidence is 'material' within the meaning of Brady when there is a reasonable probability that, had the evidence been disclosed, the result of

---

violated his rights under Brady. He offered evidence that could only have been found in the police file of his case, which his counsel was later reprimanded for improperly obtaining from the city archives. Nonetheless, the PCRA court found his presentation was untimely because he failed to show why he could not have presented this evidence sooner. The court also did not consider the evidence under the first exception to out-of-time claims—i.e. that "the failure to raise the claim previously was the result of interference by government officials—but instead analyzed the petitioner's Brady claim under the second exception which deals with "facts upon which the claim is predicated [which] were unknown to the petitioner and could not have been ascertained by the exercise of due diligence." See 42 Pa.C.S.A. § 9545(b)(1)(i) and (ii).

Given that the petitioner has already presented some of this "newly discovered evidence" to the PCRA court, it is very likely that the court would also consider presentation of the police activity sheet to be related to that previous claim of "newly discovered evidence." See Commonwealth v. Washington, 592 Pa. 698, 737 (2007)(finding petitioner's claim decided on the merits was "previously litigated"). His second PCRA petition would have been considered "previously litigated" or "untimely." See, e.g., Wallace v. Price, No. 99-231, 2002 WL 31180963, at *9 (W.D. Pa. Oct. 1, 2002)(finding that the petitioner's second petition brought under a new legal theory was "previously litigated"); Johnson v. Folino, 671 F.Supp.2d 658, 665-66 (E.D. Pa. 2009), and Johnson v. Folino, 705 F.3d 117, 125 (3d Cir. 2013)(explaining that petitioner who had filed third, fourth, and fifth "protective" PCRA petitions to assert his rights under the PCRA for claims related to previously undisclosed evidence gained during federal discovery but the PCRA court considered them untimely).

The police activity sheet is exactly the type of information the prosecutor should have disclosed to the petitioner prior to trial. The Commonwealth's suppression of the police activity sheet for over seventeen years is adequate "cause" to excuse the procedural default. See Fisher v. Rozum, 441 Fed.Appx. 115, 119 (3d Cir. Aug. 3, 2011)(finding "cause" when petitioner did not file second PCRA under 42 Pa.C.S.A. § 9545(b)(1)(ii) after discovering new evidence because Pennsylvania law would bar second PCRA and ultimate reason for procedural default was government suppression).

[182] Commonwealth's Sur-reply to Habeas Petition, Doc. No. 50 at 29. See United States v. Bansal, 663 F.3d 634, 670 (3d Cir. 2011)(explaining how Brady is not implicated if there is no prejudice to the defendant).

the proceeding would have been different." <u>Cone v. Bell</u>, 556 U.S. 449, 469-70 (2009).[183]

If the withheld evidence would have affected "preparation or presentation of the defendant's case" or "the course that the defense" could have pursued, it is material. <u>United States v. Bagley</u>, 473 U.S. 667, 683 (1985).[184] The "touchstone of materiality is . . . not whether the defendant would more likely or not have received a different verdict with the [suppressed] evidence, but whether in its absence he received a fair trial. . . ." <u>Kyles v. Whitley</u>, 514 U.S. 419, 434 (1995). The evidence must be such that it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." <u>Id.</u> at 435.[185] The materiality of the undisclosed evidence is considered in light of the other evidence offered by the state during trial. <u>Folino</u>, 705 F.3d at 129.

### a)     The Police Teletype, Radio Message, and Handwritten Note Were Material

The police teletype, radio message, and handwritten note are all contemporaneous witness descriptions of the robbery suspects and were not disclosed to the petitioner before trial. They each offer similar descriptions of the robbery assailants and, most importantly, place a gun only in the hands of the assailant matching Teagle's description.

---

[183] <u>See also</u> <u>United States v. Perez</u>, 280 F.3d 318, 348 (3d Cir. 2002)(explaining how evidence is material "if there is a reasonable probability that, had it been disclosed, the result of the proceedings would have been different.").

[184] "The Supreme Court has clarified that material information must be disclosed even absent a defense request…." <u>Lambert v. Beard</u>, 633 F.3d 126, 133 (3d Cir. 2011)(citing <u>Bagley</u>, 473 U.S. at 682), <u>reversed and remanded on other grounds</u>, <u>Wetzel v. Lambert</u>, 132 S.Ct. 1195, 1199 (2012).

[185] <u>See also</u> <u>Giglio v. United States</u>, 405 U.S. 150, 154 (1972); <u>Kyles</u>, 514 U.S. at 434 ("The question is not whether the defendant would more likely than not have received a different verdict with the [concealed] evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."); <u>Youngblood v. West Virginia</u>, 547 U.S. 867, 870 (2006); <u>Smith v. Holtz</u>, 210 F.3d 186, 196 (3d Cir. 2000)(citing <u>Kyles</u>, 514 U.S. at 434).

The petitioner argues that they are "material" because they support his contention that Teagle was, in fact, the shooter.

The source of each of the documents varies. The police teletype was sent from Philadelphia police to Investigator Maslo of the Millbourne Police Department on January 27, 1993. Its author is unknown.[186] The teletype provided a description of *three* suspects in the murder investigation—the two robbers and the driver of the getaway car. These three suspects were described as: (1) black male, approximately 21 years old, 5'4", thin build, brown complexion, slight mustache, wearing a ¾ sleeve brown leather jacket and a dark blue wool baseball cap, and armed with a silver semi-automatic; (2) black male, mid-20's, 5'6", brown complexion, slight mustache, wearing a ¾ sleeve green leather jacket; and (3) the driver of the getaway car was described as black male, 20's, 6'1", medium build, medium brown complexion, short black haircut, wearing a brown leather jacket.[187]

The radio message was a general message sent over the police radio on January 24, 1993 at 1:00 a.m. This radio message described the suspects as: "(1) black male, 21 years old, 5'4", thin build, brown complected, light mustache, wearing a dark blue wool baseball cap and a light brown ¾ length leather jacket, armed with a silver automatic; and (2) black male, mid-20's, 5'6", medium build, brown comp., slight mustache, wearing a ¾ sleeve green leather jacket."  The radio message also stated that the males "fled the

---

[186] The teletype states, "Auth Richard Neal." However, I cannot say for certain what "auth" means. It could mean "author" or it could mean "authorized." The parties, or more specifically the Commonwealth, did not explain who Richard Neal is. <u>See</u> Petitioner's Motion to Depose, Doc. No. 59 at 2.

[187] <u>See</u> Doc. No. 122, Ex. 1.

area in an older model small white station wagon, possibly a Toyota or Subaru, males are considered to be armed and dangerous."[188] The source of this message is unclear from the record.[189]

The handwritten note titled "Descriptions" offers the same information as to the two suspects. In this note, the suspects are described as: "(1) black male, 21 yrs, 5'4", thin build, brown skinned, light mustache, wearing a ¾ length brown leather jacket, and a

---

[188] The Commonwealth counters that, although the radio message stated that a man fitting Teagle's description was in possession of the silver automatic, the message concluded with the warning that both "males are considered to be armed and dangerous." This argument is weak. If one of the robbers had a gun and the two left the scene together, of course they would *both* be considered armed and dangerous because they were working together. This point, however, does not establish that *both* were carrying guns.

The Commonwealth also argues that there is evidence in the record that both men were armed, so this new evidence does not conflict with the trial evidence. The Commonwealth, however, does not point to where this other evidence that shows both men were armed is located in the record. The Commonwealth instead points to a police radio transmission from the night of the robbery in which an unidentified female caller indicated that both robbers had guns. She told police during a 911 call that "Two guys had the guns." See Commonwealth's Sur-reply to Habeas Petition, Doc. No. 50, Ex. B at 2. The Commonwealth indicates that this transmittal was given to the defendant. See Commonwealth Response to Habeas Petition, Doc. No. 31, Ex. 12 (Discovery Letter dated 12/15/93). This evidence offers little to support the Commonwealth's argument. The statement was never clarified and no further details about the robbery suspects were offered by this caller. This evidence, appropriately, was not offered at trial as hearsay. In fact, the court did not allow a 911 call to be played/admitted which the prosecution claimed had Lawson's voice on it. N.T. 9/30/94, 115-19 (sidebar during Cooper Testimony). Being that it is vague and unclear, it does little to support a claim that both robbers were armed. The only other evidence that indicates that both men were armed is Teagle's statement. This would not be evidence that could be used against the petitioner.

[189] The Commonwealth contends that radio message was based on information Officer McIver collected on the night of the robbery. See Commonwealth's Post-Hearing Memorandum of Law, Doc. No. 111 at 16. The information collected by Officer McIver, however, does not entirely match what was put out in the radio message. The radio memorandum he prepared contains descriptions of the two suspects who were wanted for aggravated assault/robbery "with a **nickel plated** automatic weapon at 2513 Kensington at 7:00 p.m. The suspects escaped east on Sergeant St. in a white Toyota hatchback. Suspect No. 1 was described as a black male, dark complexion, **late 20's, height 5'3", weight 170, close cut hair**, mustache, wearing a blue wool baseball cap, a brown leather waist length jacket, and no glasses. Suspect No. 2 was described as a black male, medium complexion, **early 20's, height 5'5", weight 145, close cut hair**, very thin mustache, wearing a green leather ¾ length jacket and **no hat or glasses**." (emphasis added).

The radio message described the suspects as "(1) black male, **21 years old, 5'4"**, thin build, brown complected, light mustache, wearing a dark blue wool baseball cap and a light brown ¾ length leather jacket, armed with **a silver automatic**; and (2) black male, **mid-20's, 5'6"**, medium build, brown comp., slight mustache, wearing a ¾ sleeve green leather jacket." The radio message also stated that the males "fled the area in an older model small white station wagon, possibly a Toyota or Subaru, males are considered to be armed and dangerous." (emphasis added). In his statement given to Detective Danks, Officer McIver indicated he only interviewed those inside the store in order to obtain the radio memorandum. The radio message, therefore, could not have come entirely from the information he received.

baseball cap, color unknown.  Armed with a silver automatic; and (2) black male, late 20's, 5'6", heavier than male #1, brown skinned, slight mustache, wearing a ¾ sleeve green leather jacket, **No Firearm Detected (N.F.D.)**." (emphasis added). The author of this note is unknown.[190]

One of these documents alone may not be material to the defendant's case. However, in the aggregate they may well be material.[191] The identity of the shooter was a contested issue at trial.[192] This "withheld evidence" is relevant to the identity of the shooter. They show that a 5' 4" black male of about 21 years of age with brown complexion, a light mustache, wearing a light brown leather jacket and baseball cap was carrying a silver automatic weapon.[193] This description matches Derrick Teagle.[194] Each description is consistent in that he was the *only* assailant seen with a gun. These

---

[190] See Transcript of Evidentiary Hearing, Doc. No. 115 at 34.

[191] District courts are required to first consider the prejudice of each piece of suppressed evidence individually and then consider the cumulative effect of the suppressed evidence. Kyles, 514 U.S. at 436.

[192] Justice Saylor noted as much in his dissent to the Pennsylvania Supreme Court's PCRA appeal decision. Commonwealth v. Washington, 592 Pa. 698, 751 n. 1 (2007)(Saylor, J., dissenting)(stating that "the identity of the shooter was the contested issue" at trial).

[193] The teletype stated, "# 1. BM, approx 21 yrs, 5'4, thin build, brown complexion, light mustache, wearing a dark blue wool baseball cap, light brown leather 3/4 jacket, armed with a silver automatic."

The handwritten note stated, "# 1 Black male, 21 yrs, 5'4, thin build, brown skinned, light moustache, wearing a 3/4 length light brown leather jacket and a baseball cap, color unknown. Armed with a silver automatic."

The General Radio Message said: "Wanted for robbery and shooting inside the Save A Lot Market 2501 Kensington AV on Saturday 1-23-93 at approx 7:p.m. Com by 2 BMS, #1 b/m 21 yrs, 5ft 4in, thin bld, brown complected, light mustache, wearing a dark wool baseball cap and a light brown ¾ length leather jacket, armed with a silver automatic...."

[194] See N.T. 9/30/94, 42-43 (Rodriguez Testimony)(the man with the gun had a "three-quarter length, light-brown jacket. He was dark-skinned, slight mustache and maybe five four... He was thin."); N.T. 9/30/94, 49-51, 61-64 (Rodriguez Testimony)(he put the potato chip bag on the counter); N.T. 9/30/94, 81-82 (Phongsak Testimony)(describing the man with the gun as being a "[y]oung black male, in his 20s, dark skinned, slim, about five six, five seven" and that "[h]e wore a leather brown jacket, three [fourth] quarters length").

descriptions further undercut Teagle's statement that both he and the petitioner had guns the night of the robbery. If they had been produced prior to trial, defense counsel could have used them to bolster his motion to sever.[195]

The Commonwealth argues that this evidence is cumulative to evidence already provided to the petitioner prior to trial. Specifically, the Commonwealth points to the eyewitness statements from Cielito Rodriguez, Suphea Phongsak, and Michael Murphy and Officer Musial's police report.[196] While it is true that evidence provided to the petitioner overlaps with information found in the non-disclosed descriptions, the differences between the disclosed evidence and the non-disclosed descriptions are what make the non-disclosed evidence material.

Cielito Rodriguez, Suphea Phongsak, and Michael Murphy, who testified, gave statements to police. These statements were disclosed before trial. All three witness

---

[195] See Bagley, 473 U.S. at 683 ("The reviewing court should assess the possibility that such effect might have occurred in light of the totality of the circumstances and with an awareness of the difficulty of reconstructing in a post-trial proceeding the course that the defense and the trial would have taken had the defense not been misled by the prosecutor's incomplete response."); Kyles, 514 U.S. at 441 ("In this case, disclosure of the suppressed evidence to competent counsel would have made a different result reasonably probable."); Smith v. Cain, 132 S.Ct. 627, 630-31 (2012)(finding that the non-disclosure of witness statements from the night of an armed robbery could have undermined the key witness' testimony as to his identification of the petitioner; the Court found this error violated Brady and habeas relief was warranted); Wilson v. Beard, 589 F.3d 651, 664-65 (3d Cir. 2009)("The question under Brady is whether 'disclosure of the suppressed evidence to competent counsel would have made a different result reasonably probable.'" (citations omitted)).

[196] According to discovery letters provided by the Commonwealth, the prosecution had also provided the petitioner with statements from Ann Marie Buchanan, David Cooper, Judith Bonaparte, and Juana Robles. See Commonwealth Response to Habeas Petition, Doc. No. 31, Ex. 12 (Discovery Letter dated 12/15/93). Officer Smith's statement was provided but not until seven months later on July 13, 1994. See Commonwealth Response to Habeas Petition, Doc. No. 31, Ex. 12 (Discovery Letter dated 07/13/94). It is unclear what was included in these other eyewitness police statements because they were not disclosed as part of these habeas proceedings. Only the statements of Rodriguez, Phongsak, and Murphy were provided in the record. See Commonwealth Response to Habeas Petition, Doc. No. 31, Ex. 22, 23 30. The Commonwealth only argues that these statements are cumulative.

statements described the robber fitting Teagle's description as having a gun.[197] Regarding the assailants' physical features, the witness statements were similar to the non-disclosed descriptions.

However, the witness statements offered varying descriptions of the gun itself. While Rodriguez and Phongsak described the gun as being a silver automatic, Murphy described the gun as being a "nickeled plate automatic handgun." See Statements of Cielito Rodriguez, Suphea Phongsak, and Michael Murphy, Doc. No. 31, Ex. 22, 23, and 30 (respectively).[198] This difference in their statements both exculpated and inculpated

---

[197] Michael Murphy also gave a statement to police on January 23, 1993 at 11:59 p.m. He was a customer in the store at the time of the robbery. He told police that one of the suspects pointed a gun at him and told him to get down. He described this suspects as being "a Black/Male, in his mid-20's," of "about average built," "wearing a coat goes a little below your waist" a wool navy baseball cap with no writing, with a mustache and close haircut. He also described the suspect as being shorter than he was and lighter than he was; Murphy's height and skin tone are unknown. See Commonwealth's Response to Habeas Petition, Doc. No. 31-22, Ex. 30 at 3. When he gave his statement, he indicated he could identify the man with the gun if he saw him again. However, he did not pick the petitioner from a photo array. He was not a part of the line-up with the petitioner and Teagle in August. See N.T. 10/6/94, 3-38 (Officer Wynn Testimony). At trial, he could not describe the robber with the gun nor give details about what the gun looked like. N.T. 10/4/94, 122-26 (Murphy Testimony).

Rodriguez described the first robber, with the gun, as being a "black male, brown skinned, slight mustache, brown leather 34 leather jacket, a light brown color and a baseball cap…[who] was in his 20s, maybe 21 years old, about 5'4" tall, skinny." She did not remember the color of the baseball cap. See Doc. No. 31, Ex. 22 at 5. She described the gun as a "silver automatic" that "had some black on it." Id. She described the second robber as "black male, brown skinned, taller, about 5'6", heavier than #1, but not fat about in his late 20s…wearing a ¾ length green leather jacket…[with] a slight mustache." Id. Cielito Rodriguez's statement corroborated Murphy's statement in that the robber matching Teagle's description had a gun and pointed it at Murphy. See Doc. No. 31, Ex. 22 at 3-4.

Phongsak described the robber who pointed the gun at her as: a "B/M [black male], he is in his 20s, he is dark-skinned, no facial hair, he is short about 5'5", he is medium thin, he had a baseball type cap, I think it was a plain dark color, he had on a brown leather jacket ¾ length…[h]e had a young face." She described the gun as being "silver, it was bigger than [the Officer's] (2in), it was not a revolver, it was an automatic." She said she might recognize him again. See Doc. No. 31, Ex. 23 at 3. The second robber she described as a "B/M [black male], he looked young, he had no hat, he had a green leather ¾ jacket, it is dark green like pine green, he was liter [sic] then the other guy, he was taller and stockier too. He is about 5ft. 7-8 in." Id. Phongsak did not know if the second robber had a gun.

[198] Murphy also told police that the gun was in the robber's left hand while all others indicated the gun was in his right hand, raising doubt about which robber he saw. See N.T. 9/2/93, 57 (Rodriguez testified at the preliminary hearing that the gun was a "silver automatic"), 48 (the gun was in his right hand); N.T. 10/3/94, 60 (Smith Testimony)(testifying robber had "silver or chrome colored revolver in his right hand"). But see N.T. 9/30/94, 37, 60-61 (Rodriguez Testimony)(testifying that other robber had left hand in his pocket, implying he may have been concealing a gun).

the petitioner in light of Teagle's statement. The undisclosed descriptions, however, all consistently put a silver automatic in the hands of the robber fitting Teagle's description, making them exculpatory as to Washington and not necessarily cumulative. While the disclosed evidence gives the indication that there were potentially two guns present during the robbery—a silver automatic and a nickel plated automatic—the non-disclosed descriptions indicate only one gun was seen by witnesses to whom police spoke on the night of the murder.[199] Provided that Teagle's statement gave both he and the other assailant guns (which he specifically described as "silver" and "nickel plated"), the disclosed evidence would inculpate the petitioner, while the non-disclosed evidence would exculpate the petitioner.[200]

In addition, the police 75-48 report prepared by Officer Michael Musial, which was provided to the petitioner prior to trial, offered a slightly different description of the assailants.[201] Though the descriptions in this report were similar to those taken

---

[199] See N.T. 9/30/94, 6-7 (Buchanan Testimony). The Commonwealth even points to Teagle's statement as evidence that two guns were present at the scene, knowing full well that this information could not be used against the petitioner at trial. See Commonwealth's Response to Habeas Petition, Doc. No. 31 at 71.

[200] I note that if Teagle's statement was redacted to remove all references of the petitioner or was not used at the joint trial the non-disclosure of this evidence may not necessarily be material. However, viewing the non-disclosed evidence in light of the totality of the circumstances of the trial, as I am obliged to do, it becomes material to the petitioner's defense. See Bagley, 473 U.S. at 683 ("The reviewing court should assess the possibility that such effect might have occurred *in light of the totality of the circumstances* and with an awareness of the difficulty of reconstructing in a post-trial proceeding the course that the defense and the trial would have taken had the defense not been misled by the prosecutor's incomplete response."(emphasis added)); Kyles, 514 U.S. at 441 ("In this case, disclosure of the suppressed evidence to competent counsel would have made a different result reasonably probable."); Wilson, 589 F.3d at 664-65("The question under Brady is whether 'disclosure of the suppressed evidence to competent counsel would have made a different result reasonably probable.'" (citations omitted)).

[201] See Commonwealth Response to Habeas Petition, Doc. No. 31, Ex. 12 (Discovery Letter dated 12/15/93).

A police activity report which was provided to habeas counsel but was not allegedly provided to the petitioner at trial indicated that Musial had located several witnesses and also gave flash information to police radio. The identity of these witnesses was unknown. The petitioner had filed a motion to depose Officer Musial as part of these habeas

contemporaneously to the robbery, the police report put the gun into the hands of the taller assailant.[202] This difference is important because the police report's description inculpates the petitioner while the contemporaneous descriptions exculpate the petitioner.[203] The police report description also supports David Cooper's testimony that

---

proceedings. I granted this request. See Motion to Depose, Doc. No. 59 at 6, Ex. 1 at 2; Order granting Motion to Depose re: Musial Deposition, Doc. No. 61.

[202] The description in the Police 75-48 states "#1 black male – dark skin, 20's **5'8"**, 170lbs, blue wool baseball hat, brown leather waist length jacket. #2 black male – medium complexion, early 20's, **5'5"**, 145lbs, green leather ¾ length jacket, thin mustache. #1 black male had nickel plated automatic weapon." (emphasis added). I will note that these descriptions appear to be the same as those included in a handwritten complaint which the Commonwealth provided. The height of the first assailant is somewhat unclear on that handwritten complaint. (It looks to be either 5'8" or 5'4".) The error may have been made in its transcription into his report. See Doc. No. 59, Ex. 1 at 8.

It is unclear where these descriptions came from. Officer Musial has the descriptions written on one page; that page indicates the complaint is only 1 page total. A separate complaint/incident report taken from Officer Bartlett has information for Juana Robles and Ann Marie Buchanan on it. (Officer McIver's indicated the Officer Bartlett was one of the officers who helped secure the store on the night of the shooting in his interview with Detective Danks. See also Officer Musial's Testimony indicating the same. N.T. 9/29/94, 86.)  A third Complaint/Incident Report prepared by Officer Crawford, consisting only of one page, has the contact information for Judith Bonaparte and a Belinda Atkerson. Lastly, there is a Complaint/Incident Report prepared by "Simpson 6168 MacJain" (the handwriting is a bit unclear) which includes "offender information" for a "B/M/24" named "Shawn Gatewood." How each of these handwritten complaints is related to the others is unknown, making the source of Officer Musial's report information unclear. See Commonwealth's Response to Habeas Petition, Doc. No. 31, Ex. 21.

The complaint and report also describe the gun being held by the robber matching Teagle's description as being "nickel plated." In light of Teagle's statement, which gave him a non-working "nickel plated" gun, and the petitioner a working silver automatic, the report does more to inculpate the petitioner than do the descriptions which were not disclosed.

[203] The contemporaneous descriptions also raise some questions about how the police investigation was conducted. The police teletype describes three suspects, including the suspect driving the getaway car. The fact that there was a third person involved in the robbery conspiracy, which the police never sought, raises some questions about the thoroughness of the police investigation. They also are much more detailed than Officer Smith's description which was rather vague. At the preliminary hearing, Officer Smith described the gun as being a "silver or chrome colored automatic pistol." N.T. 12/2/93, 13 (Smith Preliminary testimony). At trial, he described the gun in the same way N.T. 10/3/94, 68 (Smith Testimony).  He described the robber with the gun/shooter as being a "black male in his 20s with dark clothing on." N.T. 10/4/94, 64, 114-16, 128-29 (Smith Testimony). The fact that the evidence contemporaneous to the shooting contradicted or undermined the evidence which was used to convict the petitioner as the shooter may give a jury pause about whether to trust the supporting evidence discovered later in the investigation.

A typical defense strategy would be to attack the veracity of the police investigation–especially given that an off-duty police officer discharged his weapon as part of the incident. There is evidence in the record that petitioner's defense counsel did proceed under such a theory. See, e.g., N.T. 10/3/94, 158-61 (Smith Testimony); N.T. 10/5/94, 62-67 (Officer Offner Testimony)(the defense attorney here is noted as being Teagle's but a larger view of the record seems to indicate that this is an error); N.T. 10/5/94, 107-14 (Officer McGuffin Testimony); N.T. 10/7/94, 55-61 (Washington Closing Argument); N.T. 10/6/94, 58-61 (Officer Permint Testimony)(defense counsel

the taller of the two suspects had the gun and was the shooter. Cooper testified that the taller of the two men had a gun and that the other one did not have a gun.[204] Cooper and Officer Smith were the only two eyewitnesses to inculpate the petitioner as the shooter. There is a reasonable probability that the consistent previous descriptions would have undercut Cooper's testimony and undermined confidence in the verdict.[205]

Most importantly, the non-disclosed descriptions must have come from witnesses beyond just Rodriguez, Phongsak, and Murphy. The teletype not only describes the two robbery suspects but the getaway driver as well. The radio message also includes a description of the getaway vehicle.[206] The person who prepared these documents must have spoken to witnesses who were outside the store at the time of the shooting because

---

suggesting that petitioner's picture in police stations may have tainted Smith's ID). While I am not suggesting that the police work in this case was subpar, the disclosure of these documents to defense counsel could have bolstered defense arguments that the charges against the petitioner were the result of "shoddy police work," raising reasonable doubt. See Kyles, 514 U.S. at 445-46 (explaining how non-disclosed evidence of contemporaneous witness statements "would have raised opportunities to attack … the thoroughness and even the good faith of the investigation"). See also Mendez v. Artuz, 303 F.3d 411, 416 (2d Cir. 2002)(finding suppressed evidence material where defendant could have "used the suppressed information to challenge the thoroughness and adequacy of the police investigation."); Lindsay v. King, 769 F.2d 1034, 1042 (5th Cir. 1985)(suppressed statement could have been used for "discrediting, in some degree, of the police methods employed in assembling the case against [the petitioner]"); Bowen v. Maynard, 799 F.2d 593, 613 (10th Cir. 1986)("The withheld evidence also raises serious questions about the manner, quality, and thoroughness of the investigation that led to [the petitioner's] arrest and trial."); Smith v. Secretary of New Mexico Dept. of Corrections, 50 F.3d 801, 830 (10th Cir. 1995)(undisclosed police report mentioning alternate suspect would have been "useful" in discrediting investigation); Stano v. Dugger, 901 F.2d 898, 903 (11th Cir. 1990)(evidence showing efforts to coerce testimony could have been used by counsel to discredit investigation).

[204] N.T. 9/30/14, 110-119, 140 (Cooper Testimony).

[205] It is also worth noting that the evidence provided to the defense regarding the radio message was also contradictory. The Commonwealth provided the petitioner with a Telephone and Radio Tape Transmittal. See Commonwealth Response to Habeas Petition, Doc. No. 31, Ex. 12 (Discovery Letter dated 12/15/93). In this transmittal, the caller described the robber fitting Mr. Teagle's description as having a "nickel-plated .25 automatic." A female caller reported that "two guys had guns" and they were "black." See Telephone and Radio Tape Transmittal, at 2, attached as Exhibit B to respondents' Sur Reply to Petitioner's Reply Brief. This evidence too corroborated the prosecution's theory of the case without disclosing the information related to this radio message which was exculpatory.

[206] This information also did not come from Officer Smith. He testified at the preliminary hearing that he did not see the petitioner get into any car. N.T. 12/2/93, 33 (Officer Smith Preliminary Hearing).

the witnesses inside the store (Rodriguez, Phongsak, and Murphy) did not see the assailants after they fled the store.[207] The witnesses outside of the store, as compared to the witnesses inside the store, would have seen the shooting or at least would have seen the suspects just before or after the shooting. Yet, the descriptions which include information about the getaway driver and vehicle only put the gun in the hands of the robber matching Teagle's description. They do not indicate that both robbers had guns. For these reasons, the descriptions are not cumulative.

The Commonwealth also argues that the descriptions are immaterial because the robber matching Teagle's description is not identified as the shooter but only as the man with the gun.[208] I disagree. Given that no witness offered evidence that *both* suspects had guns, it would be a logical inference that only the suspect who was seen with a gun was the shooter.[209] Teagle's statement corroborates some of the information in disclosed witness statements—the main details of the robbery—but exculpates himself with regards to the shooting.[210] This raises questions about whether the parts exculpating Teagle but inculpating the petitioner should have been used during their joint trial. The production of

---

[207] See N.T. 9/2/93, 51, 55, 58 (Rodriguez preliminary testimony); N.T. 9/29/94, 112, 129 (Robles Testimony); N.T. 9/29/94, 146 (Buchanan Testimony); N.T. 9/30/94, 20 (Buchanan Testimony); N.T. 9/30/94, 41, 62 (Rodriguez Testimony); N.T. 9/30/94, 76 (Phongsak Testimony).

[208] Commonwealth's Sur-reply to Habeas Petition, Doc. No. 50 at 29.

[209] While Smith, Cooper, and Robles identified the petitioner as having a gun, they did not indicate that both assailants had guns. See N.T. 9/29/94, 108-11 (Robles Testimony). Robles only saw one robber, who had a gun. N.T. 9/29/94, 106-10 (Robles Testimony). Office Smith only saw one robber; that robber had a gun. N.T. 10/3/94, 60, 96, 153 (Smith Testimony). David Cooper saw two men but only saw one with a gun. N.T. 9/30/94, 107-114, 119, 140 (Cooper Testimony).

[210] Interestingly, he also exculpates himself regarding his physical description on the night of the robbery. He doesn't remember much of what he wore on that evening except that he had on a baseball cap. He also claimed that the petitioner had on a cap as well, though no other description offered this detail.

these documents before trial could at least have further supported the petitioner's motion to sever.[211]

If defense counsel had been offered the contemporaneous descriptions, all of which are consistent with one another, counsel could have further undercut the claim that the petitioner was the shooter. In the least, the disclosure of the descriptions could have aided the defense's preparation of its case.[212] The descriptions point to the existence of other witnesses outside of the store who saw the robbers flee. The only two witnesses to the shooting presented at trial were Officer Smith and David Cooper. Both inculpated the petitioner as the shooter. If there were other witnesses outside the store, they too would likely have witnessed the shooting. If the descriptions are any indication, those individuals may have contradicted the testimony of Officer Smith and David Cooper. Under these circumstances, counsel could have "effectively attacked the

---

[211] Whether the documents themselves were admissible is of no consequence. The undisclosed evidence, in the very least, could have generated other admissible evidence—i.e. other possible witnesses to the shootings—which could have been favorable to the petitioner. See U.S. v. Alvin, No. 10-65, 2014 WL 2957439, at *9 (E.D. Pa. Jul. 1, 2014)(citing Folino, 705 F.3d at 131). Brady requires a court to consider the impact of non-disclosure on the preparation or presentation of the defendant's case and to consider the course that the defense could have pursued if the material had been disclosed. See Bagley, 473 U.S. at 683 ("The reviewing court should assess the possibility that such effect might have occurred in light of the totality of the circumstances and with an awareness of the difficulty of reconstructing in a post-trial proceeding the course that the defense and the trial would have taken had the defense not been misled by the prosecutor's incomplete response."); Kyles, 514 U.S. at 441 ("In this case, disclosure of the suppressed evidence to competent counsel would have made a different result reasonably probable."); Wilson v. Beard, 589 F.3d 651, 664-65 (3d Cir. 2009)("The question under Brady is whether 'disclosure of the suppressed evidence to competent counsel would have made a different result reasonably probable.'" (citations omitted)).

[212] See Bagley, 473 U.S. at 683 ("The reviewing court should assess the possibility that such effect might have occurred in light of the totality of the circumstances and with an awareness of the difficulty of reconstructing in a post-trial proceeding the course that the defense and the trial would have taken had the defense not been misled by the prosecutor's incomplete response."); Kyles, 514 U.S. at 441 ("In this case, disclosure of the suppressed evidence to competent counsel would have made a different result reasonably probable."); Smith v. Cain, 132 S.Ct. 627, 630-31 (2012)(finding that the non-disclosure of witness statements from the night of an armed robbery could have undermined the key witness' testimony as to his identification of the petitioner; the Court found this error violated Brady and habeas relief was warranted); Wilson, 589 F.3d at 664-65 ("The question under Brady is whether 'disclosure of the suppressed evidence to competent counsel would have made a different result reasonably probable.'" (citations omitted)).

Commonwealth's case" if the documents had been disclosed prior to trial. <u>Simmons v.</u>

<u>Beard</u>, 590 F.3d 223, 238 (3d Cir. 2009).

In light of the facts and circumstances of the case as a whole, the non-disclosed

descriptions would be material to the petitioner's case. There is a reasonable probability

that the disclosure of these descriptions would have changed the outcome of the trial,

particularly in regard to who the jury found to be the shooter.[213] The government's

withholding of the evidence "undermines confidence in the outcome of the trial." <u>Kyles</u>,

514 U.S. at 434 (quoting <u>Bagley</u>, 473 U.S. at 678)(quotation marks omitted).

### b) When Considered with the Other Non-disclosed Evidence, the Police Activity Sheet was Material

During federal discovery, the petitioner first obtained a police activity sheet dated

February 25, 1993. This sheet indicated that witnesses David Cooper, Judith Bonaparte,

and Juana Robles were all shown photos, including that of the petitioner, and all failed to

make a positive identification.[214] Cooper and Bonaparte were in the parking lot at the

time of the shooting.[215] Robles saw the suspects shortly before the shooting.[216] Cooper

and Robles both testified at trial. Both offered evidence that inculpated the petitioner.

---

[213] <u>See</u> <u>Smith v. Cain</u>, 132 S.Ct. 627, 630-31 (2012)(finding that the non-disclosure of witness statements from the night of an armed robbery could have undermined the key witness' testimony as to his identification of the petitioner; the Court found this error violated <u>Brady</u> and habeas relief was warranted).

[214] The sheet does not indicate the date on which those failed identifications took place; it simply recorded them as notes on the investigation. As the prosecutor noted at the evidentiary hearing, they could have taken place on the date of the activity sheet or at some time prior to the sheet's preparation and were not recorded until the sheet was prepared. <u>See</u> Transcript of Evidentiary Hearing, Doc. No. 115 at 35-36.

[215] <u>See</u> N.T. 9/30/94, 105-42 (Cooper Testimony).

[216] N.T. 9/29/94, 112, 129-31 (Robles Testimony).

Cooper was one of two witnesses in the parking lot during the shooting who testified, the other being Officer Smith. Cooper testified that the taller of the two men had a silver gun.[217] Since the petitioner was the taller of the two suspects, he would have inculpated the petitioner by inference. The fact that Cooper could not identify the petitioner in a photo array shortly after the crime would be material as impeaching evidence.[218] Cooper's testimony corroborated Officer Smith's testimony that the petitioner had a gun and would have been the shooter by inference. If it was substantially undermined, the outcome could have been different.

Besides Officer Smith, Robles was the only other witness to identify the petitioner as being one of the assailants. She identified the petitioner only at trial.[219] She identified him as being the robber with the gun she saw in the store.[220] While Robles had previously

---

[217] Cooper testified that the taller assailant, with the gun, was about his height – 5' 9." N.T. 9/30/94, 139-40 (Cooper Testimony). The other robber was about three to four inches shorter than them both. N.T. 9/30/94, 140 (Cooper Testimony).

[218] The fact that he did not identify the petitioner at trial and claimed he did not have a good look at the petitioner does not matter. The fact that he could not have pointed to the petitioner as being the robber with the gun in a photo array would have raised questions about his credibility. The only description of the robbers that Cooper could give was that they were black males and that one was taller than the other and one was shorter than the other. N.T. 9/30/94, 112-13 (Cooper Testimony).

[219] See N.T. 10/6/94, 18-19, 23 (Officer Wynn Testimony about Robles failed line-up ID). The petitioner also contends that counsel would have been better positioned to file a motion *in limine* to preclude Robles' in court identification. While it is unclear what the outcome of such a motion might have been, this additional failed identification would have been one more factor a court would have used to determine if her identification had an independent basis. See Response to Writ of Habeas Corpus, Doc. No. 31, Ex. 3 at 3 (Poserina, J. Trial Court Memorandum)("At a pretrial lineup she did not identify him, but at the time of trial she was sure. She said that 'Now that she sees him without all of the other males in the lineup, I know it was him.'"). Defense counsel did argue that Robles' identification was "questionable" at sidebar. In his argument, he stated that Robles had not picked the petitioner out of a line-up nor out of a photo array. However, since the Commonwealth concedes that police activity sheet was not disclosed to him, it is unclear if he actually knew the she failed to identify the petitioner at a photo array or simply made the statement as part of argument. See N.T. 10/4/94, 16 (sidebar during Martha Harrington Testimony).

[220] See N.T. 9/29/94, 111 (Robles Testimony).

failed to identify the petitioner at a line-up—and was impeached on this point—her failure to identify him at a photo array as well would also have been material. A photo array conducted a few weeks after the incident compared with a line-up identification occurring eight months after could have greater impeachment value. Her testimony also directly contradicted that of Cielito Rodriguez. Rodriguez described the assailant who pointed a gun at Robles as a man matching Teagle's description.[221] Though Robles claimed she was "certain" of her identification of the petitioner at trial, a jury could think otherwise.[222] This additional information could have affected her credibility in the context.

The police activity sheet is also material because it could have been used to undercut part of the prosecutor's closing argument that related to Robles' identification.[223] The prosecutor attempted to mitigate Robles' inability to identify the petitioner at the line-up by arguing that line-ups were intimidating.[224] If defense counsel

---

[221] N.T. 9/30/94, 29, 34 (Rodriguez Testimony). Her testimony was also corroborated by testimony given by Suphea Phongsak and by a finding of Teagle's fingerprints on the potato chip bag, a bag which Rodriguez testified this man placed on the cashier counter. N.T. 9/30/94, 49-51, 61-64 (Rodriguez Testimony); N.T. 10/5/94, 19, 10, 13-19 (Forrest Gorodetzer Testimony). See N.T. 10/4/94, 67-69 (Officer McIver Testimony); N.T. 10/4/94, 73-77, 94-106 (Jeffrey Parker Testimony). Buchanan's testimony further corroborated that the man near Phongsak was the one with the gun. N.T. 9/30/94, 6-9 (Buchanan Testimony).

[222] The Commonwealth argues that the jury was already warned about the reliability of Ms. Robles' identification, making her failed identification on another occasion immaterial. I find little merit in this argument. The trial court instructed the jury that it must consider with caution any identification testimony of a witness who previously failed to identify the defendant or whose identification was of doubtful accuracy. See N.T. 10/11/94, 18-19. If anything, the instruction shows why evidence of a prior failed identification is material to the jury's decision.

[223] See Lambert v. Beard, 633 F.3d 126, 135 (3d Cir. 2011)(explaining how non-disclosed information that undercut key argument in prosecutor's closing was material), reversed and remanded on other grounds, Wetzel v. Lambert, 132 S.Ct. 1195, 1199 (2012).

[224] N.T. 10/7/94, 86-88 (Commonwealth Closing Argument).

had been aware that Robles failed to identify the petitioner at a photo array shortly after the crime was committed, he could have countered this argument.[225]

"[U]ndisclosed evidence that would seriously undermine the testimony of a key witness may be considered material when it relates to an essential issue or the testimony lacks strong corroboration." Folino, 705 F.3d at 129. Robles and Cooper were two of the three eyewitnesses who inculpated the petitioner. The identity of the shooter and/or robber with the gun was an essential issue at trial. The failure of Robles or Cooper to identify the petitioner at a photo array shortly after the robbery could "seriously undermine" their testimony. The only corroborating eyewitness evidence that would have indicated the petitioner was the shooter or even that he had a gun was Officer Smith's testimony. If this information had been disclosed to defense counsel prior to trial, defense counsel could have cross-examined Cooper on this point. This is especially important because Cooper was in the parking lot at the time of the shooting. He had a view of both

---

[225] The Commonwealth argues that the sheet is immaterial because defense counsel "extensively impeached Ms. Robles with her inability to identify petitioner at the lineup." See Commonwealth' Post-Hearing Memorandum of Law, Doc. No. 114 at 22; N.T. 9/29/94, 114-33. While that may be true, Ms. Robles claimed on cross that she could not make a positive identification of the petitioner at the line-up because she could not remember "at that time." N.T. 9/29/94, 116-118. If defense counsel had had knowledge that she had also previously failed to identify the petitioner at the photo array much closer to the date of the robbery, defense counsel could have impeached her on this point. This line of cross-examination could be considered a different type of impeaching evidence, one based instead on inconsistent statement and not failure of memory. "[U]ndisclosed Brady material that would have provided a different avenue of impeachment is material, even where the witness is otherwise impeached." Lambert, 633 F.3d at 134 (citing Slutzker, 393 F.3d at 387).

Ms. Robles also had testified that she could not make a positive identification at the time of the line-up because she was depressed. N.T. 9/29/94, 123 (Robles Testimony). If defense counsel was aware that she also did not make a positive identification some six months earlier, when she may not have been in the same mental state, he could have further undercut this point.

robbers fleeing and was not chasing them like Officer Smith.[226] Taken with the other non-disclosed evidence, I find that the undisclosed information about the failed identifications is material to the petitioner's defense.

Because all of the non-disclosed evidence is "material," the "prejudice" requirement is satisfied for the purposes of excusing the default and for Brady.

### 7. The Evidence Withheld by the Commonwealth Was Very Likely Favorable to Mr. Washington

The final element in the analysis is that the undisclosed evidence must be favorable to the petitioner.[227] To be favorable, the evidence must either be exculpatory or impeaching. See Strickler, 527 U.S. at 281-82; Banks, 540 U.S. at 691; Lambert, 387 F.3d at 252. Evidence is considered "favorable" when its disclosure and effective use by defense counsel "may make the difference between conviction and acquittal." Bagley, 473 U.S. at 676.

All four documents are favorable to the petitioner. The police teletype, radio message, and handwritten note offer descriptions of the assailants, which place a gun only in the hands of the assailant matching Teagle's description. They also provide

---

[226] Smith testified he was dodging gunfire and maneuvering through parked cars. See N.T. 10/3/94, 61, 72, 102 (Smith Testimony). Cooper was not taking these same actions. See N.T. 9/30/94, 105-42 (Cooper Testimony). Smith testified he only saw one robber exit the store; that robber had a gun. N.T. 10/3/94, 60-61 (Smith Testimony).

[227] Prosecutors are not required to provide the defendant with all police investigatory work in a petitioner's own file. Moore v. Illinois, 408 U.S. 786, 795 (1972). However, under Brady, prosecutors have "a duty to learn of any *favorable* evidence known to the others acting on the government's behalf in this case, including the police." Strickler, 527 U.S. at 280 (quoting Kyles, 514 U.S. at 437)(emphasis added).

descriptions which, arguably, do not match that of the petitioner. Even if they are not directly exculpatory, they could at least serve as <u>Giglio</u> impeachment material.[228]

The Commonwealth argues that the police activity sheet would not necessarily be favorable to the petitioner. The activity sheet included information that the assigned detective received an anonymous tip on February 18, 1993 about an individual bragging that he shot and killed a security guard at Kelly's Korner. The Commonwealth argues that this information undermines the document's value to the petitioner because it points to the petitioner's guilt. I disagree. An anonymous "tip" that the petitioner was "bragging" about the shooting would likely be inadmissible hearsay if the person who gave the tip was not available to testify.[229] The Commonwealth's failure to disclose the police activity sheet further supports the grant of habeas relief to the petitioner.[230]

---

[228] <u>See, e.g.</u>, <u>Bagley</u>, 473 U.S. at 676 ("Impeachment evidence, however, as well as exculpatory evidence, falls within the <u>Brady</u> rule."(citing <u>Giglio v. United States</u>, 405 U.S. 150, 154 (1972)).

[229] By all accounts only the police officer who had received the "tip" could have testified to its existence. The "tip" itself would be admissible as a statement by the opposing party, if offered by the person who heard it out-of-court. <u>See</u> Pa. R. Evid. 803 (25). However, there is no hearsay exception which would allow the officer to testify as to hearing the statement from the person who heard it. <u>See</u> Pa. R. Evid. 803, 803.1, 804. <u>See also</u> N.T. 10/6/94, 47-50 (Officer Permint Testimony)(sidebar discussing evidence regarding another anonymous tip). I will note that there is no other evidence that corroborates the trustworthiness of this tip.

[230] In line with the dictates of <u>Kyles</u>, I have considered each piece of evidence individually and then cumulatively. While each piece of undisclosed evidence may not have been material or prejudicial to the petitioner's case, the four documents in the aggregate have a cumulative prejudicial effect on the outcome of the trial. "Individual items of suppressed evidence may not be material on their own, but may, in the aggregate, 'undermine[ ] confidence in the outcome of the trial.'" <u>Folino</u>, 705 F.3d at 129 (quoting <u>Bagley</u>, 473 U.S. at 678). <u>See also</u> <u>Marshall v. Hendricks</u>, 307 F.3d 36, 62-63 (3d Cir. 2002)(finding that in determining materiality, we must look at the cumulative effect of multiple non-disclosures, rather than an item-by-item review).

In this case, each of these pieces of undisclosed evidence spoke to one of the main points of contention in this case: whether the petitioner or Teagle was the shooter. The descriptions and identifications served to offer counter evidence to Teagle's statement that the petitioner was the accomplice with the working gun who was the shooter. <u>See</u> <u>Kyles</u>, 514 U.S. at 422("[A court's] duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case." (alterations and internal quotation marks omitted)).

For these reasons, I find the Commonwealth's failure to disclose the three contemporaneous descriptions and the police activity sheet violate <u>Brady</u>.[231]

## VI. CONCLUSION[232]

For the foregoing reasons, I will grant the habeas petition and issue a conditional writ of habeas corpus directing the Commonwealth of Pennsylvania to commence a new trial on these charges within one hundred twenty (120) days or to release the petitioner, subject to any detainers.

An appropriate Order follows.

---

[231] Once a reviewing court has found a constitutional error under <u>Brady</u> and its progeny, no harmless error analysis is necessary. <u>Kyles</u>, 514 U.S. at 435. The materiality analysis under <u>Brady</u> accounts for the "substantial and injurious effect" of the suppressed evidence on the jury verdict, in line with the <u>Brecht</u> harmless error standard. <u>See id.</u> ("Assuming, <u>arguendo</u>, that a harmless-error enquiry were to apply, a <u>Bagley</u> error could not be treated as harmless, since 'a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different'… necessarily entails the conclusion that the suppression must have had 'substantial and injurious effect or influence in determining the jury's verdict…' ")(citing <u>Bagley</u>, 473 U.S. at 682; <u>Brecht</u>, 507 U.S. at 623)(citations and quotation marks omitted). <u>See also</u> <u>Fry v. Pliler</u>, 551 U.S. 112, 122 (2007)(holding that <u>Brecht</u> was the appropriate harmless error standard for § 2254 proceedings after AEDPA); <u>Smith v. Cain</u>, 132 S.Ct. 627, 630-31 (2012)(finding that <u>Brady</u> error without undergoing harmless error analysis); <u>Lambert v. Beard</u>, 537 Fed.Appx. 78, 87 (3d Cir. Sept. 20, 2013)(same).

[232] I have analyzed Claims 1, 2, and 3 and found that each involved a violation of the petitioner's constitutional rights. Each of these errors warrant habeas relief and are not harmless. However, even if I had found that any one of the errors was harmless or that all of the errors were harmless, I would still find that the petitioner was entitled to habeas relief. Each error undermined the fairness of the petitioner's trial. The use of Teagle's statement at their joint trial prevented him from asserting his rights under the Confrontation Clause without giving up his Fifth Amendment rights. The prosecutor's arguments further eroded the petitioner's due process rights by crediting Teagle's statement. Then, in light of both of those constitutional errors, the Commonwealth failed to disclose exculpatory evidence. I cannot say that the petitioner received a fair trial in light of all of these errors. <u>See</u> <u>Taylor v. Kentucky</u>, 436 U.S. 478, 487-88 & n. 15 (1978)("The prosecutor's description of those events was not necessarily improper, but the combination of the skeletal instructions, the possible harmful inferences from the references to the indictment, and the repeated suggestions that petitioner's status as a defendant tended to establish his guilt created a genuine danger that the jury would convict petitioner on the basis of those extraneous considerations, rather than on the evidence introduced at trial."); <u>Kentucky v. Whorton</u>, 441 U.S. 786, 790 (1979)("The court's inquiry should have been directed to a determination of whether the failure to give such an instruction in the present case deprived the respondent of due process of law in light of the totality of the circumstances."); <u>United States ex rel. Sullivan v. Cuyler</u>, 631 F.2d 14, 17 (3d Cir. 1980)("[U]nified consideration of the claims in the petition well satisfies the interests of justice because the cumulative effect of the alleged errors may violate due process, requiring the grant of the writ, whereas any one alleged error considered alone may be deemed harmless."); <u>Albrecht v. Horn</u>, 485 F.3d 103, 139 (3d Cir. 2007)("We recognize that errors that individually do not warrant habeas relief may do so when combined."); <u>Marshall v. Hendricks</u>, 307 F.3d 36, 94 (3d Cir. 2002)(recognizing "cumulative error doctrine" as possible avenue of habeas relief); <u>U.S. v. Salehi</u>, 187 Fed.Appx. 157, 169 (3d Cir. Jun. 28, 2006)(same).